# EXHIBIT A

**Agency Agreement**

# AGENCY AGREEMENT

This Agency Agreement ("Agreement") is made as of April 18, 2018, by and between The Bon-Ton Stores, Inc. and its associated chapter 11 debtors in possession (collectively, "Merchant"),[1] on the one hand, and (a) a contractual joint venture comprised of GA Retail, Inc. ("GA") and Tiger Capital Group, LLC ("Tiger" and collectively with GA, the "Agent") and (b) Wilmington Savings Fund Society, FSB, as the indenture agent and collateral trustee for the 8.00% second-lien senior secured notes due 2021 (the "Second-Lien Notes") issued by BTDS, on the other hand (in such capacities, the "Notes Trustee" and collectively with Agent, "Purchaser").  Purchaser and Merchant are collectively the "Parties."

## Section 1.  **Recitals**

WHEREAS, on February 4, 2018, the entities comprising Merchant commenced ten voluntary chapter 11 bankruptcy cases (the "Bankruptcy Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

WHEREAS, pursuant to an order of the Bankruptcy Court entered on February 6, 2018 [D.I. 105], the Bankruptcy Cases are being jointly administered under the caption *In re The Bon-Ton Stores, Inc., et al.*, Lead Case No. 18-10248-MFW (Bankr. D. Del.).

WHEREAS, on March 12, 2018, the Bankruptcy Court entered an order (the "Bidding Procedures Order") [D.I. 348] that, among other relief, approved bidding procedures (the "Bidding Procedures") for and scheduled a hearing (the "Sale Approval Hearing") on the approval of the sale of all or substantially of Merchant's assets.

WHEREAS, on March 12, 2018, the Bankruptcy Court entered an order (the "Final DIP Order") [D.I. 352] authorizing Merchant to obtain postpetition secured debtor-in-possession financing on a final basis.

WHEREAS, an ad hoc group of holders of $251,325,000 in principal amount of the Second-Lien Notes (the "Second Lien Noteholders") has issued a direction to the Notes Trustee to credit bid (the "Credit Bid") $125,000,000 of its claims under the indenture governing the Second-Lien Notes (the "Notes Claims") as consideration under this Agreement and the Notes Trustee has made the Credit Bid.

WHEREAS, Merchant operates retail stores and desires that the Agent act as Merchant's exclusive agent for the purposes of:

    (a)    selling all of the Merchandise (as hereinafter defined) from Merchant's retail store locations identified on Exhibit 1(a)(1) attached hereto (each a "Store" and collectively the "Stores") and distribution centers (including e-commerce

---

[1]    Merchant consists of The Bon-Ton Stores, Inc.; The Bon-Ton Department Stores, Inc. ("BTDS"); The Bon-Ton Giftco, LLC; Carson Pirie Scott II, Inc.; Bon-Ton Distribution, LLC; McRIL, LLC; Bonstores Holdings One, LLC; Bonstores Realty One, LLC; Bonstores Holdings Two, LLC; and Bonstores Realty Two, LLC.

facilities) identified on Exhibit 1(a)(2) attached hereto (each a "Distribution Center" and collectively, the "Distribution Centers") by means of a "going out of business," "store closing," "sale on everything," "everything must go," or similar sale as described further below (the "GOB Sale"), with the nature and manner of advertising the GOB Sale being in Agent's sole discretion, subject to the terms and conditions of this Agreement and the Sale Guidelines and Approval Order (each as defined below);

(b)     marketing and selling, or otherwise designating the purchasers of, the furniture, furnishings, trade fixtures, machinery, equipment, office supplies, Supplies (as defined below), conveyor systems, racking, rolling stock, and other tangible personal property (collectively, "FF&E") owned by Merchant, wherever located ("Owned FF&E");

(c)     designating the assignees of any or all of Merchant's unexpired leases of non-residential real property (together with all amendments, extensions, modifications, and other material documents related thereto, each a "Lease" and all such Leases collectively, the "Leases") and executory contracts (together with all amendments, extensions, modifications, and other material documents related thereto, each a "Contract" and all such Contracts collectively, the "Contracts"), in each case excluding any Leases or Contracts that may be rejected as permitted and in accordance with the procedures under the Approval Order (defined below) and subject to the assumption and assignment procedures to be incorporated into the Approval Order;

(d)     marketing and selling, and/or otherwise designating the purchasers and/or assignees of any or all real property owned by Merchant (the "Owned Real Estate"), including but not limited to the real property identified on Exhibit 1(d) annexed hereto;

(e)     marketing and selling, and/or otherwise designating the purchasers, assignees, and/or licensees of any or all intellectual property owned by Merchant (the "Intellectual Property"), including but not limited to the intellectual property identified on Exhibit 1(e) annexed hereto, provided that, the disposition of any Intellectual Property that would result in the sale or lease of personally identifiable information (as such term is defined in section 101(41A) of the Bankruptcy Code) shall be subject to a determination made by a consumer privacy ombudsman appointed in Merchant's chapter 11 cases; and

(f)     marketing and selling, and/or otherwise designating the purchasers, licensees, and/or assignees of any or all of Merchant's other real and tangible and intangible personal property (the "Other Assets" and, collectively with the Merchandise, the Owned FF&E, all Leases, all Contracts, the Owned Real Estate, and the Intellectual Property, the "Assets"). For the avoidance of doubt, the Other Assets include but are not limited to all cash on hand and in the Debtors' retail store locations, cash in transit, cash in bank accounts, Merchant's interest in and rights with respect to cash posted as collateral for letters of credit, receivables (including

credit card receivables), deposits, security deposits, credit card processing float, proceeds of retail sales in all of the Debtors' retail store locations from and after the date of this Agreement to the extent not used to pay down the DIP Obligations (as defined in the Final DIP Order), claims and causes of action arising under chapter 5 of the Bankruptcy Code and similar state law ("Avoidance Actions"), and all other claims and causes of action, including but not limited to commercial tort claims, based on facts and circumstances existing as of the Closing, whether or not theretofore discovered or asserted ("Other Causes of Action"). Notwithstanding the foregoing, the Assets shall not include (a) the Consulting Agreement by and between Merchant and a joint venture comprised of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (the "Phase 1 Consultant"), dated January 29, 2018 (the "Phase 1 Liquidation Agreement"), which shall not be subject to the Lease/Contract Designation Rights (as defined below) or otherwise assumed by Purchaser or (b) the proceeds from the sale of Additional Agent Goods (as defined in the Phase 1 Liquidation Agreement) pursuant to the Phase 1 Liquidation Agreement, other than the "Additional Agent Goods Fee" due to Merchant under the Phase 1 Liquidation Agreement. Merchant shall not reject or amend the Phase 1 Liquidation Agreement without the express written consent of Purchaser. For the avoidance of doubt, all Net Proceeds, less the Consulting Fee, plus the Additional Agent Goods Fee (each as defined in the Phase 1 Liquidation Agreement) shall constitute Assets under this Agreement and shall be remitted to Purchaser pursuant to the terms hereof.

WHEREAS, the Official Committee of Unsecured Creditors appointed in the Bankruptcy Cases (the "Committee") filed an adversary proceeding (the "Adversary Proceeding") on March 29, 2018 seeking, among other relief, to avoid certain liens securing the Notes Claims.

NOW, THEREFORE, in consideration of the Purchase Price (defined below) and the mutual covenants and agreements set forth in this Agreement, the Parties hereby agree as follows:

Section 2. **Appointment of Agent/Approval Order**.  Consistent with the Bidding Procedures and as soon as practicable after full execution of this Agreement, Merchant shall file in the Bankruptcy Cases a proposed form of order (the "Approval Order") in a form reasonably satisfactory to Merchant and Purchaser.  At the Sale Approval Hearing, Merchant shall seek entry of the Approval Order as the "Sale Order," as that term is used in the Bidding Procedures Order.  The Approval Order shall, among other things:

    (a)    find that:

        (i)    this Agreement is in the best interest of Merchant, its estate and creditors, and other parties in interest

        (ii)    the Parties entered into this Agreement in good faith pursuant to Section 363(m) of the Bankruptcy Code and without collusion as described in Section 363(n) of the Bankruptcy Code;

(iii) time is of the essence in effectuating this Agreement and proceeding with the GOB Sale at the Stores uninterrupted;

(iv) Merchant's decisions to (a) enter into this Agreement and (b) perform its obligations under this Agreement are a reasonable exercise of Merchant's sound business judgment consistent with its fiduciary duties and is in the best interests of Merchant, its estate, its creditors, and other parties in interest; and

(v) this Agreement was negotiated in good faith and at arms' length and Purchaser is entitled to the protection of section 363(m) and 364(e) of the Bankruptcy Code; and

(b) order, adjudge, and decree that:

(i) this Agreement and all of the transactions contemplated hereby are approved in their entirety;

(ii) the Parties are authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby;

(iii) following the occurrence of the closing under this Agreement, which shall occur no later than April 19, 2018 (the "Closing"), subject to payment of the Cash Purchase Price (as defined below) and Purchaser's compliance with its other obligations hereunder, Agent shall have the exclusive right to market and sell, and/or otherwise designate the purchasers, licensees, and/or assignees of, any or all of the Assets free and clear of all liens, claims, and encumbrances thereon without further order of the Bankruptcy Court;

(iv) the sale, license, transfer, or other conveyance of any Assets (other than the Assets being sold pursuant to the GOB Sale, as to which no further notice shall be required) reflected in notices filed in the Bankruptcy Cases from time to time by the Agent, substantially in the form annexed hereto as Exhibit 2(b)(iv) (each an "Asset Designation Notice"), shall be automatically effective on the date reflected in the applicable Asset Designation Notice and subject to the satisfaction of any closing conditions reflected therein, and the sale or other conveyance of such Assets shall be free and clear of all liens, claims, and encumbrances without further order of the Bankruptcy Court, provided, however, that nothing in the Approval Order shall inhibit the ability of Agent to seek other or further orders of the Court in connection with the sale or other disposition of any Assets;

(v) the form of Asset Designation Notice is approved;

(vi)        subject to Agent's compliance with its payment obligations under this Agreement and the Approval Order, Agent is authorized to execute, in the name of and as agent for Merchant, any and all deeds, bills of sale, and other instruments or documents necessary to effectuate the sale, transfer, or other conveyance of any of the Assets;

(vii)       following the payment of the Cash Purchase Price but subject to Agent's obligation to pay Expenses and fund the Wind-Down Payment pursuant to the Wind-Down Budget (as defined below), all proceeds (cash or otherwise) of any of the Assets except as otherwise set forth in this Agreement ("Proceeds"), including but not limited to all Proceeds arising from the sale, lease, licensing, assignment, or other disposition of any of the Assets, shall be the sole property of Purchaser, and Purchaser shall be entitled to retain all Proceeds for its own account, subject to further distribution among the entities comprising Purchaser pursuant to any agreements between the entities comprising Purchaser and the Second Lien Noteholders;

(viii)      the Wind-Down / Expense Advance shall be deemed held in escrow for the exclusive purpose of paying (1) Expenses (as defined below) and (2) administrative expenses and other amounts pursuant to and solely as reflected in the Wind-Down Budget (provided that such payments may be made from the Wind-Down / Expense Advance as and when due without further order of the Court or action by any Party), and shall not be used for any other purpose without the express written consent of Agent in its sole discretion;

(ix)        following the occurrence of the Closing, subject to Agent's obligation to pay Expenses and fund the Wind-Down Payment, Merchant and any trustee appointed in the Bankruptcy Cases or any successor cases thereto shall hold the Assets (other than the Assets being sold through the GOB Sale and the Wind-Down / Expense Advance) strictly in trust for the benefit of Purchaser and, as such, the Assets shall not constitute property of Merchant's bankruptcy estate pursuant to and consistent with 11 U.S.C. § 541(b)(1) at any time following the Closing;

(x)         following the payment of the Cash Purchase Price but subject to Agent's obligation to pay Expenses and fund the Wind-Down Payment, any Proceeds received by, or otherwise in the possession of, Merchant at any time shall be segregated and held strictly in trust for the benefit of Purchaser, shall not be commingled with Merchant's own assets, and, as such, shall not become property of Merchant's bankruptcy estate pursuant to and consistent with 11 U.S.C. §541(b)(1), and shall be paid over to Purchaser immediately;

(xi)        upon the payment of the Cash Purchase Price, and solely to the extent that any Assets or Proceeds are, notwithstanding the Approval Order,

subsequently determined to constitute property of Merchant's estate, but subject to Agent's obligation to pay Expenses and fund the Wind-Down Payment, Purchaser shall have a senior lien on such Assets and all Proceeds thereof, which lien is deemed automatically perfected, provided that nothing in the Approval Order shall inhibit Purchaser's ability, and the Approval Order shall expressly authorize Purchaser, to take any action Purchaser deems appropriate to perfect and enforce such lien;

(xii)    upon the payment of the Cash Purchase Price and subject to Agent's obligation to pay Expenses and fund the Wind-Down Payment, until all Assets have been sold or otherwise disposed of, and solely to the extent that any Assets or Proceeds are, notwithstanding the Approval Order, subsequently determined to constitute property of Merchant's estate, Purchaser shall have a superpriority administrative expense claim against Merchant to the extent of any amounts owing from Merchant to Purchaser in connection with this Agreement, including as a result of any breach of this Agreement and/or as a result of any Proceeds being in Merchant's possession;

(xiii)    the Lease/Contract Designation Rights are approved, and Purchaser is authorized to designate the assignees of any or all of the Contracts and Leases pursuant thereto;

(xiv)    at any time (i) with respect to any unexpired real estate Lease under which Merchant is lessee, prior to the earlier to occur of (1) September 2, 2018 and (2) expiration of such Lease by its terms or the rejection thereof, and (ii) with respect to all other Contracts and Leases, prior to the earlier to occur of (1) December 31, 2018, and (2) rejection thereof (the shortest of the foregoing periods applicable to a particular Contract or Lease is the "Designation Rights Period" applicable to that Contract or Lease), Purchaser shall have the exclusive right, which right may be exercised at any time and from time to time, to file a notice in the Bankruptcy Cases (each such notice, a "Lease/Contract Assumption Notice") substantially in the form annexed hereto as Exhibit 2(b)(xiii) designating the assignee of any one or more Leases and/or Contracts and setting forth the proposed cure amount due pursuant to section 365 of the Bankruptcy Code (each a "Cure Amount");

(xv)    the counterparties to the Leases or Contracts identified in any Lease/Contract Assumption Notice shall have twenty-one days to object to the proposed assumption and assignment;

(xvi)    if no objection to the proposed assumption and assignment of a Lease or Contract is timely received, such Lease or Contract shall, upon payment of the applicable cure payment, if any, to the applicable

counterparty, automatically be deemed assigned to and assumed by the assignee identified in the Lease/Contract Assumption Notice pursuant to section 365 of the Bankruptcy Code, without further order of the Bankruptcy Court or further action by any person or entity;

(xvii)     if an objection to the proposed assumption and assignment of a Lease or Contract is timely received, such Lease or Contract shall not be assumed or assigned until such objection is resolved by agreement of the applicable counterparty or order of the Bankruptcy Court;

(xviii)    the designee under any Lease/Contract Assumption Notice shall be required, if requested by the applicable counterparty, to provide adequate assurance of future performance with respect to such Lease or Contract if the applicable counterparty so requests;

(xix)      pursuant to section 365(k) of the Bankruptcy Code, neither Merchant nor any other Party shall have any further obligation under any Lease or Contract after assumption and assignment thereof pursuant to the Lease/Contract Designation Rights;

(xx)       in addition to the Lease/Contract Designation Rights, Purchaser shall have the right, upon written notice to Merchant and as reflected in notices filed in the Bankruptcy Cases from time to time, direct Merchant to reject any Lease or Contract as specified by Purchaser;

(xxi)      at the Closing, all funds held in escrow by Wilmington Trust, National Association ("WT") pursuant to that certain Escrow Agreement dated as of March 5, 2018 by and among the members of Agent, the Second Lien Noteholders, and WT shall be released at the Closing for application to the Cash Purchase Price;

(xxii)     Agent shall have the exclusive right to use the Stores and all other Assets for the purpose of conducting the GOB Sale, free of any interference from any entity or person, subject to compliance with the Sale Guidelines (as defined below) and Approval Order;

(xxiii)    Agent, as the exclusive agent for Merchant, is authorized to conduct, advertise, post signs, utilize sign-walkers, and otherwise promote the GOB Sale as a "going out of business", "store closing", "sale on everything", "everything must go", or similar themed sale, in accordance with the Sale Guidelines (as the same may be modified and approved by the Bankruptcy Court), subject to compliance with the Sale Guidelines, the Approval Order, and all applicable federal, state, and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and

orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "<u>Applicable General Laws</u>"), <u>other than</u> all applicable laws, rules and regulations in respect of "going out of business", "store closing" or similar-themed sales and permitting (collectively, the "<u>Liquidation Sale Laws</u>");

(xxiv)  Agent is authorized to conduct the GOB Sale notwithstanding any Liquidation Sale Laws;

(xxv)  so long as the GOB Sale is conducted in accordance with the Sale Guidelines and the Approval Order and in a safe and professional manner, Purchaser shall be deemed to be in compliance with any Applicable General Laws;

(xxvi)  Agent is granted a limited license and right to use all Intellectual Property for purposes of conducting the GOB Sale and otherwise marketing any or all of the Assets;

(xxvii)  unless otherwise ordered by the Bankruptcy Court, all newspapers and other advertising media in which the GOB Sale is advertised shall be directed to accept the Approval Order as binding and to allow the Parties to consummate the transactions provided for in this Agreement, including, without limitation, conducting and advertising the GOB Sale in the manner contemplated by this Agreement;

(xxviii)  unless otherwise ordered by the Bankruptcy Court, all utilities, landlords, creditors, and other interested parties and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the GOB Sale, or institute any action in any forum other than the Bankruptcy Court that in any way directly or indirectly interferes with or obstructs or impedes the conduct of the GOB Sale;

(xxix)  the Bankruptcy Court retains exclusive jurisdiction over the enforcement and interpretation of, and over and all matters arising from, this Agreement;

(xxx)  Merchant is directed to provide weekly reporting to Agent of all amounts expended for Expenses and pursuant to the Wind-Down Budget;

(xxxi)  Merchant shall make its books and records available to Purchaser at all times;

(xxxii)  Purchaser shall not be liable for any claims against Merchant except as expressly provided for in this Agreement;

(xxxiii)    all payments made by Merchant from the Wind-Down Payment shall be made pursuant to, and solely in accordance with, the Wind-Down Budget;

(xxxiv)    Purchaser shall neither have nor incur any obligation to advance or fund any amounts to or for Merchant except as set forth in this Agreement and the Wind-Down Budget;

(xxxv)    any amendment to or other modification of the Wind-Down Budget shall only be effective upon approval by Purchaser in its sole discretion;

(xxxvi)    Agent is authorized to sell the Additional Agent Merchandise on the terms set forth herein, subject to the Sale Guidelines;

(xxxvii)    following the occurrence of the Closing, the Adversary Proceeding is deemed dismissed with prejudice;

(xxxviii)    following the occurrence of the Closing, neither the Debtor nor any other entity acting on its behalf or as its successor (including but not limited to the Committee and any chapter 7 or 11 trustee) may recover from the Notes Trustee or any holders of Second-Lien Notes any costs or expenses of preserving, or disposing of, any of the collateral securing Merchant's obligations under the Indenture and the Second-Lien Notes pursuant to section 506(c) of the Bankruptcy Code;

(xxxix)    Purchaser and its designees are granted derivative standing to pursue the Avoidance Actions (subject to section 11.2(f) below) and Other Causes of Action in the name of and/or on behalf of Merchant;

(xl)    in the event any of the provisions of the Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Purchaser shall be entitled to the protections provided in Bankruptcy Code sections 363(m) and 364(e) and, no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the GOB Sale or the liens or priority authorized or created under this Agreement or the Approval Order;

(xli)    neither Purchaser nor any entity comprising Purchaser is or shall be a mere continuation of Merchant or otherwise subject to successor liability in connection with any of the Assets;

(xlii)    upon receipt by the DIP Administrative Agent (as defined in the Final DIP Order) and certain other persons as directed in the Payoff Letter (as defined below) of the DIP Payoff (as defined below) pursuant to Section 3.1(a) of this Agreement, all ongoing commitments under the DIP Credit Agreement (as defined in the Final DIP Order) shall be canceled and terminated;

(xliii)      to the extent Purchaser has not designated the purchaser or other assignee of any Assets (the "<u>Residual Assets</u>") as of December 31, 2018 (as may be extended by written agreement of the Parties, the "<u>Designation Rights Termination Date</u>"), (1) ownership of all cash (on hand, in the bank, in transit, or otherwise), credit card processing float, accounts receivable, notes receivable, credit card receivables, other receivables, deposits, security deposits, proceeds of retail sales in all of the Debtors' retail store locations, rights to refunds, other rights to payment, and Intellectual Property comprising Residual Assets shall vest in Purchaser or its nominee and (2) ownership of all other Residual Assets shall revert to the Debtors' estates, each on the Designation Rights Termination Date; and

(xliv)      this Agreement, the Approval Order, and all provisions hereof and thereof are binding on any successor to Merchant, including but not limited to any chapter 7 or chapter 11 trustee, and subject to Agent's obligation to pay Expenses and fund the Wind-Down Payment, any such successor shall continue to hold all Assets and Proceeds strictly in trust for the benefit of Purchaser.

**Section 3.  <u>Consideration to Merchant and Agent.</u>**

3.1    <u>Purchase Price</u>.  The aggregate consideration being provided to Merchant in exchange for Purchaser's rights and Merchant's obligations under this Agreement is as follows (collectively, the "<u>Purchase Price</u>"), which shall be allocated among the Assets in accordance with Purchaser's bid letter dated April 4, 2018:

(a)    <u>Cash Purchase Price</u>.  At the Closing and subject to the receipt of a payoff letter (the "<u>Payoff Letter</u>") in form and substance satisfactory to the DIP Administrative Agent, Agent shall (i) pay to the DIP Administrative Agent, for the benefit of the DIP Lenders, and certain other persons as directed in the Payoff Letter, the amount in cash (the "<u>DIP Payoff</u>") necessary to (1) indefeasibly pay the Pay-Off Amount (*plus* any Per Diem Interest) (as each such term is defined in the Payoff Letter), which amount shall include all DIP Obligations, including, without limitation, all outstanding principal, accrued interest, fees (including, without limitation, the outstanding Pre-Petition Tranche A Prepayment Premium and the Pre-Petition Specified Tranche A-1 Prepayment Premium (as each such term is defined in the DIP Credit Agreement)), costs and expenses (including, without limitation, all attorneys' fees, costs and expenses), (2) cash collateralize outstanding letters of credit in accordance with the DIP Credit Agreement, and (3) fund the DIP Indemnity Account in accordance with Paragraph 36 of the Final DIP Order, (ii) fund the Carve Out Account in the amount of $15,800,000 in accordance with the last two sentences of Paragraph 39(c) of the Final DIP Order to be held in escrow in the trust account of [Young Conaway Stargatt & Taylor LLP], all as set forth in the Payoff Letter, and (iii) pay $3,000,000 to Merchant to provide liquidity for outstanding checks.  Together, items (i), (ii), and (iii) are the "<u>Cash Purchase Price</u>."  The Payoff Letter shall contain a release from each of the Merchant, the Agent and the Prepetition Second Lien Parties in favor of the DIP Lenders.  Each capitalized term used but not defined in this Section 3.1(a) shall have the meaning set forth in the Final DIP Order.

(b)      Credit Bid.  At the Closing, pursuant to the Credit Bid and as provided in the Approval Order, $125,000,000 of Notes Claims shall be deemed offset and exchanged for Purchaser's rights and Merchant's obligations under this Agreement.

(c)      Wind-Down Funding.  Subject to the occurrence of the Closing, in addition to the Cash Purchase Price and the Credit Bid, Agent shall pay cash from the Proceeds of the Assets (or, solely to the extent the Proceeds are not available, funds provided by Agent) to Merchant from time to time after the Closing (the "Wind-Down Payment"), in the amount of $93,800,000 (the "Wind-Down Cap") for the purpose of paying certain administrative expenses of Merchant's bankruptcy estate as set forth in the Wind-Down Budget (as defined below).  Payments from the Wind-Down Payment for Wind-Down Services are subject to and to be used solely as set forth in the budget and schedule attached as Exhibit 3.1(c) hereto (as may be amended from time to time by agreement of the Parties, subject to approval by Purchaser in its sole discretion and, solely with respect to [compensation of the Committee's professionals], 503(b)(9) Claims, and Stub Rent Claims (each as defined below), subject to approval by the Committee, the "Wind-Down Budget").  Merchant shall provide Purchaser with a register of all checks and ACH/wire transfers Merchant intends to issue pursuant to the Wind-Down Budget at least one business day before issuance, which register shall identify the payees, amounts, and expense categories of such payments.  If so requested by Purchaser, Merchant shall, to the extent commercially feasible, (i) establish separate bank accounts for specific categories of expenses identified in the Wind-Down Budget (the "Wind-Down Accounts"), (ii) deposit the portions of the Wind-Down Payment allocable to categories for which Wind-Down Accounts have been established into such accounts, and (iii) not pay from any Wind-Down Account any amounts other than the administrative expenses reflected in the Wind-Down Budget for the applicable category.  Any portion of the Wind-Down Payment that has not been expended by Merchant as of the Designation Rights Termination Date shall revert and be returned to Purchaser upon the dismissal or conversion of Merchant's chapter 11 bankruptcy cases or the effective date of a plan of liquidation of Merchant.  Any costs incurred by Merchant in connection with providing the Wind-Down Services (as defined below) shall be subject to the Wind-Down Budget and subject to the Wind-Down Cap and Merchant shall have no obligation to provide such Wind-Down Services unless the cost to do so is included in the Wind-Down Budget or provided for as an Expense.

(d)      Wind-Down / Expense Advance.  As necessary from time to time on or before April 28, 2018, Agent shall advance (including through retention of Proceeds by Merchant) to Merchant the aggregate sum of $50,000,000 (the "Wind-Down / Expense Advance") solely for payment of (i) Expenses (as defined below) and (ii) administrative expenses reflected in the Wind-Down Budget, as and when due.  Any payment from the Wind-Down / Expense Advance (a) of expenses reflected in the Wind-Down Budget shall be credited against the Wind-Down Payment and (b) of Expenses shall constitute a payment of Expenses by Agent.  The Wind-Down / Expense Advance shall, to the extent commercially feasible, be held in a segregated account and shall not be used for payment of any amounts other than as set forth in this paragraph 3.1(d).

(e)      Expenses.  After the Closing, Agent shall be responsible for the payment of all Expenses pursuant to Section 4.1 below.

(f)      Assumption of Certain Claims.

(i)    Upon the occurrence of the Closing, Agent shall assume the obligation to pay (a) $2,000,000 (the "503(b)(9) Cap") on account of claims against Merchant under section 503(b)(9) of the Bankruptcy Code ("503(b)(9) Claims") and (b) $8,000,000 (the "Stub Rent Cap") on account of claims against Merchant on account of stub rent ("Stub Rent"). An amount equal to the sum of the 503(b)(9) Cap and the Stub Rent Cap shall be placed into a segregated account established by Agent to be held in trust for the benefit of holders of 503(b)(9) Claims and Stub Rent Claims. To the extent the sum of all allowed Stub Rent Claims or 503(b)(9) Claims, as the case may be, exceeds the Stub Rent Cap or the 503(b)(9) Cap, as applicable, such claims shall be paid pro rata up to, and subject to, the Stub Rent Cap or the 503(b)(9) Cap, as applicable. All payments by Agent on account of Stub Rent Claims and 503(b)(9) Claims shall be paid directly to the applicable claimants and shall be credited against the Wind-Down Payment.

(ii)    Within ten days after entry of the Approval Order, Merchant shall file and serve upon each known trade creditor and landlord identified in Merchant's books and records as holding a 503(b)(9) Claim and/or a Stub Rent Claim a notice identifying such entity's respective 503(b)(9) Claim or Stub Rent Claim (the "Creditor Notice"). Each recipient of a Creditor Notice shall have twenty days to file with the Bankruptcy Court and serve upon Merchant, Purchaser, and the Committee a response to such Creditor Notice identifying with specificity any dispute regarding such entity's 503(b)(9) Claim and/or Stub Rent Claim. If no response is timely filed by a recipient of a Creditor Notice, the amount and priority of the 503(b)(9) Claim and/or Stub Rent Claim identified on such Creditor Notice shall be binding and conclusive upon the holder thereof, and such holder shall thereafter be barred from objecting to such amount and priority. If a recipient of a Creditor Notice timely files a response thereto, Merchant and Agent, in consultation with the Committee, shall use best efforts to resolve the dispute asserted therein, provided that disputes that cannot be resolved within ten days shall be resolved by the Bankruptcy Court at the next scheduled omnibus hearing thereafter. The actual out-of-pocket costs of preparing, filing, and serving the Creditor Notice shall be paid by Agent as an Expense. Within sixty days after the entry of the Approval Order, Merchant shall provide Agent with a reconciliation of all of the allowed 503(b)(9) Claims and allowed Stub Rent Claims. Purchaser shall have no obligation to investigate, assess, object to, or contest the merits of any 503(b)(9) Claims or Stub Rent Claims and is entitled to rely on the amounts included on such reconciliation.

(iii)    This paragraph 3.1(f) shall survive termination of this Agreement for any reason.

3.2    Consideration to Purchaser.

(a)    Proceeds. Upon the payment of the Cash Purchase Price but subject to Agent's obligations to pay the Expenses and the Wind-Down Payment, all Proceeds shall be the exclusive property of Purchaser, subject to further distribution among the entities comprising Purchaser pursuant to any agreements between the entities comprising Purchaser and the Second Lien Noteholders.

(b)    Assets and Proceeds Held in Trust. Subject to Section 3.2(a), Merchant shall hold all of the Assets in trust for the benefit of Purchaser. Subject to Section 3.2(a), any

Proceeds received by, or otherwise in the possession of, Merchant at any time shall be segregated and held strictly in trust for the benefit of Purchaser, shall not be commingled with Merchant's own assets, shall not become property of Merchant's bankruptcy estate, and shall be paid over to Purchaser immediately.  For the avoidance of doubt, the costs associated with maintaining the Assets available for sale pursuant to this Agreement shall be borne by Purchaser either as Expenses (as defined below) or through the Wind-Down Payment.

(c)     Merchant and Purchaser further agree that if at any time, Merchant holds any amounts due to Purchaser under this Agreement, Merchant may, in its discretion, offset such amounts being held by Merchant against any undisputed amounts due and owing by, or required to be paid by, Purchaser or Agent hereunder.

(d)     Remaining Merchandise.  To the extent that there is Merchandise remaining at the Sale Termination Date (the "Remaining Merchandise"), such Remaining Merchandise shall be deemed automatically transferred to Agent free and clear of all liens, claims, and encumbrances.  Agent and its affiliates shall be authorized to sell or otherwise dispose of the Remaining Merchandise with all logos, brand names, and other Intellectual Property intact, and shall be authorized to advertise the sale of the Remaining Merchandise using the Intellectual Property.

3.3     Proceeds of GOB Sales.

(a)     Following the payment of the Cash Purchase Price but subject to Agent's obligation to pay Expenses and fund the Wind-Down Payment, Agent may (but shall not be required to) establish its own accounts (including without limitation credit card accounts and systems), dedicated solely for the deposit of the Proceeds of the GOB Sales (the "GOB Sale Proceeds") and the disbursement of amounts payable to Agent in connection with the GOB Sales (the "Agency Accounts"), and Merchant shall promptly, upon Agent's reasonable request, execute and deliver all necessary documents to open and maintain the Agency Accounts; provided, however, Agent shall have the right, in its sole and absolute discretion, to continue to use Merchant's Designated Deposit Accounts (as defined below) as the Agency Accounts in which case Merchant's Designated Deposit Accounts shall be deemed to be Agency Accounts. Agent shall exercise sole signatory authority and control with respect to the Agency Accounts. The Agency Accounts shall be dedicated solely to the deposit of GOB Sale Proceeds and other amounts contemplated by this Agreement in connection with the GOB Sale and the distribution of amounts payable hereunder in connection with the GOB Sale.  Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the GOB Sale and the Agency Accounts.  Upon Agent's notice to Merchant of Agent's designation of the Agency Accounts (other than Merchant's Designated Deposit Accounts), all GOB Sale Proceeds (including credit card GOB Sale Proceeds) shall be deposited into the Agency Accounts.

(b)     Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant's identification number(s) and existing bank accounts for credit card transactions relating solely to the GOB Sale.  In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying

customary practices and procedures. Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s). At Agent's request, Merchant shall cooperate with Agent to establish Merchant's identification numbers under Agent's name to enable Agent to process all such credit card GOB Sale Proceeds for Agent's account. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to the GOB Sale, whether received during or after the Sale Term. Agent shall not be responsible for, as an Expense or otherwise, any credit card fees, charges, or chargebacks relating to periods prior to the Closing.

(c)     Unless and until Agent establishes its own Agency Accounts (other than Merchant's Designated Deposit Accounts), all GOB Sale Proceeds and other amounts contemplated by this Agreement (including credit card GOB Sale Proceeds), shall be collected by Merchant and deposited on a daily basis into depository accounts designated by, and owned and in the name of, Merchant for the Stores, which accounts shall be designated solely for the deposit of GOB Sale Proceeds and other amounts contemplated by this Agreement (including credit card GOB Sale Proceeds), and the disbursement of amounts payable to or by Agent hereunder (the "Designated Deposit Accounts"). All funds in the Designated Deposit Accounts shall at all times be held in trust for the benefit of Purchaser, subject to Agent's obligation to pay Expenses and fund the Wind-Down Payment. The Designated Deposit Accounts shall be cash collateral accounts, with all cash, credit card payments, checks and similar items of payment, deposits and any other amounts in such accounts being GOB Sale Proceeds or other amounts contemplated hereunder, and Merchant hereby grants to Purchaser, subject to Agent's obligation hereunder to fund the Wind-Down Payment and Expenses, a first priority senior security interest in each Designated Deposit Account and all funds on deposit in such accounts from and after the Closing.

(d)     Merchant shall take all actions necessary to designate Agent as an authorized signer on all Designated Deposit Accounts and to grant Agent the ability to initiate wire transfers from such Designated Deposit Accounts, provided that Purchaser's interest in the Designated Deposit Accounts shall be subject to Agent's obligation to pay Expenses and fund the Wind-Down Payment.

(e)     On each business day to the extent practicable, Merchant shall promptly pay to Agent by wire funds transfer all funds in the Designated Deposit Accounts (including, without limitation, GOB Sale Proceeds, GOB Sale Proceeds from credit card sales, and all other amounts) deposited into the Designated Deposit Accounts for the prior day(s), subject to Section 3.2(c) above.

Section 4.  **Expenses.**

4.1     Subject to and only upon entry of the Approval Order, in addition to and not subject to the Wind-Down Payment or Wind-Down Cap, Agent shall be unconditionally responsible for all "Expenses," which shall be paid by Agent in accordance with Section 4.2

below.  As used herein, "Expenses" shall mean the Store-level operating expenses that arise during the Sale Term, limited to the following:

(a)    actual payroll with respect to all Retained Employees used in connection with conducting the GOB Sale for actual days/hours worked at a Store during the Sale Term as well as payroll for any temporary labor engaged for the GOB Sale during the Sale Term;

(b)    any amounts payable by Merchant for benefits for Retained Employees (including FICA, unemployment taxes, workers' compensation and healthcare insurance, but excluding Excluded Payroll Benefits) for Retained Employees used in the GOB Sale, in an amount not to exceed 23% of the base payroll for all Retained Employees (the "Payroll Benefits Cap");

(c)    subject to Section 6.1, the actual Occupancy Expenses categorized on Exhibit 4.1(c) in all cases limited on a per Store, per diem basis not to exceed the respective aggregate monthly amounts shown on Exhibit 4.1(c);

(d)    Retention Bonuses for Retained Employees, as provided for in Section 9.4 below;

(e)    advertising and direct mailings relating to the GOB Sale, Store interior and exterior signage and banners, and sign-walkers, in each case relating to the GOB Sale, including the amounts set forth in section 15.1;

(f)    credit card fees, bank card fees, and chargebacks and credit/bank card discounts with respect to Merchandise sold in the GOB Sale;

(g)    bank service charges (for Store, corporate accounts, and Agency Accounts), check guarantee fees, and bad check expenses to the extent attributable to the GOB Sale;

(h)    costs for additional Supplies at the Stores necessary to conduct the GOB Sale as and to the extent requested by Agent;

(i)    all fees and charges required to comply with applicable laws in connection with the GOB Sale as and to the extent agreed to by Agent;

(j)    Store cash theft and other store cash shortfalls in the registers;

(k)    all actual costs and expenses associated with Agent's on-site supervision of the Stores and Distribution Centers, including (but not limited to) any and all fees, wages, taxes, third party payroll costs and expenses, and deferred compensation of Agent's field personnel, travel to, from or between the Stores and Distribution Centers, and out-of-pocket and commercially reasonable expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the GOB Sale);

(l)    postage, courier and overnight mail charges requested by Agent to the extent relating to the GOB Sale;

(m)    third party payroll processing expenses associated with the GOB Sale;

(n)    costs of transfers initiated by Agent of Merchandise and Additional Agent Merchandise between and among the Stores and Distribution Centers during the Sale Term, including delivery and freight costs, it being understood that Agent shall be responsible for coordinating such transfer of Merchandise;

(o)    retention payments for Merchant's corporate employees in an amount not to exceed $300,000 in the aggregate, subject to agreement of Merchant and Purchaser in their respective discretion;

(p)    to the extent Agent elects to use Merchant's e-commerce site and related sales platform ("E-Commerce Platform"), costs of operating the E-Commerce Platform equal to (i) actual expenses to operate the E-Commerce Platform in an amount equal to $300,000 per week (prorated for partial weeks), *plus* (ii) the actual costs of shipping Online Merchandise to customers who purchase such Online Merchandise through the E-Commerce Platform from the Sale Commencement Date through and including the date that is seven (7) days after Agent provides Merchant with notice of Agent's intention to discontinue using the E-Commerce Platform as a sales platform to fulfill customer orders, *plus* (iii) actual marketing expenses related to the E-Commerce Platform specifically requested by Agent in writing (including by email) such as, but not limited to, paid search and external advertising; and

(q)    compensation of a consumer privacy ombudsman, if one is appointed by the United States Trustee, subject to approval of such compensation by the Bankruptcy Court.

Notwithstanding anything herein to the contrary, to the extent that any Expense category listed in section 4.1 is also included on Exhibit 4.1(c), Exhibit 4.1(c) shall control and such Expenses shall not be double counted.   There will be no double counting or payment of Expenses to the extent that Expenses appear or are contained in more than one Expense category.

As used herein, the following terms have the following respective meanings:

(i)    "Central Service Expenses" means costs and expenses for Merchant's central administrative services necessary for the GOB Sale, including, but not limited to, internal payroll processing, MIS services, cash and inventory reconciliation, data processing and reporting, information technology updates, functionality, and maintenance, and accounting (collectively, "Central Services").

(ii)    "Excluded Payroll Benefits" means (i) the following benefits arising, accruing or attributable to the period prior to, during, or after the Sale Term: (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Payroll Benefits Cap, including, without limitation, any payments due under the WARN Act.

(iii)    "Occupancy Expenses" means, with respect to the Stores, base rent, percentage rent, HVAC, utilities, CAM, storage costs, real estate and use taxes, Merchant's association dues and expenses, utilities expenses, cash register maintenance, routine repairs,

building maintenance, trash and snow removal, housekeeping and cleaning expenses, local and long-distance telephone and internet/wifi expenses, security (including, without limitation, security systems, courier and guard service, building alarm service and alarm service maintenance), and rental for furniture, fixtures and equipment.

(iv)    "Third Party" means, with reference to any Expenses to be paid to a Third Party, a party which is not affiliated with or related to Merchant.

(v)    Notwithstanding any other provision of this Agreement to the contrary, "Expenses" shall not include: (i) Excluded Payroll Benefits; (ii) Central Service Expenses, (iii) Occupancy Expenses or any occupancy-related expenses of any kind or nature in excess of the respective per Store occupancy-related amounts expressly provided for as an Expense under Section 4.1(c) above; (iv) any expenses of any kind relating to or arising from Merchant's home office, and/or (v) any other costs, expenses or liabilities payable by Merchant not provided for herein, all of which shall be paid solely by Merchant (including from the Wind-Down Payment, to the extent provided in the Wind-Down Budget).

4.2    Payment of Expenses.

Subject to and only upon entry of the Approval Order, Agent shall be responsible for the payment of all Expenses out of Proceeds (or from Agent's own accounts if and to the extent there are insufficient Proceeds).  All Expenses incurred during each week of the GOB Sale (*i.e.* Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or paid by Merchant and thereafter reimbursed by Agent as provided for herein; provided, however, in the event that the actual amount of an Expense is unavailable on the date of the reconciliation (such as payroll), Merchant and Agent shall agree to an estimate of such amounts, which amounts will be reconciled once the actual amount of such Expense becomes available.  Agent and/or Merchant may review or audit the Expenses at any time.

4.3    Distribution Center Expenses

Agent shall be responsible for allocating and designating the shipment of Merchandise from Merchant's Distribution Centers to the Stores.  All costs and expenses of operating the Distribution Centers, including, but not limited to, use and occupancy expenses, Distribution Center employee payroll and other obligations, and/or processing, transferring, consolidating, shipping, and/or delivering goods within or from the Distribution Centers (the "Distribution Center Expenses"), shall be borne by Agent as an Expense except to the extent provided for in the Wind-Down Budget.

Section 5. **Merchandise.**

5.1    Merchandise Subject to This Agreement.

(a)    "Excluded Goods" means all (1) goods that are not owned by Merchant, including but not limited to goods that belong to sublessees, licensees, department lessees, or concessionaires of Merchant and (2) goods held by Merchant on memo, on consignment (except to the extent otherwise agreed by the applicable consignor), or as bailee.  Merchant shall be

solely responsible for the disposition and/or abandonment of all Excluded Goods and all costs, expenses, and obligations associated therewith. Purchaser shall incur no cost, expense, or obligation in connection with any Excluded Goods.

(b)    "Merchandise" means all goods owned by Merchant for resale as of the occurrence of the Closing, other than Excluded Goods.

(c)    "On-line Merchandise" means all inventory that is both (i) designated for sale through the E-Commerce Platform as of the Sale Commencement Date and (ii) located in Merchant's West Jefferson Distribution Center as of the Sale Commencement Date.

5.2    Distribution Center Allocation.    Allocation and designation of Merchandise located in the Distribution Centers to the Stores shall be in Agent's sole discretion, subject to the Wind-Down Budget.

Section 6. **Sale Term.**

6.1    Term.    Subject to satisfaction of the conditions precedent set forth in Section 10 hereof, the GOB Sale shall commence at each Store on a date determined by Agent in its sole discretion after the occurrence of the Closing (the "Sale Commencement Date") and shall end at each Store no later than August 31, 2018 (the "Sale Termination Date", and the period from the Sale Commencement Date to the Sale Termination Date as to each Store being the "Sale Term"), provided that the Sale Commencement Date shall occur no later than April 19, 2018.  Agent may, in its discretion, earlier terminate the GOB Sale on a Store-by-Store basis upon not less than seven (7) days' prior written notice (a "Vacate Notice") to Merchant (the "Vacate Date"), provided, that it being understood that Agent's obligations to pay all Expenses, including Occupancy Expenses, for each Store subject to a Vacate Notice shall continue until the applicable Vacate Date, provided, however, that, with respect to Occupancy Expenses, Agent's obligations to pay all Occupancy Expenses for each Store shall continue until the last day of the calendar month in which the Vacate Date occurs for such Store.

6.2    Vacating the Stores.    At the conclusion of the GOB Sale, Agent agrees to leave each Store in "broom clean" condition, ordinary wear and tear excepted, except for unsold items of Owned FF&E which may be abandoned by Agent in place in a neat and orderly manner pursuant to Section 7 below.  Agent shall vacate each Store on or before the Sale Termination Date as provided for herein, at which time Agent shall surrender and deliver the Store premises, and Store keys, to Merchant unless the applicable Lease is being conveyed pursuant to the Lease/Contract Designation Rights.  Agent's obligations to pay all Expenses for the Stores shall continue as provided for in Section 6.1.

Section 7. **FF&E.**

7.1    Abandonment of FF&E.    Agent shall be authorized to abandon any and all FF&E, whether owned or not by Merchant, in place without any cost or liability to Agent.  For the avoidance of doubt, Agent shall have no responsibility whatsoever with respect to FF&E that is not owned by Merchant, provided that nothing in this Section 7 shall limit Agent's rights with

respect to Owned FF&E under the Asset Designation Rights or with respect to leased FF&E under the Lease/Contract Designation Rights.

Section 8.  **Conduct of the GOB Sale.**

8.1    <u>Rights of Agent</u>.  Subject to entry of the Approval Order, in addition to any other rights granted to Agent elsewhere in this Agreement, Agent shall be permitted to conduct the GOB Sale as a "going out of business", "store closing", "sale on everything", "everything must go", or similar themed sale throughout the Sale Term without compliance with any Liquidation Sale Laws.  The Agent shall conduct the GOB Sale in the name of and on behalf of Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and subject to the Approval Order.  Agent shall conduct the GOB Sale in accordance with the sale guidelines attached hereto as Exhibit 8.1(the "<u>Sale Guidelines</u>").  In addition to any other rights granted to Agent hereunder in conducting the GOB Sale the Agent, in the exercise of its reasonable discretion shall have the right:

(a)    to establish Sale prices and discounts and Store hours;

(b)    except as otherwise expressly included as an Expense, to use without charge during the Sale Term all FF&E, computer hardware and software, existing Supplies, intangible assets (including Merchant's name, logo and tax identification numbers), Store keys, case keys, security codes and safe and lock combinations required to gain access to and operate the Stores, and any other assets of Merchant located at the Stores (whether owned, leased, or licensed);

(c)    (i) consistent with the Wind-Down Budget, to be provided by Merchant with central office facilities, central administrative services and personnel to process and perform Central Services and provide other central office services reasonably necessary for the GOB Sale; (ii) to use reasonably sized offices located at Merchant's central office facility to effect the GOB Sale; and (iii) to use all customer lists, mailing lists, email lists, and web and social networking sites utilized by Merchant in connection with its business (to the extent such items can be segregated to the Stores and  solely in connection with the GOB Sale and pursuant to such reasonable restrictions requested by Merchant in order for Merchant to comply with its privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data);

(d)    to establish and implement advertising, signage and promotion programs consistent with the "going out of business", "store closing", "sale on everything", "everything must go", or similar themed sale, including without limitation by means of media advertising, and similar interior and exterior signs and banners, and the use of sign walkers, each at Agent's expense; and

(e)    to transfer Merchandise between and among the Stores and Distribution Centers at Agent's expense.

8.2    <u>Terms of Sales to Customers; Final/As Is Sales</u>.  All sales of Merchandise will be "final sales" and "as is," and appropriate signage and sales receipts will reflect the same.  Agent

shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash or nationally recognized bank credit cards.   Upon entry of the Approval Order, Agent shall not accept or honor coupons during the Sale Term.  The Agent shall clearly mark all receipts for the Merchandise sold at the Stores during the Sale Term so as to distinguish such Merchandise from the goods sold prior to the Sale Commencement Date.  Unless otherwise agreed between Agent and the issuer of Merchant's private-label credit cards ("PLCCs"), Agent shall not accept PLCCs as a form of payment during the Sale.

       8.3    <u>Sales Taxes.</u>

       (a)    During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise and Additional Agent Merchandise, as indicated on Merchant's point of sale equipment (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "<u>Sales Taxes</u>") shall be added to the sales price of Merchandise and Additional Agent Merchandise and collected by Agent, on Merchant's behalf, at the time of sale.  All Sales Taxes shall be deposited into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "<u>Sales Taxes Account</u>").  Merchant shall prepare and file all applicable reports and documents required by the applicable taxing authorities, and Merchant shall promptly pay all Sales Taxes from the Sales Taxes Account. Merchant will be given access to the computation of gross receipts for verification of all such tax collections.  Provided that Agent performs its responsibilities in accordance with this Section 8.3, Agent shall have no further obligation to Merchant, any taxing authority, or any other party, and Merchant shall indemnify and hold harmless Agent from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities.  If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations hereunder, Agent shall indemnify and hold harmless Merchant from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

       (b)    Without limiting the generality of Section 8.3(a) hereof, it is hereby agreed that, as Agent is conducting the GOB Sale solely as agent for Merchant, various payments that this Agreement contemplates that one party may make to the other party (including the payment by Agent of the Guaranteed Amount) do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

       8.4    <u>Supplies</u>.  Agent shall have the right to use, without charge, all existing supplies located at the Stores, Distribution Centers and corporate office(s), including, without limitation, boxes, bags, paper, twine and similar sales materials (collectively, "<u>Supplies</u>").  In the event that additional Supplies are required in any of the Stores during the GOB Sale, Merchant agrees to

promptly provide the same to Agent, if available, for which Agent shall reimburse Merchant at Merchant's cost therefor.

8.5    <u>Returns of Merchandise</u>.  Agent shall accept returns of goods sold by Merchant prior to the Closing for a period of ten days from and including the Sale Commencement Date. Thereafter, Agent shall have no obligation to accept returns of goods sold by Merchant prior to the Closing.  Agent's acceptance of returns shall not impact the Wind-Down Budget or the Wind-Down Cap.

8.6    <u>Gift Certificates & Credits</u>.  Agent shall accept Merchant's gift certificates, gift cards, store credits, return credits, or similar merchandise credits issued by Merchant (collectively, "<u>Gift Certificates</u>") for a period of ten days from and including the Sale Commencement Date.  Thereafter, Agent shall have no obligation to accept Gift Certificates. Agent's acceptance of Gift Certificates shall not impact the Wind-Down Budget or the Wind-Down Cap.

8.7    <u>Right to Monitor</u>.  Merchant shall have the right to monitor the GOB Sale and activities attendant thereto and to be present in the Stores during the hours when the Stores are open for business; provided that Merchant's presence does not unreasonably disrupt the conduct of the Sale.  Merchant shall also have a right of access to the Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency.

8.8    <u>Sale Reconciliation</u>.  On each Wednesday during the Sale Term, Agent and Merchant shall cooperate to reconcile Expenses, make payments/setoffs on account of the GOB Sale Proceeds and reconcile such other GOB Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e. Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent (the "<u>Weekly Sale Reconciliation</u>").  Within thirty (30) days after the end of the Sale Term, or as soon as practicable thereafter, Agent and Merchant shall complete a final reconciliation of the Sale (the "<u>Final Reconciliation</u>"), the written results of which shall be certified by representatives of each of the Merchant and Purchaser as a final settlement of accounts between the Merchant and Purchaser with respect to the GOB Sale.  Within five (5) days after the completion of the Final Reconciliation and execution of a settlement letter including an appropriate mutual release for the benefit of Merchant and Purchaser, Agent shall pay to Merchant, or Merchant shall pay to Agent, as the case may be, any and all amounts due the other pursuant to the Final Reconciliation.  The Approval Order shall provide that the Final Reconciliation, once agreed to by Merchant and Purchaser, shall be automatically deemed approved pursuant to Bankruptcy Code section 105(a) and Rule 9019 of the Federal Rules of Bankruptcy Procedure without further order of the Bankruptcy Court or action by any party.  During the Sale Term, and thereafter until all of Merchant's and Purchaser's and Agent's obligations under this Agreement have been satisfied, Merchant and Purchaser shall have reasonable access to Merchant's and Purchaser's records with respect to the GOB Sale (including, but not limited to Merchandise, GOB Sale Proceeds, and Expenses) to review and audit such records.

8.9     Additional Agent Merchandise.

(a)     Agent shall be entitled to include in the Sale additional merchandise procured by Agent which is of like kind as, and no lesser quality to, the Merchandise located in the Stores ("Additional Agent Merchandise").  Agent shall be responsible for payment of all costs associated with any Additional Agent Merchandise.  All proceeds of the sale of Additional Agent Merchandise shall remain the exclusive property of Agent.

(b)     The Additional Agent Merchandise shall be at all times subject to the control of Agent.  If requested by Agent, Merchant shall, at Agent's expense, insure the Additional Agent Merchandise and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers.

(c)     Any transactions relating to the Additional Agent Merchandise are, and shall be construed as, a true consignment from Agent to Merchant.  Merchant acknowledges, and the Approval Order (as and when applicable) shall provide, that the Additional Agent Merchandise shall be consigned to Merchant as a true consignment under Article 9 of the Uniform Commercial Code in effect in the State of Delaware (the "UCC").  Agent is hereby, and shall be through the Approval Order, granted a first priority security interest in (i) the Additional Agent Merchandise and (ii) the Additional Agent Merchandise Proceeds, which security interest shall be deemed perfected pursuant to the Approval Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver any notices and file any financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Merchandise and any proceeds from the sale thereof as consigned goods thereunder and Merchant as the consignee therefor, and Agent's security interest in such Additional Agent Merchandise and Additional Agent Merchandise proceeds.

(d)     Agent shall provide signage in the Stores notifying customers that the Additional Agent Merchandise has been included in the Sale.

8.10     E-Commerce Platform.  Subject to the Wind-Down Budget and payment of Expenses, Agent shall use the E-Commerce Platform in connection with the GOB Sale to fulfill customer orders made during the GOB Sale Term and otherwise promote the GOB Sale (in Agent's capacity as Agent hereunder), provided that Agent shall have the option, in its sole discretion, to terminate the use of the E-Commerce Platform at any time after four weeks of use.  During the use of the E-Commerce Platform, and consistent with the Wind-Down Budget (i) Merchant shall continue to provide for the operation and maintenance of the E-Commerce Platform, including information technology and E-Commerce Platform updates, and provide Agent with all assistance with respect to the functionality of the E-Commerce Platform, fulfillment of orders, and promotion of the GOB Sale and (ii) Agent shall pay as an Expense those amounts reflected in Section 4.1(p) through and including the date that is seven (7) days after Agent provides Merchant with notice of Agent's intention to discontinue using the E-Commerce Platform as a sales platform to fulfill customer orders (the "LDOB Date"); provided, however, that, if Agent continues the Sale at the Stores after the LDOB Date, Merchant shall, as a Central Service and at no cost or expense to Agent (other than as provided in the Wind-Down Budget), maintain the E-Commerce Platform with limited functionality for the limited purposes

of advertising and promoting the Sale at the Stores, periodically updating such advertising and promotions, and maintaining and updating the Store locator function at no cost or expense to Agent. With respect to the E-Commerce Platform, (i) Agent shall be authorized to sell Additional Agent Goods through the E-Commerce Platform and (ii) the Parties may implement such other processes, procedures, and agreements as may be necessary or appropriate for the efficient and continued operation of the E-Commerce Platform. In the event Agent elects to discontinue using the E-Commerce Platform as a sales platform to fulfill customer orders, Merchant agrees that neither Merchant nor any other person or entity shall complete any sale of goods for Merchant's or any other person's or entity's account utilizing the E-Commerce Platform during the GOB Sale Term, Merchant shall otherwise comply with Merchant's obligations under this Agreement in respect of the E-Commerce Platform, and Merchant shall, as a Central Service and at no cost or expense to Agent (other than as provided in the Wind-Down Budget), maintain the E-Commerce Platform with limited functionality for the limited purposes of advertising and promoting the GOB Sale at the Stores, periodically updating such advertising and promotions, and maintaining and updating the Store locator function. As part of the Allocation Schedule, Merchant and Agent shall mutually agree upon an allocation of certain On-line Merchandise to be promptly delivered to the Stores and not sold through the E-Commerce Platform (the "Designated On-line Merchandise"). In the event Agent ceases using the E-Commerce Platform as a sales platform prior to the Sale Termination Date, Merchant shall be responsible for processing and ticketing all Merchandise not sold through the E-Commerce Platform for sale in the Stores and delivering any remaining On-line Merchandise (the "Remaining On-line Merchandise") to the Stores according to a mutually agreed upon allocation schedule.

Section 9. **Employee Matters.**

9.1     Merchant's Employees.    Subject to the Wind-Down Budget and payment of Expenses, Agent may use Merchant's employees in the conduct of the Sale to the extent Agent deems necessary for the Sale, and Agent may select and schedule the number and type of Merchant's employees required for the Sale. Agent shall identify any such employees to be used in connection with the Sale (each such employee, a "Retained Employee"). Notwithstanding the foregoing, Merchant's employees shall at all times remain employees of Merchant. Agent's selection and scheduling of Merchant's employees shall at all times comply with all applicable laws and regulations. Merchant and Agent agree that, except to the extent that wages and benefits of Retained Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Payroll Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any employment agreement, collective bargaining agreement, or be deemed a joint or successor employer with respect to such employees. For the avoidance of doubt, Merchant shall be responsible for providing any required notice under the WARN Act with respect to its employees and otherwise comply with the WARN Act with respect to any "plant closing" or "mass layoff" (as defined in the WARN Act) or group termination or similar event affecting the employees, whether before or after the date of this Agreement. Merchant shall not, without the prior consent of Agent, raise the salary or wages or increase the benefits for, or pay any bonuses

or other extraordinary payments to, any Store or Distribution Center employees prior to the Sale Termination Date. Merchant shall not transfer any employee in anticipation of the Sale nor any Retained Employee during the Sale Term, in each case without Agent's prior consent. To the extent reasonably requested by Agent, and at Agent's expense, Merchant shall use commercially reasonable efforts to hire additional temporary employees to facilitate the GOB Sale, which employees shall constitute Retained Employees for purposes of this Agreement.

9.2    Termination of Employees. Agent may in its discretion stop using any Retained Employee at any time during the Sale, subject to the conditions provided for herein. In the event that Agent desires to cease using any Retained Employee, Agent shall notify Merchant at least seven (7) days prior thereto; provided, however, that, in the event that Agent determines to cease using an employee "for cause" (such as dishonesty, fraud or breach of employee duties), the seven (7) day notice period shall not apply; provided, further, however, that Agent shall immediately notify Merchant of the basis for such "cause." From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Stores or Distribution Centers except "for cause" without Agent's prior consent. Notwithstanding the foregoing, Agent shall not have the right to terminate the actual employment of any employee, but rather may only cease using such employee in the Sale and paying any Expenses with respect to such employee (and all decisions relating to the termination or non-termination of such employees shall at all times rest solely with Merchant).

9.3    Payroll Matters. During the Sale Term, Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the Sale. Each Wednesday (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, workers' compensation and benefits for such week, to the extent such amount constitutes Expenses hereunder.

9.4    Employee Retention Bonuses. Subject to approval by the Bankruptcy Court, Agent may pay, as an Expense, retention bonuses and/or severance pay ("Retention Bonuses") (which bonuses shall be inclusive of payroll taxes, but as to which no benefits shall be payable), up to a maximum of $7,400,000 in the aggregate, to such Retained Employees who do not voluntarily leave employment, are not otherwise entitled to receive severance pay, and are not terminated "for cause," as Agent may determine in its discretion. Subject to approval by the Bankruptcy Court, the amount of such Retention Bonuses shall be in an amount to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through Merchant's payroll system.

Section 10. **Conditions Precedent and Subsequent.**

(a)    The willingness of Purchaser to enter into the transactions contemplated under this Agreement, and the occurrence of the Closing, are directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Purchaser in its sole discretion:

(i)    Entry of the Approval Order shall have occurred no later than April 18, 2018;

(ii)    All representations and warranties of Merchant hereunder shall be true and correct in all material respects as of the Closing, and Merchant shall have in all material respects performed the obligations and complied with the covenants required by this Agreement to be performed or complied with by it prior to the Closing; and

(iii)    All of the Parties shall have executed this Agreement.

(b)    The willingness of Merchant to enter into the transactions contemplated under this Agreement, and the occurrence of the Closing, are directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Merchant:

(i)    The Bankruptcy Court shall have entered the Approval Order no later than April 18, 2018;

(ii)    All representations and warranties of Purchaser hereunder shall be true and correct in all material respects as of the Closing, and Purchaser shall have in all material respects performed the obligations and complied with the covenants required by this Agreement to be performed or complied with by it prior to the Closing; and

(iii)    All of the Parties shall have executed this Agreement.

Section 11.  **Representations, Warranties and Covenants.**

11.1    <u>Merchant's Representations, Warranties and Covenants</u>.    Merchant hereby represents, warrants and covenants in favor of Purchaser as follows:

(a)    As of the date of this Agreement and at the Closing, Merchant (i) is duly organized, validly existing and in good standing under the laws of State of Delaware; (ii) has all requisite corporate power and authority to own, lease and operate the Assets and to carry on its business as presently conducted; (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder; and (iv) has paid when due, and until the sale or other disposition of all of the Assets, will continue to pay when due, all United States Trustee fees.

(b)    Subject only to entry of the Approval Order, Merchant, as of the date of this Agreement and at the Closing, has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "<u>Agency Documents</u>") and to perform fully its obligations thereunder. Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for

Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale, except for any such consent the failure of which to be obtained could not reasonably be expected to prevent or materially delay or impair the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder. Each of the Agency Documents has been duly executed and delivered by Merchant and, upon the due authorization, counter-execution, and delivery of this Agreement by Purchaser, constitutes the legal, valid and binding obligation of Merchant enforceable in accordance with its terms.

(c) The Cash Purchase Price determined pursuant to Section 3.1(a) above shall not exceed [$574,831,000] as of April 19, 2018.

(d) Merchant, as of the date of this Agreement and at the Closing, owns good and marketable title to all of the Assets, free and clear of all security interests, liens, claims and encumbrances of any nature other than the security interests securing the DIP Obligations (as defined in the Final DIP Order) and the Second-Lien Notes. Merchant shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance upon or with respect to any of the Assets. From and after the Closing, subject to the Wind-Down Budget, Merchant shall perform such tasks and services as are necessary to maintain all of the Assets in salable condition, to preserve the Assets and the economic value thereof, and to maintain good, clear, and marketable title to all of the Assets at all times until all Assets have been sold or otherwise disposed of, and such tasks and services as Purchaser may otherwise reasonably request in connection with the Assets, including but not limited to paying all ad valorem taxes and utilities when due, performing all routine maintenance, cooperating with Purchaser to obtain the refund of all deposits and security deposits, and renewing all necessary licenses and registrations (collectively, all of the foregoing are the "Wind-Down Services").

(e) Merchant has maintained its pricing files in the ordinary course of business, and prices charged to the public for goods are the same in all material respects as set forth in such pricing files for the periods indicated therein, all pricing files and records are true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods without consideration of any point of sale discounts, as of the dates and for the periods indicated therein. Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (ii) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider.

(f) Through the Sale Commencement Date, Merchant has ticketed or marked, and shall continue to ticket or mark, all items of inventory received at the Stores in a manner consistent with similar Merchandise located at the Stores, and in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking inventory.

(g) Since March 1, 2018, Merchant has not, and through the Sale Commencement Date Merchant shall not, purchase for or transfer to or from the Stores any merchandise or goods outside the ordinary course.

(h)    To Merchant's knowledge after reasonable inquiry, all Merchandise is in compliance with all applicable federal, state and local product safety laws, rules and standards. Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.

(i)    Subject to the Wind-Down Budget, Merchant shall, throughout the Sale Term, maintain in good working order, condition, and repair all cash registers, heating systems, air conditioning systems, elevators, escalators and all other mechanical devices necessary or appropriate for the conduct of the Sale at the Stores.  Except as otherwise restricted by the Bankruptcy Code upon filing of the Bankruptcy Case or the Wind-Down Budget, and absent a bona fide dispute, throughout the Sale Term, Merchant shall remain current on all expenses and payables necessary or appropriate for the conduct of the GOB Sale.

(j)    Subject the Wind-Down Budget, payment of Expenses by Agent, and approval by the Bankruptcy Court, Merchant has paid, and will continue to pay throughout the Sale Term, all self-insured or Merchant-funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(k)    Since March 1, 2018, Merchant has not taken, and shall not throughout the Sale Term take, any actions with the intent of increasing the Expenses of the Sale, including without limitation increasing salaries or other amounts payable to employees; except to the extent an employee was due an annual raise in the ordinary course.

(l)    Prior to the execution of this Agreement, Merchant has provided Agent reasonable access to all pricing and cost files, computer hardware, software and data files, inter-Stores transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Stores and the Distribution Centers or on order or in transit.

(m)    To Merchant's knowledge after reasonable inquiry, all documents, information and supplements provided by Merchant to Agent in connection with Agent's due diligence and the negotiation of this Agreement were true and accurate in all material respects at the time provided.

(n)    Other than filing the Bankruptcy Case, no action, arbitration, suit, notice, or legal, administrative or other proceeding before any court or governmental body has been instituted by or against Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, or that if adversely determined, would adversely affect the conduct of the Sale.

The representations set forth in Sections 11.1(e), (f), (g), and (h) shall not survive the Closing.

11.2    Purchaser's Representations, Warranties and Covenants.    Purchaser hereby represents, warrants and covenants in favor of Merchant as follows:

(a)     Each member comprising Purchaser: (i) is duly and validly existing and in good standing under the laws of the State of its organization; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; (iii) is duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including, in the case of the entities comprising Agent, all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of such member to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)     To the extent permitted and authorized under the Indenture, (i) each member comprising Purchaser has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder; (ii) each member comprising Purchaser has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required on the part of such member for such member to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the transactions contemplated thereby, and (iii) each of the Agency Documents has been duly executed and delivered by the members of Purchaser party thereto and, assuming the due authorization, execution, and delivery of this Agreement by Merchant, constitutes the legal, valid and binding obligation of such member enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, and similar laws affecting the rights of creditors generally and by general principles of equity.  No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for, Purchaser's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as provided herein.  No contract or other agreement to which Purchaser is a party or by which Purchaser is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)     No action, arbitration, suit, notice or legal administrative or other proceeding before any court or governmental body has been instituted by or against Purchaser, or has been settled or resolved or, to Purchaser's knowledge, has been threatened against or affects Purchaser, which questions the validity of this Agreement or any action taken or to be taken by Purchaser in connection with this Agreement or which, if adversely determined, would have a material adverse effect upon Purchaser's ability to perform its obligations under this Agreement.

(d)     The GOB Sale shall be conducted in compliance with all applicable state and local laws, rules and regulations and Merchant's leases and other agreements, except as otherwise provided for in the Sale Guidelines and Approval Order.

(e)     Absent prior consent by Merchant, Purchaser will not cause any non-emergency repairs or maintenance (emergency repairs are repairs necessary to preserve the security of a Store premise or to ensure customer safety) to be conducted at the Stores.

(f)     Purchaser shall not prosecute, or otherwise use offensively or defensively, Avoidance Actions against any of Merchant's (1) non-insider trade vendors or landlords,

(2) employees and officers with respect to retention payments received pursuant to Retention Agreements in 2017, or (3) directors with respect to directors' fees received, and such Avoidance Actions shall be released as of the Closing.  This paragraph 11.2(f) shall survive any termination of this Agreement for any reason.

Section 12.  **Insurance.**

12.1    Merchant's Liability Insurance.  Until the Designation Rights Termination Date or as otherwise directed by Purchaser or set forth in this Agreement, Merchant shall continue to maintain, subject to the Wind-Down Budget and the Wind-Down Cap, in such amounts as it currently has in effect, all of its liability insurance policies, including but not limited to commercial general liability, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with, the Assets and/or Merchant's operation of its business and the Store and Distribution Centers; and Merchant shall cause Purchaser to be named as an additional named insured (as its interest may appear) with respect to all such policies.  Merchant shall deliver to Purchaser certificates evidencing such insurance setting forth the duration thereof and naming Purchaser as an additional named insured, in form reasonably satisfactory to Purchaser.  All such policies shall require at least thirty (30) days' prior notice to Purchaser of cancellation, non-renewal or material change.  In the event of a claim under any such policies, Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder (which may be reimbursed as an Expense and/or pursuant to the Wind-Down Payment, subject to the Wind-Down Budget and the Wind-Down Cap), unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Purchaser, or Purchaser's employees, independent contractors or agents.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts on or after the date of this Agreement without Purchaser's prior written consent.

12.2    Merchant's Casualty Insurance.  Until the Designation Rights Termination Date or as otherwise directed by Purchaser or set forth in this Agreement, Merchant shall continue to maintain, subject to the Wind-Down Budget and the Wind-Down Cap, all of its presently existing property casualty coverage related to the Assets (including but not limited to fire, flood, wind, hail, natural disaster, theft, and extended coverage casualty insurance) until the sale or other disposition of all Assets covered by such policies.  From and after the date of this Agreement, all such policies will also name Purchaser as an additional named insured or loss payee, as applicable (as its interest may appear).  In the event of a loss to the Assets on or after the date of this Agreement, all proceeds of such insurance shall constitute Proceeds hereunder. Merchant shall deliver to Purchaser certificates evidencing such insurance, setting forth the duration thereof and naming Purchaser as an additional insured or loss payee, as applicable, in form and substance reasonably satisfactory to Purchaser.  All such policies shall require at least thirty (30) days' prior notice to Purchaser of cancellation, non-renewal or material change. Merchant shall not make any change in the amount of any deductibles or self-insurance amounts on or after the date of this Agreement without Purchaser's prior written consent.  Upon the sale, conveyance, or other disposition of any Asset specifically identified in any of Merchant's casualty insurance policies, Merchant, if reasonably requested by Purchaser, shall cancel the casualty coverage specifically applicable to such Asset.

12.3    <u>Agent's Insurance</u>.  Agent shall maintain, at Agent's cost (as an Expense) and in such amounts as Agent currently has in effect, commercial general liability policies covering injuries to persons and property in or in connection with Agent's agency at the Stores and shall cause Merchant to be named as an additional insured with respect to such policies.  Agent shall deliver to Merchant certificates evidencing such insurance policies setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonably satisfactory to Merchant.  In the event of a claim under any such policies, Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Merchant or Merchant's employees, independent contractors or agents (other than Agent or Agent's employees, agents or independent contractors).  Agent shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Merchant's prior written consent.

12.4    <u>Worker's Compensation Insurance</u>.  Merchant shall, at all times while any employees are in its employ, maintain in full force and effect workers' compensation insurance (including employer liability insurance) in compliance with all statutory requirements.

Section 13.  **Purchaser's Security Interest.**

Subject to Agent's obligation to pay Expenses and fund the Wind-Down Payment:

(a)    Upon the occurrence of the Closing, and solely to the extent that any Assets or Proceeds are, notwithstanding the Approval Order, subsequently determined to constitute property of Merchant's estate, Purchaser shall have a senior lien on all Assets and Proceeds, which lien shall be deemed by the Approval Order to be automatically perfected.  The Approval Order shall grant Purchaser relief from the automatic stay, and nothing in the Approval Order shall inhibit Purchaser's ability, to take any action Purchaser deems appropriate to perfect such lien.

(b)    Upon the occurrence of the Closing and until all Assets have been sold or otherwise disposed of, and solely to the extent that any Assets or Proceeds are, notwithstanding the Approval Order, subsequently determined to constitute property of Merchant's estate, Purchaser shall have a superpriority administrative expense claim against Merchant to the extent of any amounts owing from Merchant to Purchaser in connection with this Agreement, including as a result of any breach of this Agreement.

Section 14.  **Designation Rights.**

14.1    <u>Lease/Contract Designation Rights</u>.

(a)    Upon the occurrence of the Closing and until the earlier to occur of (i) the end of the Designation Rights Period applicable to a particular Lease or Contract and (ii) the Designation Rights Termination Date, Purchaser shall have the exclusive right to designate the assignees of Merchant's right, title, and interest in and to any or all of the Leases and Contracts (the "<u>Lease/Contract Designation Rights</u>") upon the terms and conditions agreed upon between Purchaser and such designee.

(b)      Merchant shall cooperate reasonably with Purchaser to arrange for the sale and assignment of the Leases and Contracts, with such sale and assignment to be on such terms as Purchaser deems acceptable in its sole and absolute discretion.  Without limiting the generality of the foregoing, Merchant agrees (1) to provide Purchaser with all due diligence materials and information as Purchaser shall reasonably request in connection with its efforts to market and attempt to sell the Leases and Contracts (including complete copies thereof and any abstracts prepared with respect thereto, and all communications with the counterparties thereunder, all property surveys, all environmental reports and tax and utility records), with Purchaser to bear all reasonable third party out-of-pocket costs and expenses relating thereto, in all cases to the extent reasonably available to Merchant, and (2) to cooperate with Purchaser, its agents, and any potential purchasers of any of the Leases and/or Contracts.

(c)      Solely to the extent requested by Purchaser, Merchant shall exercise renewal and/or extension options under the Leases and Contracts.

(d)      At any time prior to the earlier to occur of (i) the end of the Designation Rights Period applicable to a particular Lease or Contract and (ii) the Designation Rights Termination Date, Purchaser shall have the right, which right may be exercised at any time and from time to time, to file a Lease/Contract Assumption Notice in the Bankruptcy Cases designating the assignee (which may in certain circumstances be Purchaser, any of the entities comprising Purchaser, any of their respective affiliates, and/or a new entity created by any of the foregoing) of one or more Leases and/or Contracts (which may occur without further order of the Bankruptcy Court pursuant to the Approval Order) and setting forth the proposed cure amount due pursuant to section 365 of the Bankruptcy Code.  The Approval Order shall provide that (a) the counterparties to the Leases or Contracts identified in any Lease/Contract Assumption Notice shall have twenty-one days to object to the proposed assumption and assignment, (b) if no objection to the proposed assumption and assignment of a Lease or Contract is timely received, such Lease or Contract shall, upon payment of the applicable cure payment, if any, to the applicable counterparty, automatically be deemed assumed by Merchant and assigned to the assignee identified in the Lease/Contract Assumption Notice pursuant to section 365 of the Bankruptcy Code, without further order of the Bankruptcy Court or further action by any person or entity, and (c) if an objection to the proposed assumption and assignment of a Lease or Contract is timely received, such Lease or Contract shall not be assumed or assigned until such objection is resolved by agreement of the applicable counterparty or order of the Bankruptcy Court.

(e)      The designee under any Lease/Contract Assumption Notice shall be required, if requested by the applicable counterparty, to provide adequate assurance of future performance with respect to such Lease or Contract if the applicable counterparty so requests.

(f)      Merchant shall have no responsibility for any cure amounts with respect to any Lease or Contract assumption and assignment.

14.2    <u>Asset Designation Rights</u>.

(a)      Upon the occurrence of the Closing, Agent shall have the exclusive right to market and sell, and/or otherwise designate the purchasers, licensees, transferees, and/or

assignees of (which may in certain circumstances be Purchaser, any of the entities comprising Purchaser, any of their respective affiliates, and/or a new entity created by any of the foregoing), any or all of the Assets free and clear of all liens, claims, and encumbrances thereon, without further order of the Bankruptcy Court (the "Asset Designation Rights").  Subject to Agent's payment obligations hereunder, Agent is authorized to execute, in the name of and as agent for Merchant, any and all deeds, bills of sale, and other instruments or documents necessary to effectuate the sale, transfer, or other conveyance of any of the Assets.

(b)  Pursuant to the Approval Order, the sale or other conveyance of any Assets reflected in Asset Designation Notices filed in the Bankruptcy Cases from time to time by the Agent shall be automatically effective on the date reflected in the applicable Asset Designation Notice and subject to the satisfaction of any closing conditions reflected therein, and the sale, license, transfer, or other conveyance of such Assets shall be free and clear of all liens, claims, and encumbrances without further order of the Bankruptcy Court, provided, however, that nothing in the Approval Order shall inhibit the ability of Agent to seek other or further orders of the Court in connection with the sale or other disposition of any Assets.

(c)  Except to the extent provided for by the Wind-Down Budget, the costs of maintaining the Assets available for marketing and sale shall constitute Expenses.  All costs of effectuating assumption and assignment shall be deemed an Expense hereunder.

Section 15.  **Miscellaneous**.

15.1  Signage.  On April 5, 2018, the Merchant purchased the signage, exclusive of freight, required for the Sale as set forth on Exhibit 15 directly from the sign vendor.  The signage shall be delivered to the Stores so as to be received in accordance with Agent's instructions on or before the Sale Commencement Date.  Upon entry of the Approval Order and simultaneous with the funding of the Cash Purchase Price, the Agent shall reimburse Merchant for one hundred percent (100%) of Merchant's actual (without mark-up or lift) documented out of pocket costs in an amount not to exceed $3,000,000 and shall directly pay as an Expense the freight costs associated with shipping such signage to the Stores.

15.2  Notices.  All notices and communications provided for pursuant to this Agreement shall be in writing and sent by electronic mail, as follows:

**If to Merchant:**

The Bon-Ton Stores, Inc.
2801 East Market Street
York, PA 17402
Attention:

*With copies (which shall not constitute notice) to*:

Malfitano Partners
Joseph A. Malfitano, PLLC
747 Third Ave., 2nd Floor

New York, NY 10017
Attn:   Joseph A. Malfitano (jm@malfitanopartners.com)

**If to Purchaser:**
GA Retail, Inc.
Attn:   Scott Carpenter (scarpenter@greatamerican.com)
        Alan Forman (aforman@brileyfin.com)

   *and*

Tiger Capital Group, LLC
Attn:   Christopher Huber (chuber@tigergroup.com)
        Mark Naughton (mnaughton@tigergroup.com)

   *and*

Wilmington Savings Fund Society, FSB
Attn:   Patrick J. Healy (phealy@wsfsbank.com)

*With copies (which shall not constitute notice) to:*

Lowenstein Sandler LLP
Counsel to Great American Group WF LLC
Attn:   Kenneth A. Rosen (krosen@lowenstein.com)
        Andrew Behlmann (abehlmann@lowenstein.com)

   *and*

Kilpatrick Townsend & Stockton LLP
Counsel to WSFS
Attn:   David Posner (dposner@kilpatricktownsend.com)

   *and*

Jones Day
Counsel to Second Lien Noteholders
Attn:   Sidney P. Levinson (slevinson@jonesday.com)
        Joshua M. Mester (jmester@jonesday.com)
        John Kane (jkkane@jonesday.com)

    15.3    <u>Governing Law/Exclusive Jurisdiction</u>.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of Delaware without reference to any conflict of laws provisions thereof, except where governed by the Bankruptcy Code.  Each of the Parties irrevocably and unconditionally submits, for itself and its properties, to the exclusive jurisdiction of the Bankruptcy Court, in any action or proceeding arising out of or relating to this Agreement.

15.4    Amendments.    This Agreement may not be modified except in a written instrument executed by all of the Parties, provided that any amendment or modification to Section 3.1(f) or 11.2(f) shall require the consent of the Committee.

15.5    No Waiver.    No consent or waiver by any Party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other Party of the same or any other obligation of such Party.    Failure on the part of any Party to complain of any act or failure to act by the other Party or to declare the other Party in default, irrespective of how long such failure continues, shall not constitute a waiver by such Party of its rights hereunder.

15.6    Currency.    All reference to dollars in this Agreement and all schedules, exhibits, and ancillary documents related to this Agreement shall refer to U.S. dollars.

15.7    Successors and Assigns.    This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and assigns, including, but not limited to, any chapter 11 or chapter 7 trustee; provided, however, that this Agreement may not be assigned by any of the Parties without the prior written consent of the other, provided further that notwithstanding the foregoing, GA and Tiger may each collaterally assign this Agreement and their rights thereunder to their respective lenders.

15.8    Execution in Counterparts.    This Agreement may be executed in one or more counterparts.    Each such counterpart shall be deemed an original but all such counterparts together shall constitute one and the same agreement.    This Agreement, to the extent signed and delivered by means of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.    At the request of any Party, each other Party shall re-execute original forms hereof and deliver them to all other Parties.    No Party shall raise the use of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident as a defense to the formation of a contract and each Party forever waives such defense.    In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against which enforcement is sought.

15.9    Section Headings.    The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

15.10    Wiring of Funds.    All amounts required to be paid under any provision of this Agreement shall be made by wire transfer of immediately available funds no later as 2:00 p.m. (Eastern Time) on the date that such payment is due, so long as all information necessary to complete the wire transfer has been received by the payor by 10:00 a.m. (Eastern Time) on the

date that such payment is due.  In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

15.11    Deposit.  Pursuant to the Bidding Procedures, Agent has provided a cash deposit in the amount of $32,700,000 (the "Deposit"), which is being held in escrow by co-counsel to Merchant, Young Conaway Stargatt & Taylor, LLP (the "Escrow Agent").  At the closing, the Deposit shall be released from escrow by the Escrow Agent and applied to the Cash Purchase Price.  In the event the Closing fails to occur, then, only upon entry of a final and non-appealable order of the Bankruptcy Court determining that such failure was the result of Purchaser's sole, material, non-excusable breach of this Agreement, then Merchant shall be entitled to retain the Deposit as liquidated damages as Merchant's sole remedy for such breach.

15.12    Nature of Remedies.  No failure to exercise and no delay in exercising, on the part of the Agent, any right, remedy, power, privilege or adjustment hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, privilege, or adjustment hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, privilege, or adjustment.

15.13    Entire Agreement.  This Agreement contains the entire agreement between the Parties with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto

15.14    Agent/Purchaser.  Each party hereto acknowledges and agrees that any payment obligation of Purchaser and Agent hereunder is binding upon both the Agent and Purchaser and they shall be jointly and severally responsible therefor.  Any action permitted under this Agreement to be taken by Purchaser may be undertaken by Agent on behalf of all entities comprising Purchaser, subject to any agreements between or among the entities comprising Purchaser, the Second Lien Noteholders, or any of them.

[ *signature page follows* ]

IN WITNESS WHEREOF, the Parties hereby execute this Agreement by their respective duly authorized representatives as a sealed instrument as of the day and year first written above.

**GA RETAIL, INC.**

By: _____

Name: _____

Its: _____


**TIGER CAPITAL GROUP, LLC**

By: _____

Name: _____

Its: _____


**WILMINGTON SAVINGS FUND SOCIETY, FSB**

**As Successor Trustee and Collateral Agent for the Second-Lien Notes**

By: _____

Name: _____

Its: _____


**THE BON-TON STORES, INC., on behalf of itself and the other entities comprising Merchant**

By: _____

Name: _____

Its: _____

## **List of Exhibits**

| | |
|---|---|
| Exhibit 1(a)(1) | Stores |
| Exhibit 1(a)(2) | Distribution Centers |
| Exhibit 1(d) | Owned Real Estate |
| Exhibit 1(e) | Intellectual Property |
| Exhibit 2(b)(iv) | Form of Asset Designation Notice |
| Exhibit 2(b)(xiii) | Form of Lease/Contract Assumption Notice |
| Exhibit 3.1(c) | Wind-Down Budget |
| Exhibit 4.1(c) | Per Store, Per Diem Occupancy Expenses. |
| Exhibit 8.1 | Sale Guidelines |

**The Bon-Ton Stores, Inc.**
Exhibit 1 (a) (1)
Full Company Liquidation Stores Closing List

| | Store List | | | | | |
|---|---|---|---|---|---|---|

| Store # | Store Name | Address | City | State | Zip | Selling Sq Ft |
|---|---|---|---|---|---|---|
| 2 | Hanover | 400 Eisenhower Drive | Hanover | PA | 17331 | 71,636 |
| 4 | Lewistown | 111 East Market Street | Lewistown | PA | 17044 | 46,660 |
| 5 | Martinsburg | 800 Foxcroft Avenue | Martinsburg | WV | 25401 | 65,780 |
| 6 | Chambersburg | 100 Chambersburg Mall | Chambersburg | PA | 17201 | 55,621 |
| 7 | Park City Furn | 870 Plaza Boulevard | Lancaster | PA | 17601 | 32,000 |
| 8 | Park City | 600 Park City Center | Lancaster | PA | 17601 | 178,967 |
| 12 | Cumberland | 1262 Vocke Rd | LaVale | MD | 21502 | 75,134 |
| 14 | Galleria | 2899 Wh teford Road, Ste 282 | York | PA | 17402 | 131,915 |
| 15 | Uniontown | 1800 Mall Run Road | Uniontown | PA | 15401 | 80,511 |
| 17 | Indiana | 2334 Oakland Avenue Suite 35 | Indiana | PA | 15701 | 60,465 |
| 18 | Warren | 4000 Market Street | Warren | PA | 16365 | 50,070 |
| 19 | Wilton | 3065 Route 50 | Saratoga Springs | NY | 12866 | 71,740 |
| 21 | Oil C ty | 6945 US 322 | Cranberry | PA | 16319 | 45,168 |
| 22 | Br ck | 80 Brick Plaza | Brick | NJ | 08723 | 53,500 |
| 25 | Binghamton | 601-635 Harry L Dr. | Johnson City | NY | 13790 | 81,112 |
| 27 | Williamsport | 300 Lycoming Mall Circle | Pennsdale | PA | 17756 | 60,952 |
| 28 | Bloomsburg | 225 Columbia Mall Drive | Bloomsburg | PA | 17815 | 46,060 |
| 29 | Queensgate | 2081 Springwood Road | York | PA | 17403 | 114,608 |
| 31 | Camp Hill | 3525 Gettysburg Road | Camp Hill | PA | 17011 | 145,200 |
| 32 | Colonial Park | 4600 Jonestown Road | Harrisburg | PA | 17109 | 136,540 |
| 35 | Reading | 1665 State Hill Road | Wyomissing | PA | 19610 | 159,368 |
| 36 | Greensburg | 5256 Rt 30 | Greensburg | PA | 15601 | 100,003 |
| 37 | Washington | 1500 W. Chestnut Street | Washington | PA | 15301 | 78,129 |
| 38 | Midway | 1066 Wyoming Avenue | Wyoming | PA | 18644 | 66,026 |
| 39 | Wilkes-Barre | 14 Wyoming Valley Mall | Wilkes-Barre | PA | 18702 | 159,454 |
| 43 | Newburgh | 1401 Route 300  Ste 139 | Newburgh | NY | 12550 | 61,785 |
| 44 | Ithaca | 40 Catherwood Road | Ithaca | NY | 14850 | 62,225 |
| 46 | Jamestown | 318 E. Fairmount Avenue | Lakewood | NY | 14750 | 59,860 |
| 48 | Westfield | 443 E. Main Street | Westfield | MA | 01085 | 74,939 |
| 62 | Eastern Hills | 4545 Transit Road | Williamsville | NY | 14221 | 151,208 |
| 63 | Sheridan | 1706 Sheridan Drive | Buffalo | NY | 14223 | 124,284 |
| 64 | Southgate | 1090 Union Road | West Seneca | NY | 14224 | 100,500 |
| 65 | McKinley | 3701 McKinley Parkway | Blasdell | NY | 14219 | 97,204 |
| 67 | Lockport | 5737 S. Transit Road | Lockport | NY | 14094 | 82,000 |
| 68 | Olean | 402 N. Union Street | Olean | NY | 14760 | 73,017 |
| 69 | Niagara | 6929 Williams Road | Niagara Falls | NY | 14303 | 88,128 |
| 72 | Bethlehem | 2524 Schoenersville Road | Bethlehem | PA | 18017 | 108,650 |
| 73 | S. Allentown | 3300 Lehigh Street | Allentown | PA | 18103 | 101,841 |
| 76 | Easton | 146 Palmer Park Mall | Easton | PA | 18045 | 115,062 |
| 78 | Quakertown | 751 SW End Blvd. | Quakertown | PA | 18951 | 88,126 |
| 81 | Doylestown | 456 North Main Street | Doylestown | PA | 18901 | 61,915 |
| 84 | Elmira | 3300 Chambers Road South, Ste. 50 | Horseheads | NY | 14845 | 74,752 |
| 94 | Camillus | 5301 W. Genesee Street | Camillus | NY | 13031 | 64,700 |
| 101 | Dayton Mall | 2700 St. Rt. 725 | Dayton | OH | 45459 | 212,000 |
| 107 | Huber Heights | 8221 Old Troy Pike | Huber Heights | OH | 45424 | 101,840 |
| 115 | Beavercreek | 2727 Fairfield Commons | Beavercreek | OH | 45431 | 151,740 |
| 117 | Piqua | 987 E. Ash Street | Piqua | OH | 45356 | 60,000 |
| 118 | Athens | 1004 E. State Street | Athens | OH | 45701 | 42,253 |
| 119 | New Philadelphia | 400 Mill Avenue, Ste. C3 | New Philadelphia | OH | 44663 | 73,310 |
| 121 | Kettering | 2050 E. Dorothy Lane | Dayton | OH | 45420 | 87,317 |
| 125 | Lancaster | 1730 River Valley Circle S. | Lancaster | OH | 43130 | 52,725 |
| 126 | Heath | 771 S. 30th Street | Newark | OH | 43056 | 73,185 |
| 128 | Zanesville | 3575 Maple Avenue | Zanesville | OH | 43701 | 70,847 |
| 129 | Marion | 1475 Marion Waldo Road | Marion | OH | 43302 | 75,673 |
| 130 | Chillicothe | 1080 N. Br dge Street | Chillicothe | OH | 45601 | 55,940 |
| 132 | Richmond | 601 East Main St. | R chmond | IN | 47374 | 100,000 |
| 137 | Sandusky | 4314 Milan Road | Sandusky | OH | 44870 | 80,398 |

**The Bon-Ton Stores, Inc.**
Exhibit 1 (a) (1)
Full Company Liquidation Stores Closing List

| | Store List | | | | | |
|---|---|---|---|---|---|---|

| Store # | Store Name | Address | City | State | Zip | Selling Sq Ft |
|---|---|---|---|---|---|---|
| 138 | Plover | 1780 Plover Road | Plover | WI | 54467 | 54,564 |
| 140 | Kohler | 4030 Hwy #28 | Sheboygan Falls | WI | 53085 | 54,541 |
| 142 | West Bend | 1291 W. Paradise Road | West Bend | WI | 53095 | 61,011 |
| 143 | Coldwater | 373 N. Willowbrook Rd. Suite Z | Coldwater | MI | 49036 | 54,146 |
| 144 | Alliance | Carnation Mall, 2500 W. State Street | Alliance | OH | 44601 | 55,552 |
| 147 | Wooster | 4095 Burbank Road | Wooster | OH | 44691 | 53,446 |
| 148 | Morgantown | 9550 Mall Road | Morgantown | WV | 26501 | 71,032 |
| 150 | Warsaw | 2856 Frontage Road | Warsaw | IN | 46580 | 80,320 |
| 151 | Frankfort | 202 Limestone Drive | Frankfort | KY | 40601 | 53,954 |
| 152 | Findlay | 1800 Tiffin Avenue | Findlay | OH | 45840 | 74,841 |
| 153 | Bowling Green | 1234 N Main Street | Bowling Green | OH | 43402 | 40,000 |
| 154 | Howell | 3599 E. Grand River Avenue | Howell | MI | 48843 | 72,873 |
| 155 | Westgate | 3311 Secor Road | Toledo | OH | 43606 | 154,000 |
| 159 | Monroe | 2121 Monroe Street | Monroe | MI | 48161 | 99,363 |
| 161 | Midland | 6830 Eastman Avenue | M dland | MI | 48642 | 64,141 |
| 163 | Jackson | 1826 W. Michigan Avenue | Jackson | MI | 49202 | 70,425 |
| 173 | Muscatine | 1903 Park Avenue | Muscatine | IA | 52761 | 43,906 |
| 175 | Mattoon | 700 Broadway Avenue E | Mattoon | IL | 61938 | 54,266 |
| 178 | Jasper | 3875 Newton Street | Jasper | IN | 47546 | 55,238 |
| 179 | Terre Haute | 3401 US Hwy 41 S | Terre Haute | IN | 47802 | 70,380 |
| 182 | Muncie | 3501 N. Granville Avenue | Muncie | IN | 47303 | 80,000 |
| 184 | Kokomo | 1156 South 17th Street | Kokomo | IN | 46902 | 60,135 |
| 186 | Green Bay Furn | 201 Bay Park Square | Green Bay | WI | 54304 | 53,265 |
| 189 | Southtown | 2400 State Route 725 | Dayton | OH | 45459 | 54,848 |
| 199 | Fort Wayne | 4201 Coldwater Road | Fort Wayne | IN | 46805 | 122,000 |
| 203 | Clarksburg | 2700 Meadowbrook Mall | Bridgeport | WV | 26330 | 124,285 |
| 205 | Ashland | 10699 US Route 60 | Ashland | KY | 41102 | 70,000 |
| 206 | Kanawha | 5700 MacCorkle Avenue SE | Charleston | WV | 25304 | 80,000 |
| 209 | Winfield | 200 Liberty Sq. Shopping Center | Hurricane | WV | 25526 | 70,476 |
| 310 | St Cloud | 600 W St. Germain St. | St. Cloud | MN | 56301 | 93,900 |
| 311 | Virginia | 1440 S 12th Avenue | Virginia | MN | 55792 | 66,582 |
| 312 | Rice Lake | 2900 South Main | R ce Lake | WI | 54868 | 54,661 |
| 313 | Fergus Falls | 2001 West Lincoln Avenue Ste. 2 | Fergus Falls | MN | 56537 | 39,536 |
| 314 | New Ulm | 110 N Minnesota Street | New Ulm | MN | 56073 | 47,277 |
| 315 | Watertown | 1300 9th Avenue SE | Watertown | SD | 57201 | 40,320 |
| 316 | Alexandria | 3015 Hwy 29 S Ste. 4037 | Alexandria | MN | 56308 | 70,314 |
| 317 | Havre | 1753 Highway 2 NW | Havre | MT | 59501 | 47,161 |
| 318 | LaCrosse | 4000 State Road 16 | LaCrosse | WI | 54601 | 41,344 |
| 319 | Albert Lea | 2440 Bridge Avenue | Albert Lea | MN | 56007 | 64,436 |
| 320 | Moorhead | 420 Center Ave, Ste. 1 | Moorhead | MN | 56560 | 106,150 |
| 321 | Bismarck | 641 Kirkwood Mall | Bismarck | ND | 58506 | 92,500 |
| 323 | Brainerd | 14136 Baxter Drive Ste. 1 | Baxter | MN | 56425 | 82,879 |
| 325 | Billings | 300 S 24th Street W, Ste. E100 | Billlings | MT | 59102 | 60,224 |
| 326 | Ottumwa | 1110 Quincy Ave | Ottumwa | IA | 52501 | 55,282 |
| 327 | Great Falls | 1200 10th Avenue South | Great Falls | MT | 59405 | 70,000 |
| 328 | Rap d City | 2200 N Maple Avenue | Rapid C ty | SD | 57701 | 88,977 |
| 329 | Rock Springs | 2445 Foothill Blvd. | Rock Springs | WY | 82901 | 60,018 |
| 330 | Dickinson | Prairie Hills Mall | Dickinson | ND | 58601 | 42,980 |
| 331 | Minot | 2400 10th Street SW | Minot | ND | 58701 | 52,468 |
| 332 | Willmar | 1605 S. 1st. Street | Willmar | MN | 56201 | 88,701 |
| 334 | Norfolk | 1700 Market Lane | Norfolk | NE | 68701 | 77,365 |
| 335 | Hastings | 3001 W 12th Ste. 4 | Hastings | NE | 68901 | 52,950 |
| 336 | North Platte | 1100 South Dewey | North Platte | NE | 69101 | 43,500 |
| 338 | Kearney | 4915 2nd Avenue | Kearney | NE | 68847 | 87,500 |
| 339 | Scottsbluff | 2302 Frontage Road Box 29 | Scottsbluff | NE | 69361 | 72,699 |
| 340 | Kalispell | 20 North Main | Kalispell | MT | 59901 | 80,000 |
| 341 | Blaine | 301 Northtown Dr. | Blaine | MN | 55434 | 130,722 |

**The Bon-Ton Stores, Inc.**
Exhibit 1 (a) (1)
Full Company Liquidation Stores Closing List

| | Store List | | | | | |
|---|---|---|---|---|---|---|

| Store # | Store Name | Address | City | State | Zip | Selling Sq Ft |
|---|---|---|---|---|---|---|
| 342 | Stillwater | 2001 Washington Avenue | Stillwater | MN | 55082 | 95,360 |
| 343 | Aberdeen | 3315 6th Avenue Southeast Ste. 2 | Aberdeen | SD | 57401 | 79,668 |
| 344 | Grand Junction | 2424 US Highway 6 & 50 | Grand Junct on | CO | 81505 | 72,279 |
| 345 | Mankato | 1850 Adams Street | Mankato | MN | 56001 | 71,046 |
| 348 | Bemidji | 1401 Paul Bunyan Drive NW | Bemidji | MN | 56601 | 56,392 |
| 349 | Butte | 3100 Harrison Avenue Ste. 5 | Butte | MT | 59701 | 65,000 |
| 351 | Missoula | 2901 Brooks Avenue | Missoula | MT | 59801 | 45,167 |
| 352 | Fargo | 3902 13th Avenue South | Fargo | ND | 58103 | 103,200 |
| 353 | Rosedale | 1675 West Highway 36 | Roseville | MN | 55113 | 149,908 |
| 354 | Midway | 1400 University Avenue West | St. Paul | MN | 55104 | 124,136 |
| 355 | Southtown | 7831 Southtown Center | Bloomington | MN | 55431 | 133,103 |
| 356 | Edina | 300 Southdale Center | Edina | MN | 55435 | 143,608 |
| 357 | Rochester | 1201 SW 12th Street | Rochester | MN | 55902 | 78,130 |
| 401 | Ames | 2801 N Grand Ave | Ames | IA | 50010 | 49,888 |
| 402 | Mason C ty | 102 S Delaware Avenue | Mason City | IA | 50401 | 59,500 |
| 403 | Fort Dodge | 217 S. 25th St., Ste 33 | Fort Dodge | IA | 50501 | 54,179 |
| 404 | Marshalltown | 2500 S Center Street | Marshalltown | IA | 50158 | 42,142 |
| 406 | Oak View | 3201 S 144th Street | Omaha | NE | 68144 | 149,326 |
| 408 | Waterloo | 2060 Crossroads Blvd. | Waterloo | IA | 50702 | 86,781 |
| 409 | Austin | 1405 18th Avenue NW | Austin | MN | 55912 | 45,277 |
| 410 | Merle Hay | 3800 Merle Hay Road Ste. 100 | Des Moines | IA | 50310 | 165,000 |
| 412 | Coralville | 1421 Coral Ridge Avenue | Coralville | IA | 52241 | 98,458 |
| 413 | Lindale Plaza | 4444 1st Avenue NE | Cedar Rapids | IA | 52404 | 100,000 |
| 414 | Jordan Creek | 101 Jordan Creek Parkway, #6000 | West Des Moines | IA | 50265 | 159,673 |
| 418 | Dubuque | 555 John F. Kennedy Road | Dubuque | IA | 52002 | 126,839 |
| 419 | Westroads | 707 N 102nd | Omaha | NE | 68114 | 171,800 |
| 421 | Davenport | 320 W Kimberly Road | Davenport | IA | 52806 | 104,913 |
| 422 | Moline | 4600 16th Street | Moline | IL | 61265 | 107,145 |
| 423 | Southridge | 1111 E Army Post Road, Ste. 2003 | Des Moines | IA | 50315 | 105,183 |
| 424 | Sioux Falls | 3500 W Empire Mall | Sioux Falls | SD | 57106 | 105,292 |
| 429 | Southern Hills | 4380 Sergeant Road | Sioux C ty | IA | 51106 | 92,695 |
| 430 | West Burlington | 550 S Gear Avenue | West Burlington | IA | 52655 | 66,705 |
| 432 | Eau Claire | 4850 Golf Road | Eau Claire | WI | 54701 | 102,000 |
| 437 | Valley West | 1551 Valley West Drive Ste. 200 | West Des Moines | IA | 50266 | 205,248 |
| 438 | Muskegon | 5580 Harvey Street | Muskegon | MI | 49444 | 106,131 |
| 439 | Sturgeon Bay | 58 N 3rd Avenue | Sturgeon Bay | WI | 54235 | 60,000 |
| 440 | Grandville | 3668 Rivertown Parkway | Grandville | MI | 49418 | 150,081 |
| 443 | Traverse City | 1776 Garfield Road | Traverse C ty | MI | 49684 | 49,666 |
| 445 | Lansing | 5220 W Saginaw Highway | Lansing | MI | 48917 | 103,000 |
| 447 | Lincoln | 3 Gateway Mall | Lincoln | NE | 68505 | 100,000 |
| 448 | Marshfield | 503 E Ives Street | Marshfield | WI | 54449 | 48,295 |
| 449 | Duluth | 1600 Miller Trunk Highway | Duluth | MN | 55811 | 140,999 |
| 451 | Grand Island | 3404 W 13th Street | Grand Island | NE | 68801 | 60,081 |
| 457 | Bay Park | 101 Bay Park Square | Green Bay | WI | 54304 | 145,672 |
| 463 | Holland | 12331 James Street | Holland | MI | 49424 | 69,148 |
| 464 | Okemos | 1982 W Grand River Avenue | Okemos | MI | 48864 | 168,757 |
| 465 | Port Huron | 4450 24th Avenue | Fort Gratiot | MI | 48060 | 70,536 |
| 475 | Bay City | 4131 E Wilder Road | Bay C ty | MI | 48706 | 110,536 |
| 501 | Bloomington | 1601 Empire St. | Bloomington | IL | 61701 | 131,606 |
| 502 | LaSalle Peru | 3940 Route 251 Ste 01 | Peru | IL | 61354 | 87,500 |
| 503 | Pekin | 3536 Court St. | Pekin | IL | 61554 | 82,100 |
| 504 | Champaign | 2000 North Neil St. | Champaign | IL | 61820 | 154,302 |
| 505 | Galesburg | 1150 W. Carl Sandburg Dr. | Galesburg | IL | 61401 | 84,894 |
| 507 | Quincy | 3347 Broadway | Quincy | IL | 62301 | 106,400 |
| 508 | Forsyth | 1005 Hickory Point Mall | Forsyth | IL | 62535 | 125,455 |
| 510 | Janesville | 2500 Milton Avenue | Janesville | WI | 53545 | 96,000 |
| 511 | Sterling | 2900 E. Lincolnway | Sterling | IL | 61081 | 60,000 |

3

**The Bon-Ton Stores, Inc.**
Exhibit 1 (a) (1)
Full Company Liquidation Stores Closing List

| | Store List | | | | | |
|---|---|---|---|---|---|---|

| Store # | Store Name | Address | City | State | Zip | Selling Sq Ft |
|---|---|---|---|---|---|---|
| 512 | Cherryvale | 7200 Harrison Avenue | Rockford | IL | 61112 | 128,330 |
| 515 | Joliet | 3340 Mall Loop Drive | Joliet | IL | 60435 | 128,000 |
| 516 | Spring Hill | 4000 Spring Hill Ring Rd | Dundee | IL | 60118 | 128,000 |
| 517 | Randhurst | 1025 Center Dr. | Mount Prospect | IL | 60056 | 205,056 |
| 518 | White Oaks | 2501 W. Wabash | Springfield | IL | 62704 | 125,000 |
| 519 | Milwaukee Grand Ave | 331 W Wisconsin Avenue | Milwaukee | WI | 53203 | 124,055 |
| 520 | Bayshore | 5701 N Lydell Avenue | Glendale | WI | 53217 | 167,606 |
| 521 | Racine | 5500 Durand Avenue | Racine | WI | 53406 | 106,157 |
| 522 | Brookfield | 15875 W Bluemound Road | Brookfield | WI | 53005 | 218,705 |
| 523 | Southridge | 5300 S 76th Street | Greendale | WI | 53129 | 221,000 |
| 526 | East Towne | 53 East Towne Mall | Madison | WI | 53704 | 138,755 |
| 527 | Mayfair | 2400 N Mayfair Road | Wauwatosa | WI | 53226 | 210,713 |
| 528 | West Towne | 36 West Towne Mall | Madison | WI | 53719 | 139,580 |
| 529 | Brookfield Furniture | 18615 W Bluemound Road | Brookfield | WI | 53045 | 55,000 |
| 530 | Evergreen | 9700 S Western Ave | Evergreen Park | IL | 60805 | 120,000 |
| 531 | Yorktown | 230 Yorktown Shopping Center | Lombard | IL | 60148 | 217,887 |
| 532 | Woodmar | 6600 Indianapolis Blvd. | Hammond | IN | 46320 | 111,080 |
| 533 | Edens Plaza | 3200 Lake Avenue | Wilmette | IL | 60091 | 160,578 |
| 535 | Stratford Square | 4 Stratford Square | Bloomingdale | IL | 60108 | 147,116 |
| 538 | Chicago Ridge | 9800 S Ridgeland Ave | Ch cago Ridge | IL | 60415 | 154,241 |
| 539 | Harlem Irving | 4200 N Harlem Avenue | Norridge | IL | 60706 | 168,058 |
| 541 | North Riverside | 7505 W Cermak Road | North Riverside | IL | 60546 | 180,550 |
| 542 | Southlake | 1995 Southlake Mall | Merrillville | IN | 46410 | 144,123 |
| 543 | Orland Square | 4 Orland Square | Orland Park | IL | 60462 | 163,370 |
| 546 | Yorktown Furniture | 2 Yorktown Mall Drive | Lombard | IL | 60148 | 45,708 |
| 547 | Edens Furniture | 3232 Lake Avenue | Wilmette | IL | 60091 | 34,830 |
| 548 | Schaumburg Furn ture | 830 E Golf Road | Schaumburg | IL | 60173 | 58,525 |
| 549 | Michigan City | 305 W US Highway 20 | M chigan City | IN | 46360 | 81,420 |
| 550 | Hawthorn | 3 Hawthorne Center | Vernon Hills | IL | 60061 | 112,121 |
| 551 | Ford City | 7601 S Cicero Avenue | Ch cago | IL | 60652 | 155,513 |
| 552 | Lincolnwood | 3333 Touhy Avenue | Lincolnwood | IL | 60712 | 122,650 |
| 553 | Bradley | 1602 N State IL- 50 | Bourbonnais | IL | 60914 | 142,200 |
| 554 | St Charles | 3850 E Main Street | St. Charles | IL | 60174 | 141,808 |
| 555 | Hawthorn Furniture | 480 East Ring Road | Vernon Hills | IL | 60540 | 46,290 |
| 556 | Fox Valley | 3 Fox Valley Center | Aurora | IL | 60505 | 131,267 |
| 561 | Orland Park Furniture | 66 Orland Square Drive | Orland Park | IL | 60462 | 71,783 |
| 563 | Grand Prairie | 5203 W. War Memorial Drive | Peoria | IL | 61615 | 181,238 |
| 571 | Laurel Park | 17624 Newburgh Rd | Livonia | MI | 48152 | 148,800 |
| 572 | Rochester Hills | 400 N.Adams St. | Rochester Hills | MI | 48309 | 121,380 |
| 573 | Partridge Creek | 17480 Hall Rd. | Clinton Township | MI | 48038 | 116,254 |
| 579 | Naperville Frn Clear. | 1835 W. Jefferson | Naperville | IL | 60540 | 30,000 |
| | | | | | Count: 212 | |

4

**The Bon-Ton Stores, Inc.**
**Exhibit 1 (a) (2)**
**Distribution Centers**

**Store List**

| Store # | Store Name | Address | City | State | Zip | Selling Sq Ft |
|---|---|---|---|---|---|---|
| 50 | Whitehall - DC | 3585 South Church St | Whitehall | PA | 18052 | n/a |
| 198 | Fairborn - DC | 1340 E Dayton Yellow Springs Rd | Fairborn | OH | 45324 | n/a |
| 460 | West Jefferson - DC | 115 Enterprise Parkway | West Jefferson | OH | 43162 | n/a |
| 950 | Rockford - DC | 4650 Shepherd Trail | Rockford | IL | 61103 | n/a |
| | | | | | Count: 4 | |

**The Bon-Ton Stores, Inc.**
**Exhibit 1 (d)**
**Owned Real Estate**

| Store # | Banner | Store Name | Address | City | State | Zip | Selling Sq Ft |
|---|---|---|---|---|---|---|---|
| | | | **Store List** | | | | |
| 4 | Bon-Ton | Lewistown | 111 East Market Street | Lewistown | PA | 17044 | 50,000 |
| 31 | Bon-Ton | Camp Hill | 3525 Gettysburg Road | Camp Hill | PA | 17011 | 145,375 |
| 36 | Bon-Ton | Greensburg | Westmoreland Mall, 5256 Route 30 | Greensburg | PA | 15601 | 99,800 |
| 67 | Bon-Ton | Lockport | 5737 South Transit Road | Lockport | NY | 14094 | 81,431 |
| 128 | Elder-Beerman | Zanesville | 3575 Maple Avenue | Zanesville | OH | 43701 | 70,847 |
| 132 | Elder-Beerman | Richmond | 601 East Main Street | Richmond | IN | 47301 | 111,350 |
| 310 | Herberger's | St. Cloud | 600 West Saint Germain Street | St. Cloud | MN | 56301 | 168,755 |
| 327 | Herberger's | Great Falls | 1200 10th Avenue South | Great Falls | MT | 59405 | 81,969 |
| 354 | Herberger's | Midway | 1400 University Avenue | St. Paul | MN | 55104 | 124,136 |
| 410 | Younkers | Merle Hay | 3800 Merle Hay Road, Su te 100 | Des Moines | IA | 50310 | 165,000 |
| 412 | Younkers | Coralville | 1421 Coral Ridge Avenue | Coralville | IA | 52241 | 98,458 |
| 432 | Younkers | Eau Claire | 4850 Golf Road | Eau Claire | WI | 54701 | 102,000 |
| 438 | Younkers | Muskegon | 5580 Harvey Street | Muskegon | MI | 49444 | 106,131 |
| 440 | Younkers | Grandville | 3668 Rivertown Parkway | Grandville | MI | 49418 | 150,081 |
| 449 | Younkers | Duluth | 1600 Miller Trunk Highway | Duluth | MN | 55811 | 140,999 |
| 501 | Bergner's | Bloomington | 1601 Empire Street | Bloomington | IL | 61701 | 131,616 |
| 503 | Bergner's | Pekin | 3500 Court Street | Pekin | IL | 61553 | 82,100 |
| 508 | Bergner's | Forsyth | 1005 Hickory Point Mall | Forsyth | IL | 62535 | 126,056 |
| 514 | Carson's | Aurora Northgate | 970 North Lake Street | Aurora | IL | 60506 | 119,000 |
| 516 | Carson's | Spring Hill | 4000 Spring Hill Mall | Dundee | IL | 60118 | 128,000 |
| 518 | Bergner's | Wh te Oaks | 2501 West Wabash | Springfield | IL | 62704 | 125,000 |
| 521 | Boston Store | Racine | 5500 Durand Avenue | Racine | WI | 53406 | 106,157 |
| 533 | Carson's | Edens Plaza | 3200 Lake Avenue | Wilmette | IL | 60091 | 155,000 |
| 549 | Carson's | Michigan City | 305 West US Highway 20 | Michigan C ty | IN | 46360 | 76,121 |
| 550 | Carson's | Hawthorn | 3 Hawthorne Center | Vernon Hills | IL | 60061 | 112,121 |
| 556 | Carson's | Fox Valley | 3 Fox Valley Center Drive | Aurora | IL | 60504 | 120,000 |
| 572 | Carson's | Rochester Hills | 400 North Adams Road | Rochester Hills | MI | 48309 | 61,233 |
| 573 | Carson's | Partridge Creek | 17480 Hall Road | Clinton | MI | 48038 | 120,000 |
| 590 | Carson's | Rockford D.C. | 4650 Shepherd Trail | Rockford -Owned | IL | 61103 | 520,000 |
| | | | "Quincy Property" | Quincy | IL | | |
| | | | | | | Count: | 30 |

1

The Bon-Ton Stores, Inc.
Exhibit 1 (e)
Intellectual Property

**BON TON ENTITIES TRADEMARKS**

| Reg Number | Serial Number | Name | Mark |
|---|---|---|---|
| 966580 | 72435362 | | BRECKENRIDGE |
| 1143734 | 73159353 | | CARSON PIRIE SCOTT |
| 1395289 | 73471798 | | CARSONS |
| 1332638 | 73495705 | | ELDER-BEERMAN |
| 1392446 | 73543142 | BON-TON STORES, INC., THE | STUART HUGHES |
| 1397712 | 73543145 | THE BON-TON DEPARTMENT STORES, INC. | SUSQUEHANNA TRAIL OUTFITTERS |
| 1526191 | 73663359 | | PIZZA STRADA |
| 1680687 | 74078995 | | THE BON-TON |
| 1661242 | 74097054 | | THE BON-TON |
| 1795407 | 74340081 | | YOUNKERS |
| 1869666 | 74355074 | | CEZANI |
| 2006730 | 74552885 | Bon-Ton Trade Corp., The | ANDREA VICCARO |
| 2006731 | 74552975 | | JENNY BUCHANAN |
| 2001829 | 74553100 | | CUDDLE BEAR |
| 1935197 | 74580597 | CARSON PIRIE SCOTT II,  NC. (F/K/A MCRAE'S, INC.) | MCRAE'S |
| 2021357 | 74638895 | | COME TO THE RIGHT PLACE |
| 2217957 | 75023572 | CARSON PIRIE SCOTT II, INC. (F/K/A MCRAE'S, INC.) | NATIONAL BANK OF THE GREAT LAKES |
| 2015874 | 75045762 | | JENNY BUCHANAN |
| 2635572 | 75348627 | | (RELATIVITY) |
| 2385966 | 75348885 | | LIVING QUARTERS |
| 2278878 | 75410193 | | HERBERGER'S |
| 2278879 | 75410395 | THE BON-TON DEPARTMENT STORES, INC. | HERBERGER'S |
| 2407600 | 75441794 | | STUDIO WORKS |
| 2493154 | 75654658 | | LIVING QUARTERS |
| 2412363 | 75857375 | | CHARGE AGAINST BREAST CANCER |
| 2384258 | 75979374 | | RELATIVITY |
| 2363348 | 75979521 | | CONSENSUS |
| | 76232809 | BON-TON DEPARTMENT STORES, INC. | MADISON & MAX |
| 3447275 | 76467824 | CARSON PIRIE SCOTT II, INC. (F/K/A MCRAE'S, INC.) | SHE SHE LA LA |
| 2856632 | 76975745 | THE BON-TON DEPARTMENT STORES, INC. | MADISON & MAX |
| 3292860 | 77035952 | | PARADISE COLLECTION |
| 3436925 | 77055123 | | KENNETH ROBERTS PLATINUM |
| 3483180 | 77183901 | | INTIMATE ESSENTIALS |
| 3528518 | 77227149 | | EXERTEK |
| 3709384 | 77359862 | | LITTLE MISS ATTITUDE |
| | 77364016 | THE BON-TON DEPARTMENT STORES, INC. | AUTHENTIC U |
| 3632950 | 77520071 | | CELEBRATIONS REGISTRY FOR VERY SPECIAL OCCASIONS |
| 3628605 | 77520170 | | CELEBRATIONS REGISTRY FOR VERY SPECIAL OCCASIONS |
| 3570064 | 77553578 | | STUDIO WORKS |
| 3666012 | 77577377 | | BOSTON STORE |
| 3848434 | 77630455 | | MISS ATTITUDE |
| 3842899 | 77814203 | | BT JEWELED |
| 3881265 | 77836970 | | KENNETH ROBERTS |
| 3909131 | 77881965 | | LIVING QUARTERS |
| 3892546 | 77969650 | CARSON PIRIE SCOTT II, INC. | BERGNER'S |
| 2765740 | 78116121 | CARSON PIRIE SCOTT II, INC. | (RELATIVITY) DESIGN LAB |
| 2934000 | 78191055 | | MISS ATTITUDE |
| | 78292100 | CARSON PIRIE SCOTT II, INC. (F/K/A MCRAE'S, INC.) | PERFECT PIMA |
| | 78560181 | | MARKET STREET EAST |
| 3217597 | 78867113 | THE BON-TON TRADE, LLC | SUSQUEHANNA TRAIL OUTFITTERS |
| 3022152 | 78976395 | | BRECKENRIDGE |
| 3069447 | 78976644 | | CHANTEUSE |
| | 85108157 | THE BON-TON DEPARTMENT STORES, INC. | CUSTOMER FIRST |
| 4143662 | 85194375 | | |
| 4139987 | 85225140 | | KENNETH ROBERTS |
| 4143891 | 85247954 | | JB |
| | 85476397 | THE BON-TON  STORES, INC. | AFFINITY |
| 4259055 | 85495083 | THE BON-TON DEPARTMENT STORES, INC. | ZOE&BELLA@BT |
| 4552374 | 85715679 | THE BON-TON DEPARTMENT STORES, INC. | CUDDLE BEAR |
| 4357088 | 85733613 | | ZOE&BELLA @BT |
| 4361044 | 85772207 | CARSON PIRIE SCOTT II, INC. | PARADISE COLLECTION |
| 4507524 | 85850871 | | STYLE ON THE STREET |
| 4998553 | 85920357 | | DESIGN DISTRICT |
| 4496279 | 85929876 | | TRENDEVOUS |
| 4532638 | 86044801 | | |
| 4626285 | 86144251 | | BEAUTY STATION |
| 4736593 | 86261094 | | |
| 4991097 | 86433458 | | BEAUTY STATION |
| 5191722 | 86532617 | | CHEF'S QUARTERS |
| 5396972 | 86698865 | | ZOE&BELLA @BT |
| 5005143 | 86979074 | | CHEF'S QUARTERS |
| 5135982 | 87019592 | | SANTA'S PANTRY |
| | 87063073 | | LOVESTYLEREWARDS |
| | 87063086 | THE BON-TON DEPARTMENT STORES  INC. | STYLEREWARDS |
| | 87368531 | | YULETIDE FARMS |
| | 87416731 | | DRESSOBSESSED |
| | 87418738 | | CLOSE TO HOME |
| | 87471882 | | THE BIG GRILL |
| | 87488334 | | MEYEWEAR |
| | 87492351 | | MEYEWEAR |
| | 87495174 | | FASHION TO GO |
| | 87495186 | | STYLE TO GO |
| | 87497118 | | STYLE 2 GO |
| | 87498911 | | FASHION 2 GO |
| | 87498969 | | TRAVEL QUARTERS |
| | 87505353 | | CUDDLE BEAR |
| | 87528193 | | LIVING QUARTERS |
| | 87535628 | | BETTER BRANDS. BIGGER SAVINGS. |
| | 87537827 | | ZOE&BELLA@BT |
| | 87626265 | | ZOE&BELLA@BT |

| Reg Number | Serial Number | Name | Mark |
|---|---|---|---|
| | 87667636 | | EO |
| | 87697689 | | BUZZWORX |
| | 87706897 | | ZOE&BELLA@BT |
| | 87748141 | | MATTI & MAX |
| | 87762369 | | MATTI & MAX |

**BON TON ENTITIES COPYRIGHTS**

| Registration Number | Title | Type |
|---|---|---|
| TX4880277 | Doing a good business: 100 years at the Bon-Ton | Literary Work |
| TX1896055 | Elder-Beerman Stores Corporation: a tradition of success | Literary Work |
| TX5900922 | A tale from Flurryville: the Berg's big surprise | Literary Work |
| TX5744198 | Wow! what a cow: a tale from funky | Literary Work |
| TX5638101 | A tale from Flurryville: Arctic Bart finds his happy heart | Literary Work |
| TX5658257 | Holiday celebrations with recipes from Younkers | Literary Work |
| TX6497902 | Baxter shares his bear | Literary Work |
| TX2217381 | Parisian celebrating a century of service | Literary Work |
| TX3196448 | Presentation - a manual of standards and guidelines | Literary Work |
| VA239074 | Riverchase Galleria  Parisian grand opening | Visual Arts |
| VA81949 | Made in Wisconsin | Visual Arts |
| VA6480 | Cratchits' Christmas dinner | Visual Arts |

**Exhibit 2(b)(iv)**
**Form of Asset Designation Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE BON-TON STORES, INC., *et al.*,[1] | Case No. 18-10248 (MFW) |
| Debtor. | Jointly Administered |

### NOTICE OF DESIGNATION OF ASSET PURCHASER

**PLEASE TAKE NOTICE** that pursuant to the *Order Approving Debtors' Entry Into Agency Agreement and Consummation of the Transactions Contemplated Thereby* (the "Approval Order") [D.I. ___],[2] Purchaser hereby designates the entity identified on Schedule A ("Designee") annexed hereto as the assignee of the Assets identified on Schedule A (the "Designated Assets") pursuant to the agreement between Purchaser, as agent for the Debtors, and Designee, an abstract of which is annexed hereto as Exhibit A (the "Purchase Agreement").

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Approval Order, upon the closing of the transaction pursuant to the Purchase Agreement, the Designated Assets shall be deemed conveyed to Designee by the Debtors free and clear of all liens, claims, encumbrances, and other interests of any kind.

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: The Bon-Ton Stores, Inc. (5229); The Bon-Ton Department Stores, Inc. (9309); The Bon-Ton Giftco, LLC (2805); Carson Pirie Scott II, Inc. (2140); Bon-Ton Distribution, LLC (5855); McRIL, LLC (5548); Bonstores Holdings One, LLC (8574); Bonstores Realty One, LLC (8931); Bonstores Holdings Two, LLC (8775); and Bonstores Realty Two, LLC (9075). The headquarters for the above-captioned Debtors is 2801 East Market Street, Bldg. E, York, Pennsylvania 17402.

[2]  Capitalized terms used but not defined in this Notice have the meanings given thereto in the Approval Order.

Dated: [_], 2018
      Wilmington, Delaware

**[COUNSEL TO PURCHASER]**

_____

**Exhibit 2(b)(iv)**
**Form of Asset Designation Notice**

<u>Schedule A</u>

| Designated Assets | Designee |
|---|---|
|  |  |

Exhibit 2(b)(xiii)
Form of Lease/Contract Assumption Notice

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE BON-TON STORES, INC., *et al.*,[1] | Case No. 18-10248 (MFW) |
| Debtor. | Jointly Administered |

## NOTICE OF ASSUMPTION AND ASSIGNMENT OF [LEASES] / [CONTRACTS]

**PLEASE TAKE NOTICE** that pursuant to the *Order Approving Debtors' Entry Into Agency Agreement and Consummation of the Transactions Contemplated Thereby* (the "Approval Order") [D.I. ____],[2] Purchaser hereby designates the entities identified on Schedule A annexed hereto as the assignees of the corresponding Leases and/or Contracts.

**PLEASE TAKE FURTHER NOTICE** that the cure amounts for the Leases and/or Contracts to be assigned pursuant to this Notice and the Approval Order are set forth on Schedule A.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the assumption and assignment of any Lease or Contract must be filed with the Bankruptcy Court and served on counsel for Purchaser at the addresses (including e-mail addresses) set forth in the signature block of this Notice on or before [_], 2018.[3]  If no timely objection to the assumption and assignment of a Lease or Contract is received, the assumption and assignment of such Lease or Contract will become effective automatically pursuant to the Approval Order on the date

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: The Bon-Ton Stores, Inc. (5229); The Bon-Ton Department Stores, Inc. (9309); The Bon-Ton Giftco, LLC (2805); Carson Pirie Scott II, Inc. (2140); Bon-Ton Distribution, LLC (5855); McRIL, LLC (5548); Bonstores Holdings One, LLC (8574); Bonstores Realty One, LLC (8931); Bonstores Holdings Two, LLC (8775); and Bonstores Realty Two, LLC (9075). The headquarters for the above-captioned Debtors is 2801 East Market Street, Bldg. E, York, Pennsylvania 17402.

[2]  Capitalized terms used but not defined in this Notice have the meanings given thereto in the Approval Order.

[3]  [First business day that is at least 15 days from notice date]

identified on <u>Schedule A</u>.  If a timely objection to the assumption and assignment of a Lease or

Contract is timely filed and served by an entity with appropriate standing, such assignment shall

not become effective until agreed to by the parties or ordered by the Court.

Dated: [_], 2018                          **[COUNSEL TO PURCHASER]**
      Wilmington, Delaware

                                      _____

Exhibit 2(b)(xiii)
Form of Lease/Contract Assumption Notice

## Schedule A

| Description | Counterparty Name and Address | Assignee Name and Address | Cure Amount | Effective Date of Assignment |
|---|---|---|---|---|
| | | | | |

Exhibit 3.1(c)
Wind Down Payment Budget

|                                                              | **Budget** |
| ------------------------------------------------------------ | ---------- |
| Expense Vendors                                              | $16.2      |
| Payroll                                                      | 35.5       |
| Severance                                                    | 3.4        |
| Retention                                                    | -          |
| IBNR                                                         | 4.0        |
| Sales Tax                                                    | 7.9[1]     |
| Interest                                                     | -          |
| Professional Fees                                           | 15.8[2]    |
| Contingency                                                  | 1.0        |
| Stub Rent & Free Rent                                        | 8.0        |
| 503(b)(9)                                                    | 2.0        |
| Other                                                        | -          |
| **Total**                                                   | **$93.8**  |
| Plus: Severance and Retention in Agent's Expenses           | 5.7        |
| **Total After Severance and Retention in Agent's Expenses** | **$99.5**  |

---

[1] Reduced to account for the fact that $6 million of sales taxes are already included in the DIP Obligations per email from J. Guglielmo dated April 17, 2018.

[2] For the avoidance of doubt, the Professional Fees shall be paid, without duplication, either as part of the payoff of the DIP Obligations or as part of the Wind Down Payment.

**The Bon-Ton Stores, Inc.**
Exhibit 4.1(c) - Occupancy - Per Diem
Full Company Liquidation Store Closing List
Excludes Distribution Centers

| Store # | Store Name | TOTAL - PER DIEM | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Base Rent | Common Area Maintenance / LL Property Insurance | Real Estate Taxes | Insurance | Building Repair & Maint. | Occupancy Other | Security | Communications | Utilities | Supplies | Equip. Leases | Equip. Maint. | Other Taxes | Total |
| 2 | Hanover | 1,162 | 89 | 362 | 27 | 117 | 20 | 11 | 54 | 194 | 42 | 5 | 4 | - | 2,087 |
| 4 | Lewistown | - | - | 62 | 23 | 78 | 21 | 11 | 41 | 133 | 42 | 5 | 4 | - | 419 |
| 5 | Martinsburg | 458 | 75 | - | 35 | 102 | 18 | 18 | 40 | 172 | 52 | 6 | 4 | 131 | 1,115 |
| 6 | Chambersburg | 581 | 92 | 95 | 22 | 80 | 18 | 10 | 48 | 194 | 43 | 6 | 4 | - | 1,193 |
| 7 | Park City Furn | 941 | 142 | 138 | 12 | 62 | 545 | 14 | 42 | 95 | 31 | 2 | 4 | - | 2,027 |
| 8 | Park City | 749 | 123 | 1,597 | 128 | 385 | 34 | 28 | 52 | 2,023 | 275 | 15 | 4 | - | 5,412 |
| 12 | Cumberland | 767 | 65 | 142 | 31 | 114 | 23 | 20 | 39 | 228 | 74 | 26 | 4 | 36 | 1,568 |
| 14 | Galleria | 2,918 | 146 | 171 | 69 | 279 | 108 | 19 | 54 | 390 | 105 | 12 | 4 | 35 | 4,308 |
| 15 | Uniontown | 893 | - | 170 | 35 | 121 | 46 | 11 | 11 | 384 | 87 | 10 | 4 | 29 | 1,944 |
| 17 | Indiana | 499 | 111 | 84 | 15 | 100 | 19 | 6 | 42 | 155 | 56 | 8 | 4 | - | 986 |
| 18 | Warren | 305 | - | - | 21 | 111 | 21 | 10 | 42 | 158 | 37 | 8 | 4 | - | 714 |
| 19 | Wilton | 722 | 120 | 227 | 27 | 129 | 39 | 28 | 38 | 409 | 74 | 12 | 4 | - | 1,829 |
| 21 | Oil City | 693 | 38 | 23 | 24 | 113 | 20 | 7 | 50 | 142 | 41 | 6 | 4 | - | 1,162 |
| 22 | Brick | 2,118 | 651 | 507 | 33 | 159 | 59 | 34 | 42 | 254 | 67 | 8 | 4 | - | 3,936 |
| 25 | Binghamton | 776 | - | 1,222 | 32 | 126 | 21 | 14 | 41 | 247 | 59 | 7 | 4 | - | 2,550 |
| 26 | Williamsport | 606 | 101 | - | 24 | 95 | 18 | 8 | 39 | 196 | 41 | 5 | 4 | - | 1,294 |
| 28 | Bloomsburg | 455 | - | - | 29 | 86 | 18 | 26 | 39 | 152 | 44 | 5 | 4 | - | 849 |
| 29 | Queensgate | 1,877 | 310 | 450 | 39 | 165 | 166 | 30 | 42 | 320 | 79 | 11 | 4 | 19 | 3,513 |
| 31 | Camp Hill | - | - | 415 | 62 | 461 | 206 | 15 | 52 | 513 | 130 | 10 | 6 | 2 | 1,872 |
| 32 | Colonial Park | 384 | 388 | 295 | 54 | 354 | 110 | 13 | 46 | 443 | 78 | 7 | 4 | - | 2,176 |
| 35 | Reading | 902 | 162 | 985 | 91 | 302 | 205 | 20 | 44 | 510 | 131 | 11 | 4 | - | 3,415 |
| 36 | Greensburg | 126 | 126 | 401 | 42 | 262 | 20 | 20 | 50 | 320 | 79 | 9 | 4 | 52 | 1,344 |
| 37 | Washington | 319 | - | - | 21 | 119 | 16 | 17 | 40 | 219 | 50 | 6 | 4 | 11 | 832 |
| 38 | Midway | 700 | 212 | 225 | 30 | 119 | 19 | 11 | 40 | 194 | 60 | 6 | 4 | 20 | 1,629 |
| 39 | Wilkes-Barre | 747 | 79 | 505 | 55 | 295 | 133 | 13 | 43 | 521 | 106 | 6 | 4 | 39 | 2,549 |
| 43 | Newburgh | 939 | 52 | 359 | 47 | 102 | 23 | 35 | 39 | 291 | 63 | 6 | 4 | - | 1,939 |
| 44 | Ithaca | 1,085 | 147 | 301 | 320 | 138 | 24 | 15 | 53 | 244 | 57 | 14 | 4 | - | 2,393 |
| 46 | Jamestown | 793 | 67 | 19 | 32 | 95 | 22 | 19 | 43 | 220 | 94 | 13 | 4 | - | 1,401 |
| 48 | Waterloo | 1,832 | 534 | 801 | 57 | 128 | 48 | 16 | 44 | 397 | 220 | 13 | 4 | 5 | 3,973 |
| 62 | Eastern Hills | 1,320 | 54 | - | 53 | 336 | 269 | 26 | 44 | 319 | 99 | 10 | 4 | - | 2,528 |
| 63 | Sheridan | 715 | 104 | 78 | 47 | 197 | 235 | 38 | 43 | 300 | 85 | 8 | 4 | - | 1,851 |
| 64 | Southgate | 1,066 | 223 | 242 | 40 | 166 | 190 | 19 | 41 | 249 | 80 | 6 | 4 | - | 2,328 |
| 65 | McKinley | 1,038 | 177 | 95 | 41 | 145 | 143 | 23 | 44 | 203 | 82 | 6 | 4 | - | 2,000 |
| 67 | Lockport | - | - | 343 | 115 | 340 | 19 | 26 | 47 | 212 | 92 | 9 | 4 | - | 1,205 |
| 68 | Olean | 522 | 51 | 57 | 31 | 108 | 20 | 12 | 42 | 166 | 71 | 12 | 4 | - | 1,092 |
| 69 | Niagara | 772 | 314 | - | 31 | 139 | 118 | 19 | 37 | 262 | 64 | 7 | 4 | - | 1,266 |
| 72 | Bethlehem | 1,407 | 70 | 381 | 182 | 223 | 185 | 17 | 44 | 490 | 121 | 25 | 4 | 47 | 3,194 |
| 73 | S. Allentown | 1,191 | 300 | 317 | 61 | 186 | 14 | 14 | 40 | 535 | 98 | 12 | 4 | 47 | 2,830 |
| 76 | Easton | 560 | 42 | 299 | 45 | 162 | 68 | 13 | 44 | 400 | 88 | 10 | 4 | 26 | 1,759 |
| 78 | Quakertown | 420 | 349 | 296 | 41 | 116 | 164 | 30 | 46 | 324 | 89 | 10 | 4 | 1 | 1,873 |
| 81 | Doylestown | 1,668 | 234 | 139 | 52 | 125 | 23 | 25 | 43 | 230 | 174 | 17 | 4 | 1 | 2,739 |
| 84 | Elmira | 531 | 105 | 209 | 24 | 102 | 65 | 50 | 50 | 343 | 73 | 10 | 4 | - | 1,539 |
| 94 | Camillus | 674 | 100 | 375 | 31 | 109 | 35 | 15 | 39 | 172 | 71 | 6 | 4 | - | 1,618 |
| 101 | Dayton Mall | 9,393 | 343 | 605 | 116 | 320 | 35 | 29 | 48 | 692 | 206 | 17 | 4 | - | 11,808 |
| 107 | Haber Heights | 1,255 | 143 | 619 | 62 | 178 | 61 | 28 | 39 | 332 | 101 | 17 | 4 | - | 2,832 |
| 115 | Beavercreek | 2,496 | 232 | 838 | 165 | 276 | 168 | 31 | 107 | 559 | 140 | 18 | 4 | - | 5,034 |
| 117 | Piqua | 370 | 126 | 60 | 29 | 94 | 18 | 8 | 40 | 210 | 52 | 8 | 4 | - | 1,020 |
| 118 | Athens | 518 | 52 | 49 | 235 | 86 | 27 | 10 | 44 | 161 | 37 | 10 | 4 | - | 1,234 |
| 119 | New Philadelphia | 718 | 81 | 289 | 34 | 106 | 198 | 21 | 36 | 380 | 65 | 8 | 4 | 1 | 1,952 |
| 121 | Kettering | 622 | 122 | 423 | 51 | 182 | 24 | 40 | 36 | 358 | 82 | 9 | 4 | - | 1,955 |
| 125 | Lancaster | 420 | 58 | 241 | 29 | 83 | 23 | 10 | 36 | 311 | 51 | 5 | 4 | 1 | 1,272 |
| 126 | Heath | 990 | 82 | 240 | 33 | 103 | 134 | 18 | 39 | 285 | 57 | 7 | 4 | - | 1,992 |
| 128 | Zanesville | - | 89 | 111 | 25 | 141 | 17 | 10 | 39 | 284 | 45 | 7 | 4 | - | 771 |
| 129 | Marion | 1,014 | 138 | 28 | 27 | 94 | 18 | 12 | 41 | 251 | 35 | 6 | 4 | - | 1,667 |
| 130 | Chillicothe | 936 | 125 | 189 | 34 | 102 | 48 | 12 | 39 | 426 | 61 | 7 | 4 | - | 1,983 |
| 132 | Richmond | - | - | 199 | 38 | 141 | 96 | 15 | 40 | 357 | 53 | 7 | 4 | 67 | 1,017 |

**The Bon-Ton Stores, Inc.**
Exhibit 4.1(c) - Occupancy - Per Diem
Full Company Liquidation Store Closing List
Excludes Distribution Centers

TOTAL - PER DIEM

| Store # | Store Name | Base Rent | Common Area Maintenance / LL Property Insurance | Real Estate Taxes | Insurance | Building Repair & Maint. | Occupancy Other | Security | Communications | Utilities | Supplies | Equip. Leases | Equip. Maint | Other Taxes | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 137 | Sandusky | 817 | 632 | 80 | 22 | 142 | 29 | 13 | 36 | 508 | 54 | 7 | 4 | 2 | 2,346 |
| 138 | Plover | 1,439 | 185 | 320 | 35 | 91 | 28 | 12 | 43 | 181 | 71 | 7 | 4 | 17 | 2,443 |
| 140 | Kohler | 1,430 | 231 | 275 | 28 | 90 | 22 | 12 | 59 | 212 | 57 | 11 | 4 | 21 | 2,456 |
| 142 | West Bend | 1,451 | 151 | 286 | 31 | 101 | 33 | 19 | 48 | 270 | 72 | 18 | 4 | 29 | 2,512 |
| 143 | Caldwater | 1,375 | 84 | 156 | 24 | 107 | 18 | 9 | 41 | 204 | 60 | 5 | 4 | 26 | 2,116 |
| 144 | Alliance | 1,261 | 136 | 52 | 59 | 92 | 19 | 15 | 38 | 197 | 54 | 6 | 4 | . | 1,934 |
| 147 | Wooster | 1,042 | 179 | 262 | 32 | 114 | 21 | 17 | 57 | 227 | 53 | 5 | 4 | . | 2,013 |
| 148 | Morgantown | 900 | 80 | 170 | 31 | 117 | 27 | 9 | 40 | 261 | 58 | 13 | 4 | 189 | 1,899 |
| 149 | Warsaw | 1,541 | . | 182 | 42 | 150 | 27 | 12 | 56 | 366 | 83 | 12 | 4 | 51 | 2,580 |
| 151 | Frankfort | 1,326 | 48 | 162 | 27 | 88 | 23 | 14 | 37 | 228 | 62 | 11 | 4 | 76 | 2,105 |
| 152 | Findlay | 992 | 83 | 122 | 36 | 142 | 18 | 11 | 38 | 278 | 51 | 7 | 4 | . | 1,782 |
| 153 | Bowling Green | 505 | 84 | 13 | 21 | 85 | 18 | 8 | 43 | 186 | 46 | 8 | 4 | . | 1,022 |
| 154 | Howell | 1,430 | 199 | 226 | 36 | 129 | 28 | 24 | 53 | 265 | 84 | 7 | 4 | 18 | 2,503 |
| 155 | Westgate | 1,075 | . | 325 | 74 | 367 | 293 | 35 | 46 | 1,008 | 130 | 9 | 6 | . | 3,368 |
| 159 | Monroe | 1,654 | 379 | 302 | 38 | 106 | 380 | 24 | 46 | 431 | 69 | 6 | 6 | 41 | 3,482 |
| 161 | Mtatd | 640 | . | 510 | 46 | 140 | 29 | 21 | 46 | 316 | 73 | 8 | 4 | 43 | 1,939 |
| 163 | Jackson | 838 | 258 | 247 | 40 | 118 | 20 | 23 | 47 | 390 | 75 | 8 | 4 | 44 | 2,113 |
| 173 | Muscatine | 699 | . | . | 21 | 80 | 19 | 13 | 45 | 159 | 40 | 5 | 4 | . | 1,085 |
| 175 | Mattoon | 524 | 76 | 14 | 21 | 94 | 26 | 9 | 47 | 194 | 34 | 14 | 4 | . | 1,059 |
| 178 | Jasper | 1,167 | 136 | 157 | 32 | 108 | 25 | 17 | 47 | 232 | 72 | 10 | 4 | 49 | 2,056 |
| 179 | Terre Haute | 725 | 147 | 249 | 42 | 111 | 23 | 23 | 40 | 356 | 56 | 6 | 4 | 71 | 1,847 |
| 182 | Muncie | 986 | 78 | 284 | 40 | 125 | 79 | 17 | 44 | 259 | 56 | 7 | 4 | 67 | 2,045 |
| 331 | Kokomo | 1,607 | 95 | . | 29 | 111 | 24 | 14 | 48 | 204 | 63 | 9 | 4 | 29 | 2,278 |
| 186 | Green Bay Furn | 665 | . | 40 | 22 | 81 | 591 | 20 | 32 | 126 | 37 | 4 | 4 | 5 | 1,589 |
| 189 | Southtown | 443 | . | 417 | 36 | 126 | 623 | 32 | 112 | 311 | 23 | 4 | 4 | . | 2,129 |
| 199 | Fort Wayne | 2,338 | 171 | 491 | 47 | 166 | 106 | 17 | 46 | 585 | 117 | 7 | 4 | 158 | 4,251 |
| 203 | Clarksburg | 1,556 | 923 | 410 | 34 | 174 | 272 | 31 | 47 | 412 | 80 | 6 | 4 | 186 | 4,134 |
| 205 | Ashland | 832 | 98 | 69 | 26 | 104 | 15 | 10 | 50 | 301 | 50 | 7 | 4 | 62 | 1,598 |
| 206 | Kanwha | 1,144 | 78 | 169 | 35 | 113 | 23 | 26 | 47 | 303 | 66 | 12 | 4 | 188 | 2,209 |
| 209 | Winfield | 1,747 | . | 94 | 105 | 131 | 23 | 16 | 63 | 211 | 87 | 4 | 4 | 83 | 2,554 |
| 310 | St Cloud | 100 | . | 188 | 57 | 276 | 31 | 17 | 63 | 386 | 78 | 12 | 3 | . | 1,214 |
| 311 | Virginia | 908 | 251 | 109 | 43 | 129 | 35 | 19 | 48 | 381 | 100 | 8 | 3 | 17 | 2,033 |
| 312 | Rice Lake | 534 | 212 | 89 | 25 | 137 | 22 | 10 | 45 | 133 | 49 | 6 | 3 | 17 | 1,282 |
| 313 | Fergus Falls | 491 | . | . | 23 | 93 | 19 | 3 | 43 | 158 | 49 | 5 | 3 | 1 | 888 |
| 314 | New Ulm | 592 | . | 79 | 27 | 159 | 19 | 17 | 44 | 181 | 45 | 6 | 3 | 1 | 1,172 |
| 315 | Watertown | 337 | 143 | 29 | 52 | 109 | 27 | 14 | 37 | 191 | 43 | 7 | 3 | . | 992 |
| 316 | Alexandria | 946 | 426 | 293 | 56 | 140 | 27 | 13 | 37 | 192 | 106 | 23 | 3 | 1 | 2,274 |
| 317 | Havre | 472 | 66 | 19 | 30 | 88 | 31 | 7 | 38 | 156 | 36 | 10 | 3 | 12 | 967 |
| 318 | LaCrosse | 1,085 | 93 | 172 | 31 | 200 | 114 | 31 | 51 | 216 | 123 | 9 | 3 | 25 | 2,153 |
| 319 | Albert Lea | 770 | 133 | 155 | 26 | 115 | 38 | 6 | 38 | 216 | 53 | 8 | 3 | . | 1,559 |
| 320 | Moorhead | 1,713 | 34 | 227 | 67 | 194 | 67 | 19 | 42 | 303 | 123 | 10 | 3 | 1 | 2,803 |
| 321 | Bismarck | 1,122 | 117 | 243 | 119 | 171 | 35 | 16 | 45 | 348 | 108 | 11 | 3 | . | 2,339 |
| 323 | Brainerd | 1,332 | 12 | 245 | 49 | 140 | 26 | 18 | 46 | 312 | 104 | 8 | 3 | . | 2,209 |
| 325 | Billings | 765 | 368 | 196 | 32 | 182 | 23 | 13 | 61 | 36 | 57 | 22 | 4 | 43 | 1,801 |
| 326 | Ottumwa | 613 | 176 | 55 | 24 | 126 | 25 | 7 | 43 | 226 | 59 | 6 | 3 | . | 1,362 |
| 327 | Great Falls | . | . | 169 | 48 | 114 | 21 | 9 | 40 | 227 | 68 | 7 | 3 | 45 | 751 |
| 328 | Rapid City | 1,576 | 137 | 270 | 56 | 153 | 22 | 14 | 44 | 534 | 76 | 9 | 3 | . | 2,894 |
| 329 | Rock Springs | 1,330 | 76 | 81 | 31 | 92 | 40 | 46 | 36 | 187 | 52 | 5 | 3 | 11 | 1,991 |
| 330 | Dickinson | 375 | 108 | 103 | 31 | 109 | 19 | 5 | 42 | 147 | 51 | 6 | 3 | . | 999 |
| 331 | Minot | 651 | 73 | 289 | 33 | 118 | 19 | 11 | 50 | 175 | 65 | 5 | 3 | . | 1,494 |
| 332 | Willmar | 1,496 | 261 | 226 | 51 | 178 | 33 | 13 | 66 | 335 | 94 | 5 | 3 | 1 | 2,766 |
| 334 | Norfolk | 1,116 | 281 | 163 | 35 | 126 | 24 | 17 | 39 | 239 | 50 | 5 | 3 | 5 | 2,103 |
| 335 | Hastings | 469 | 52 | 21 | 27 | 91 | 20 | 8 | 55 | 182 | 43 | 5 | 3 | . | 983 |
| 336 | North Platte | 598 | 294 | 108 | 25 | 85 | 18 | 5 | 40 | 145 | 44 | 7 | 3 | 3 | 1,375 |
| 338 | Kearney | 1,138 | 77 | 186 | 56 | 190 | 33 | 14 | 51 | 349 | 123 | 32 | 3 | 16 | 2,268 |
| 339 | Scottsbluff | 1,084 | 102 | 94 | 36 | 151 | 22 | 18 | 48 | 214 | 70 | 8 | 3 | 8 | 1,857 |

2

3

**The Bon-Ton Stores, Inc.**
Exhibit 4.1(c) - Occupancy - Per Diem
Full Company Liquidation Store Closing List
Excludes Distribution Centers

**TOTAL - PER DIEM**

| Store # | Store Name | Base Rent | Common Area Maintenance / L.L. Property Insurance | Real Estate Taxes | Insurance | Building Repair & Maint. | Occupancy Other | Security | Communications | Utilities | Supplies | Equip. Leases | Equip. Maint | Other Taxes | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 340 | Kalispell | 1,177 | 151 | 31 | 64 | 122 | 43 | 20 | 44 | 173 | 84 | 7 | 3 | 19 | 1,937 |
| 341 | Blaine | 1,515 | 183 | 250 | 76 | 315 | 75 | 22 | 47 | 493 | 155 | 14 | 4 | 1 | 3,148 |
| 342 | Stillwater | 1,941 | - | 508 | 86 | 267 | 47 | 23 | 46 | 436 | 137 | 54 | 3 | 1 | 3,549 |
| 343 | Aberdeen | 990 | 167 | 117 | 80 | 107 | 28 | 9 | 43 | 225 | 83 | 7 | 3 | - | 1,861 |
| 344 | Grand Junction | 1,117 | 134 | 211 | 51 | 129 | 26 | 21 | 46 | 286 | 122 | 14 | 3 | 38 | 2,199 |
| 345 | Mankato | 1,004 | 119 | 313 | 48 | 146 | 28 | 27 | 47 | 256 | 94 | 14 | 3 | 1 | 2,101 |
| 348 | Bemidji | 722 | 79 | 96 | 35 | 122 | 24 | 10 | 48 | 202 | 59 | 8 | 3 | 1 | 1,410 |
| 349 | Butte | 808 | 100 | 134 | 55 | 102 | 26 | 13 | 43 | 203 | 68 | 5 | 3 | 15 | 1,576 |
| 351 | Missoula | 1,000 | 221 | 333 | 25 | 166 | 30 | 12 | 39 | 236 | 49 | 12 | 3 | 20 | 2,148 |
| 352 | Fargo | 1,698 | 952 | 247 | 78 | 262 | 87 | 31 | 58 | 707 | 153 | 10 | 4 | - | 4,286 |
| 353 | Rosedale | 1,795 | 1,023 | 708 | 112 | 375 | 136 | 36 | 51 | 722 | 219 | 28 | 3 | - | 5,207 |
| 354 | Midway | - | 355 | 908 | 56 | 219 | 39 | 38 | 44 | 507 | 99 | 9 | 3 | - | 2,278 |
| 355 | Southtown | 2,298 | 1,038 | 1,707 | 83 | 312 | 104 | 17 | 62 | 552 | 202 | 19 | 3 | 0 | 6,399 |
| 356 | Edina | 2,514 | 152 | 613 | 62 | 324 | 33 | 22 | 39 | 791 | 129 | 9 | 3 | 1 | 4,692 |
| 357 | Rochester | 1,018 | 1 | - | 66 | 131 | 44 | 27 | 53 | 709 | 106 | 34 | 3 | - | 2,192 |
| 401 | Ames | 1,007 | 84 | 211 | 24 | 102 | 34 | 8 | 50 | 167 | 62 | 10 | 3 | - | 2,192 |
| 402 | Mason City | 708 | 196 | 23 | 31 | 144 | 31 | 19 | 70 | 266 | 64 | 6 | 3 | - | 1,560 |
| 403 | Fort Dodge | 600 | 54 | 20 | 27 | 108 | 41 | 12 | 72 | 170 | 76 | 10 | 3 | - | 1,195 |
| 404 | Marshalltown | 373 | 60 | 17 | 41 | 99 | 21 | 8 | 60 | 195 | 58 | 8 | 3 | 22 | 940 |
| 406 | Oak View | 1,926 | 192 | 476 | 81 | 199 | 36 | 16 | 79 | 650 | 198 | 11 | 4 | 22 | 3,890 |
| 408 | Waterloo | 646 | 36 | 122 | 35 | 174 | 21 | 21 | 44 | 292 | 84 | 8 | 3 | - | 1,483 |
| 409 | Austin | 255 | 45 | - | 24 | 116 | 17 | 9 | 45 | 389 | 43 | 6 | 3 | 1 | 953 |
| 410 | Merle Hay | - | 231 | 496 | 62 | 252 | 329 | 19 | 45 | 411 | 141 | 8 | 3 | - | 1,828 |
| 412 | Coralville | - | 142 | 604 | 59 | 361 | 44 | 17 | 49 | 275 | 141 | 8 | 3 | - | 1,704 |
| 413 | Lindale Plaza | 868 | 182 | 732 | 53 | 228 | 37 | 19 | 44 | 416 | 131 | 8 | 3 | - | 2,722 |
| 414 | Jordan Creek | 2,117 | 192 | 760 | 98 | 290 | 75 | 32 | 50 | 516 | 169 | 16 | 3 | - | 4,318 |
| 418 | Dubuque | 721 | 242 | 319 | 54 | 161 | 195 | 46 | 57 | 525 | 116 | 8 | 3 | - | 2,447 |
| 419 | Westroads | 118 | 1,064 | 520 | 129 | 330 | 56 | 45 | 77 | 689 | 263 | 18 | 3 | 45 | 3,356 |
| 421 | Davenport | 649 | 263 | 292 | 35 | 152 | 121 | 14 | 45 | 270 | 77 | 7 | 4 | 2 | 1,960 |
| 422 | Moline | 1,188 | 56 | 264 | 30 | 199 | 144 | 23 | 48 | 315 | 82 | 12 | 3 | - | 2,457 |
| 423 | Southridge | 539 | - | - | 94 | 148 | 63 | 14 | 44 | 367 | 64 | 8 | 7 | - | 1,352 |
| 424 | Sioux Falls | 1,223 | 295 | 325 | 114 | 241 | 42 | 13 | 51 | 469 | 160 | 10 | 3 | - | 3,022 |
| 429 | Southern Hills | 1,012 | 270 | 667 | 27 | 241 | 309 | 23 | 51 | 284 | 113 | 10 | 3 | - | 2,853 |
| 430 | West Burlington | 779 | 168 | 101 | 27 | 97 | 151 | 26 | 65 | 300 | 56 | 10 | 3 | 38 | 1,674 |
| 432 | Eau Claire | - | 187 | 396 | 53 | 173 | 197 | 20 | 52 | 372 | 91 | 10 | 3 | - | 1,707 |
| 437 | Valley West | 981 | 193 | 1,512 | 410 | 364 | 44 | 26 | 74 | 519 | 278 | 27 | 3 | 12 | 4,546 |
| 438 | Muskegon | 452 | 196 | 305 | 69 | 124 | 21 | 20 | 32 | 550 | 43 | 6 | 3 | 49 | 1,558 |
| 439 | Sturgeon Bay | - | 275 | 102 | 29 | 148 | 224 | 40 | 146 | 184 | 185 | 6 | 3 | 13 | 1,343 |
| 440 | Grandville | 524 | 116 | 589 | 95 | 249 | 32 | 10 | 62 | 775 | 49 | 28 | 3 | 85 | 2,431 |
| 443 | Traverse City | 930 | 176 | - | 35 | 86 | 50 | 8 | 48 | 385 | 89 | 10 | 3 | 14 | 1,301 |
| 445 | Lansing | 1,555 | 210 | 286 | 52 | 168 | 83 | 31 | 48 | 473 | 110 | 9 | 3 | 73 | 3,163 |
| 447 | Lincoln | 308 | 16 | 277 | 59 | 295 | 30 | 13 | 57 | 377 | 88 | 6 | 3 | 11 | 2,362 |
| 448 | Mansfield | - | - | 16 | 21 | 83 | 52 | 13 | 58 | 171 | 88 | 11 | 1 | 14 | 830 |
| 449 | Duluth | 124 | - | 600 | 203 | 311 | 329 | 51 | 51 | 767 | 278 | 11 | 3 | - | 2,421 |
| 451 | Grand Island | 467 | 59 | 85 | 29 | 106 | 40 | 8 | 42 | 217 | 69 | 6 | 3 | 1 | 1,129 |
| 457 | Bay Park | 2,556 | 78 | 717 | 92 | 198 | 166 | 31 | 72 | 406 | 135 | 13 | 4 | - | 4,521 |
| 463 | Holland | 399 | 152 | 49 | 44 | 91 | 52 | 10 | 47 | 254 | 79 | 8 | 4 | 31 | 1,219 |
| 464 | Okemos | 4,083 | 293 | 943 | 74 | 238 | 329 | 29 | 42 | 826 | 172 | 9 | 4 | 82 | 7,120 |
| 465 | Port Huron | 791 | - | - | 30 | 96 | 40 | 15 | 51 | 308 | 68 | 8 | 3 | 25 | 1,244 |
| 475 | Bay City | 1,836 | 170 | 101 | 57 | 136 | 390 | 23 | 53 | 481 | 138 | 8 | 3 | 20 | 2,661 |
| 501 | Bloomington | 616 | 885 | 377 | 65 | 264 | 122 | 25 | 63 | 412 | 147 | 8 | 3 | - | 1,438 |
| 502 | LaSalle Peru | 524 | 86 | 95 | 59 | 157 | 136 | 24 | 53 | 378 | 80 | 11 | 3 | - | 3,614 |
| 503 | Pekin | 384 | 115 | 144 | 139 | 139 | 19 | 33 | 49 | 241 | 73 | 8 | 3 | - | 1,695 |
| 504 | Champaign | 1,351 | 546 | 143 | 66 | 208 | 140 | 26 | 73 | 699 | 146 | 11 | 3 | - | 3,410 |
| 505 | Galesburg | 493 | 95 | 49 | 34 | 117 | 24 | 27 | 58 | 311 | 47 | 6 | 4 | - | 1,262 |
| 507 | Quincy | 112 | 226 | 232 | 63 | 150 | 92 | 41 | 123 | 365 | 91 | 11 | 4 | - | 1,511 |

**The Bon-Ton Stores, Inc.**
Exhibit 4.1(c) - Occupancy - Per Diem
Full Company Liquidation Store Closing List
Excludes Distribution Centers

| Store # | Store Name | Base Rent | Common Area Maintenance / LL Property Insurance | Real Estate Taxes | Insurance | Building Repair & Maint. | Occupancy Other | Security | Communications | Utilities | Supplies | Equip. Leases | Equip. Maint. | Other Taxes | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 508 | Forsyth | 92 | 280 | 251 | 42 | 185 | 112 | 24 | 58 | 298 | 74 | 7 | 3 | - | 1,427 |
| 510 | Janesville | 573 | 75 | 284 | 80 | 157 | 36 | 18 | 106 | 315 | 97 | 10 | 4 | 22 | 1,778 |
| 511 | Sterling | 837 | 168 | 10 | 27 | 107 | 21 | 17 | 116 | 206 | 63 | 7 | 3 | - | 1,582 |
| 512 | Cherryvale | 1,060 | 180 | 490 | 89 | 206 | 46 | 65 | 46 | 483 | 153 | 11 | 3 | - | 2,833 |
| 515 | Joliet | 1,895 | 108 | 229 | 71 | 185 | 96 | 29 | 113 | 589 | 153 | 12 | 4 | 6 | 3,487 |
| 516 | Spring Hill | - | 207 | 325 | 68 | 178 | 32 | 21 | 135 | 416 | 127 | 11 | 4 | 0 | 1,523 |
| 517 | Randhurst | 1,385 | 352 | 2,216 | 119 | 312 | 99 | 41 | 68 | 511 | 288 | 28 | 3 | 2 | 5,423 |
| 518 | White Oaks | 324 | 41 | 390 | 65 | 210 | 138 | 23 | 59 | 673 | 123 | 11 | 3 | - | 2,059 |
| 519 | Milwaukee Grand Ave | 18 | 128 | 276 | 28 | 294 | 104 | 185 | 73 | 988 | 99 | 6 | 3 | - | 2,204 |
| 520 | Bayshore | 1,230 | 182 | 571 | 113 | 477 | 65 | 38 | 76 | 843 | 245 | 38 | 4 | 165 | 4,045 |
| 521 | Racine | 1 | 178 | 494 | 61 | 256 | 32 | 14 | 99 | 501 | 134 | 11 | 4 | 71 | 1,855 |
| 522 | Brookfield | 4,254 | 24 | 847 | 209 | 550 | 122 | 25 | 50 | 1,447 | 346 | 49 | 5 | 151 | 8,078 |
| 523 | Southridge | 3,575 | 682 | 901 | 113 | 451 | 234 | 33 | 87 | 927 | 222 | 23 | 4 | 195 | 7,446 |
| 526 | East Towne | 1,526 | 194 | 321 | 78 | 165 | 204 | 20 | 63 | 630 | 144 | 10 | 4 | 63 | 3,422 |
| 527 | Mayfair | 3,897 | 241 | 1,335 | 142 | 571 | 225 | 77 | 87 | 1,286 | 306 | 50 | 4 | 243 | 8,463 |
| 528 | West Towne | 3,016 | 195 | 420 | 105 | 281 | 96 | 21 | 73 | 558 | 212 | 34 | 4 | 103 | 5,119 |
| 529 | Brookfield Furniture | 2,334 | - | 270 | 43 | 157 | 1,223 | 8 | 65 | 171 | 41 | 10 | 4 | 8 | 4,333 |
| 530 | Evergreen | 2,395 | 93 | 92 | 106 | 356 | 122 | 44 | 119 | 635 | 204 | 34 | 4 | 2 | 4,206 |
| 531 | Yorktown | 2,358 | 519 | 755 | 175 | 561 | 123 | 48 | 147 | 736 | 365 | 20 | 4 | - | 5,810 |
| 532 | Woodmar | 629 | 258 | 1 | 53 | 299 | 64 | 20 | 108 | 399 | 147 | 10 | 3 | 94 | 2,084 |
| 533 | Edens Plaza | - | 615 | 1,729 | 92 | 273 | 58 | 33 | 97 | 590 | 290 | 22 | 3 | 1 | 3,802 |
| 535 | Stratford Square | 1,347 | 369 | 342 | 69 | 237 | 95 | 33 | 69 | 381 | 135 | 11 | 3 | 7 | 3,099 |
| 536 | Chicago Ridge | 2,233 | 86 | 2,236 | 126 | 331 | 52 | 44 | 82 | 616 | 293 | 28 | 3 | 8 | 6,140 |
| 539 | Harlem Irving | 2,308 | 2,678 | 1,211 | 232 | 435 | 83 | 69 | 64 | 698 | 320 | 32 | 5 | 13 | 8,148 |
| 541 | North Riverside | 1,447 | 905 | 1,372 | 112 | 692 | 205 | 58 | 68 | 679 | 208 | 15 | 5 | 5 | 5,372 |
| 542 | Southlake | 1,068 | 194 | 624 | 93 | 266 | 51 | 29 | 58 | 783 | 207 | 11 | 3 | 111 | 3,498 |
| 543 | Orland Square | 1,603 | 68 | 1,960 | 170 | 356 | 73 | 40 | 82 | 650 | 448 | 51 | 3 | - | 5,506 |
| 546 | Yorktown Furniture | 1,542 | 150 | 505 | 35 | 74 | 996 | 18 | 72 | 119 | 29 | 5 | 3 | 2 | 3,602 |
| 547 | Lyons Furniture | 2,607 | 59 | 911 | 29 | 81 | 915 | 18 | 106 | 106 | 34 | 5 | 3 | - | 4,221 |
| 548 | Schaumburg Furniture | 1,663 | 158 | 1,011 | 36 | 87 | 807 | 23 | 49 | 118 | 32 | 5 | 3 | - | 3,994 |
| 549 | Michigan City | 53 | 170 | - | 44 | 127 | 21 | 19 | 74 | 366 | 80 | 7 | 3 | 61 | 1,026 |
| 550 | Hawthorn | 450 | 378 | 207 | 64 | 212 | 41 | 39 | 91 | 583 | 146 | 8 | 3 | 2 | 2,223 |
| 551 | Ford City | 539 | 218 | 686 | 82 | 204 | 185 | 64 | 60 | 1,404 | 203 | 11 | 3 | - | 3,658 |
| 552 | Lincolnwood | 2,696 | - | 2,025 | 90 | 281 | 61 | 40 | 62 | 823 | 207 | 18 | 3 | - | 6,309 |
| 553 | Bridge | 2,311 | 63 | 430 | 63 | 161 | 147 | 67 | 67 | 431 | 120 | 10 | 3 | 2 | 3,873 |
| 554 | St Charles | 1,176 | - | - | 49 | 194 | 119 | 43 | 67 | 740 | 130 | 10 | 3 | - | 2,532 |
| 555 | Hawthorn Furniture Gallery | 1,563 | 175 | - | - | 72 | 462 | 11 | - | - | - | - | 3 | - | 2,287 |
| 556 | Fox Valley | 660 | 387 | 349 | 163 | 436 | 29 | 35 | 66 | 676 | 125 | 8 | 4 | - | 2,938 |
| 561 | Orland Park Furniture | 2,186 | 72 | - | 57 | 81 | 1,267 | 15 | 52 | 155 | 36 | 4 | 4 | - | 3,929 |
| 563 | Grand Prairie | 2,588 | 257 | 835 | 122 | 276 | 33 | 29 | 66 | 503 | 232 | 15 | 4 | 0 | 4,961 |
| 571 | Laurel Park | 4,792 | - | 543 | 135 | 402 | 67 | 42 | 123 | 1,005 | 360 | 16 | 4 | 108 | 7,597 |
| 572 | Rochester Hills | 13 | 219 | 390 | 103 | 357 | 38 | 31 | 56 | 651 | 230 | 19 | 4 | 97 | 2,209 |
| 573 | Partridge Creek | 2,237 | 179 | 421 | 157 | 196 | 33 | 16 | 43 | 697 | 200 | 10 | 4 | 53 | 4,247 |
| 579 | Naperville Frn Clear | 242 | - | 62 | 11 | 86 | 259 | 9 | 1 | 619 | 39 | - | 1 | - | 1,331 |
| 212 | Total | 230,444 | 39,426 | 73,743 | 12,953 | 39,000 | 22,497 | 4,725 | 11,540 | 82,672 | 22,322 | 2,419 | 779 | 4,513 | 547,032 |

## EXHIBIT 8.1

## SALE GUIDELINES

A.     The Sale shall be conducted so that the Stores in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Stores.

B.     The Sale shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Store on a Sunday.

C.     On "shopping center" property, Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Store is located; provided that Agent may solicit customers in the Stores themselves. On "shopping center" property, Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

D.     At the conclusion of the Sale or the Designation Rights Period, as applicable, Agent shall vacate the Stores in broom clean condition; provided that Agent may abandon any FF&E not sold in the Sale at the Stores, the Distribution Centers, the Headquarters, or Merchant's other corporate offices at the conclusion of the Sale or the Designation Rights Period, as applicable, without cost or liability of any kind to Agent.  Any abandoned FF&E left in a Store or Distribution Center, the Headquarters, or Merchant's other corporate offices after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant.  For the avoidance of doubt, as of the Sale Termination Date or termination of the Designation Rights Period, as applicable, Agent may abandon, in place and without further responsibility or liability of any kind, any FF&E located at a Store or, Distribution Center, the Headquarters, or Merchant's other corporate offices.

E.     Following, and subject to, the entry of the Approval Order, Agent may advertise the Sale as a "store closing", "sale on everything", "everything must go" or similar-themed sale, as dictated by the Approval Order.

F.     Agent shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sale; provided, however, that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Merchant and Agent shall not use neon or day-glo on its display, hanging signs, or interior banners.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines.  In addition, the Merchant and Agent shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Store, shall not be wider than the storefront of the Store, and shall not be larger than 4 feet x 40 feet.  In addition, the Merchant and Agent shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Approval Order. Nothing contained in these Sale Guidelines shall be construed to create or impose upon Agent any additional restrictions not contained in the applicable lease agreement.

F.      Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

G.      Except with respect to the hanging of exterior banners, Agent shall not make any alterations to the storefront or exterior walls of any Stores.

H.      Agent shall not make any alterations to interior or exterior Store lighting. No property of the landlord of a Store shall be removed or sold during the Sale. The hanging of exterior banners or in-Store signage and banners shall not constitute an alteration to a Store.

I.      Agent shall keep Store premises and surrounding areas clear and orderly consistent with present practices.

J.      Subject to the provisions of the Agreement, Agent shall have the right to sell all Owned FF&E at the Closing Stores and the Distribution Centers, the Headquarters and (subject to any side letter between JV Agent and Purchaser, which shall not in any way affect Merchant's rights under the Agreement) and Purchaser shall have the right to sell all Owned FF&E at the Designation Rights Stores and the Nebraska Distribution Center.  JV Agent may advertise the sale of the Owned FF&E in a manner consistent with these guidelines at the Closing Stores and the Indiana Distribution Center and Purchaser may advertise the sale of the Owned FF&E in a manner consistent with these guidelines at the Designation Rights Stores and the Nebraska Distribution Center.  The purchasers of any Owned FF&E sold during the sale shall be permitted to remove the Owned FF&E either through the back shipping areas at any time, or through other areas after applicable business hours. For the avoidance of doubt, as of the Sale Termination Date or the termination of the Designation Rights Period, as applicable, Agent may abandon, in place and without further responsibility, any FF&E at the Stores, the Distribution Centers, the Headquarters, and Merchant's other corporate offices.

K.      Agent shall be entitled to include Additional Agent Merchandise in the Sale in accordance with the terms of the Approval Order and the Agreement.

L.      At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Stores' premises as set forth in the applicable leases.  The Merchant, Agent and their agents and representatives shall continue to have access to the Stores as provided for in the Agreement.

M.      Post-petition rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease.  Agent shall have no responsibility to the landlords therefor.

N.      The rights of landlords against Merchant for any damages to a Store shall be reserved in accordance with the provisions of the applicable lease.

O.      If and to the extent that the landlord of any Store affected hereby contends that Agent or Merchant is in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant, JV Agent and Purchaser as follows:

> If to Agent:

Great American Group, LLC
Attn:   Scott Carpenter (scarpenter@greatamerican.com)

Alan Forman (aforman@brileyfin.com)

*and*

Tiger Capital Group, LLC
Attn:    Christopher Huber (chuber@tigergroup.com)
         Mark Naughton (mnaughton@tigergroup.com)

*and*

Wilmington Savings Fund Society, FSB
Attn:    ☐

*With copies (which shall not constitute notice) to:*

Lowenstein Sandler LLP
Counsel to Great American Group LLC
Attn:    Kenneth A. Rosen (krosen@lowenstein.com)
         Andrew Behlmann (abehlmann@lowenstein.com)

*and*

Kilpatrick Townsend & Stockton LLP
Counsel to WSFS
Attn:    David Posner (dposner@kilpatricktownsend.com)

*and*

Jones Day
Counsel to Second Lien Noteholders
Attn:    Sidney P. Levinson (slevinson@jonesday.com)
         Joshua M. Mester (jmester@jonesday.com)
         John Kane (jkkane@jonesday.com)

<u>If to Merchant</u>:

with a copy (which shall not constitute notice) to: