**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| THE BON-TON STORES, INC., *et al.*,[1] | Case No. 18-10248 (MFW) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date:  January 31, 2019 at 10:30 a.m. (ET)**<br>**Objection Deadline: January 24, 2019 at 4:00 p.m. (ET)** |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) DISMISSING THE
DEBTORS' CHAPTER 11 CASES; (II) ESTABLISHING PROCEDURES WITH
RESPECT TO FINAL FEE APPLICATIONS; (III) DIRECTING THE DEBTOR
ENTITIES TO BE DISSOLVED; AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the

"<u>Debtors</u>") hereby submit this motion (this "<u>Motion</u>") for entry of orders, substantially in the

forms attached hereto as <u>Exhibit A</u> and <u>Exhibit B</u> (the "<u>Initial Order</u>," and the "<u>Dismissal Order</u>,"

respectively, and together, the "<u>Proposed Orders</u>"):  (a) dismissing the Debtors' chapter 11 cases

(collectively, the "<u>Chapter 11 Cases</u>"); (b) authorizing, but not directing, the Debtors to abandon

and destroy any and all remaining books and records that are not designated by the Purchaser

(defined below) prior to the Designation Rights Termination Date (defined below), as applicable;

(c) approving procedures for the filing and approval of final fee applications by professionals

retained in the Chapter 11 Cases (collectively, the "<u>Professionals</u>"), and providing for payment

of fees incurred by the Professionals in the Chapter 11 Cases ("<u>Professional Fees</u>"); (d) directing

the Debtors to be dissolved on the terms provided for in the Initial Order and Dismissal Order,

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax
identification number, are:  The Bon-Ton Stores, Inc. (5229); The Bon-Ton Department Stores, Inc. (9309); The
Bon-Ton Giftco, LLC (2805); Carson Pirie Scott II, Inc. (2140); Bon-Ton Distribution, LLC (5855); McRIL, LLC
(5548); Bonstores Holdings One, LLC (8574); Bonstores Realty One, LLC (8931); Bonstores Holdings Two, LLC
(8775); and Bonstores Realty Two, LLC (9075).  The mailing address for the above-captioned Debtors is P.O. Box
20159, York, Pennsylvania 17402.

respectively; and (e) providing such other related relief as is just and necessary.  In support of the

Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT[2]

1.      The Debtors initiated these Chapter 11 Cases with the objective of

maximizing value for their stakeholder by either reorganizing or selling substantially all of their

assets on a going concern basis.  In furtherance thereof, on the Petition Date, the Debtors filed

the Sale Motion and continued marketing their assets in an effort to preserve the Debtors'

business as a going concern, save thousands of jobs and maintain a department store business

upon which hundreds of vendors and landlords could continue to depend.

2.      Despite overseeing an active sale process, in which potential purchasers

conducted extensive due diligence and engaged with the Debtors with respect to various

transactional structures, the Debtors were unable to obtain a going concern outcome and,

therefore, conducted a lengthy auction to obtain the highest and best bid for the Debtors' assets.

Ultimately, the Court entered that certain *Order, Pursuant to Sections 105, 363, and 365 of the*

*Bankruptcy Code, Approving Sale of Certain of the Debtors' Assets and Granting Related Relief*

[D.I. 632] (the "Sale Order"), pursuant to which the Court approved the sale of the Assets (the

"Sale") to (a) a contractual joint venture comprised of GA Retail, Inc. and Tiger Capital Group,

LLC (together, the "Agent") and (b) Wilmington Savings Fund Society, FSB, as the indenture

agent and collateral trustee for the 8.00% second-lien senior secured notes due 2021 issued by

BDTS (together with the Agent, the "Purchaser").

3.      In connection with the Sale, and pursuant to the Agency Agreement

executed in connection therewith and negotiated with the Committee's input, the Purchaser

---

[2]      Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to such terms elsewhere in this Motion.

obtained, among other things, designation rights (the "Designation Rights") with respect to certain of the Assets, and the Debtors have worked (and continue to work) cooperatively with the Purchaser as it exercises and implements those Designation Rights while the Debtors simultaneously wind down their affairs.  Under the terms of the Agency Agreement, the Designation Rights period was set to expire on December 31, 2018, but was extended by agreement of the parties to the Agency Agreement to January 31, 2019 (the "Designation Rights Termination Date" and the period expiring upon such date, the "Designation Rights Period"). The Designation Rights include the Purchaser's right to designate certain assets that will vest in the Purchaser or its designee on or before the Designation Rights Termination Date, with the remainder, if any, reverting to the Debtors' estates.

4.      Throughout the Designation Rights Period, the Debtors have utilized the Wind-Down Payment and Expense budget to meet their ongoing administrative expense liabilities and, in furtherance thereof, have also satisfied 503(b)(9) Claims and Stub Rent Claims on the terms memorialized in the Agency Agreement and negotiated by the Committee. Although the Debtors did not establish an administrative claims bar date, the Debtors have worked diligently to satisfy undisputed postpetition administrative expense claims in the ordinary course while simultaneously meeting their obligations under the Agency Agreement.  It is anticipated that the Purchaser will designate all Assets with meaningful value by the Designation Rights Termination Date, a process which is well underway,[3] and upon the passage of the Designation Rights Termination Date there will not be any remaining assets of meaningful value to monetize for the benefit of the Debtors' creditors.  The only remaining Asset of any

---

[3]      The Purchaser, or the Debtors on its behalf, have filed at least ten notices designating certain assets for disposition as of the filing hereof.

01:24012653.4

value, the AMT Refund[4] detailed below, is subject to the Second Lien Noteholders' valid, perfected lien and, accordingly, the Debtors seek to abandon their interest in such AMT Refund in connection with the relief requested herein.

5.      For these reasons, and those further set forth below, there is no reasonable prospect of distributions from any Debtor's estate to any holders of prepetition unsecured claims against the Debtors (other than prepetition claims arising under section 503(b)(9) of the Bankruptcy Code, which have been paid *pro rata* pursuant to the negotiated terms of the Sale Order and the processes established thereby), and the estates do not and will not have available funds to satisfy any additional administrative expense claims, priority claims or general unsecured claims.

6.      Although the Debtors, in consultation the Committee, have explored alternative options to bring the Chapter 11 Cases to a conclusion, the Debtors—with the support of the Committee—believe that it is clear that a dismissal is the most expeditious and cost-effective mechanism to wind down the Debtors' affairs.  In reaching this conclusion, the Debtors determined that a dismissal would not negatively impact creditors (vis-à-vis a chapter 11 plan or conversion to chapter 7) because there are no remaining assets of any value available for distributions to unsecured creditors or to support the administrative costs of pursuing anything other than the prompt exit from bankruptcy.  In fact, upon the passage of the Designation Rights Termination Date, the Debtors will not have any funds available to pay any costs incurred on and after February 1, 2019, other than Professional Fees incurred through the date of dismissal, subject to the Carve-Out and the Carve-Out Reserve, as applicable.  In seeking approval of the

---

[4]      As explained herein, the ability to realize any value for the AMT Refund is contingent on the Debtors maintaining appropriate corporate standing such that each Debtor is positioned to file tax returns in the upcoming years.  For the reasons set forth in this Motion, the Debtors believe that each Debtor entity should nevertheless be dissolved upon the dismissal of the Chapter 11 Cases, which will foreclose such entities' ability to process applicable tax returns and, consequently, realize the full value of the AMT Refund.

dismissal of these Chapter 11 Cases pursuant to the Initial Order and Dismissal Order, respectively, the Debtors are cognizant of the Supreme Court's decision in *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017) and the propriety of "structured" dismissals.

7.     Therefore, the Debtors, with the support of the Committee, request the dismissal of the Chapter 11 Cases and related relief on the terms set forth in the Proposed Orders attached hereto.

## JURISDICTION AND VENUE

8.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to rule 9013-l(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     The statutory bases for the relief requested herein are pursuant to sections 105(a), 305, 349, 363(b)(1), 726, 554(a), and 1112(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 1017, 2002, 6007 and 9013 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 1017-2.

01:24012653.4

# BACKGROUND

**A.    General Background**

11.    On February 4, 2018 (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.    On February 15, 2018, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee") in these Chapter 11 Cases.

**B.    Background Regarding Prepetition Debt, the DIP Facility, the Sale, and Liens and Superiority Claims Granted to the Agent**

*A.    Prepetition Debt*

13.    As detailed in the First Day Declaration and the *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing; (II) Authorizing the Debtors' use of Cash Collateral; (III) Granting Adequate Protection of Prepetition Secured Parties; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [D.I. 17] (the "DIP Motion")[5], the Debtors had, as of the Petition Date, prepetition funded secured indebtedness in the principal amount of approximately $875 million.

14.    Under the Prepetition ABL Documents, the Prepetition ABL Lenders provided revolving credit and other financial accommodations to, and issued letters of credit for the account of, the Prepetition ABL Borrowers. The Prepetition ABL Facility consisted of up to $730,000,000 in Prepetition Tranche A Revolver Loans and up to $150,000,000 in Tranche A-1 Revolver Loans.  As of the Petition Date, the aggregate principal amount outstanding under the

---

[5]    Capitalized terms used in this summary of the Debtors' prepetition secured indebtedness shall be ascribed the definitions used in the DIP Motion.

Prepetition ABL Facility was not less than approximately $525 million, including approximately

$339 million in outstanding Prepetition Tranche A Revolver Loans, approximately $150 million

in outstanding principal amount of "second out" Prepetition Tranche A-1 Revolver Loans, and

approximately $36 million in letters of credit.  As detailed below, the Prepetition ABL

Obligations were rolled up, in full, in connection with the Court-approved DIP Financing.

15.     In addition, pursuant to the Second Lien Indenture and the Prepetition

Second Lien Documents, The Bon-Ton Department Stores, Inc. incurred approximately $350

million in indebtedness to certain Second Lien Noteholders of Prepetition Second Lien Notes,

which remained outstanding, in full, as of the Petition Date.

16.     The rights and priorities of the Prepetition ABL Administrative Agent and

the Indenture Trustee were governed by the Intercreditor Agreement dated as of July 9, 2012.

B.     *DIP Financing*

17.     On the Petition Date, the Debtors sought entry of interim and final orders

authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis

consisting of a senior secured superpriority credit facility in the aggregate principal amount of up

to $725,000,000 (the "DIP Facility") consisting of (a) $600,000,000 in DIP Tranche A Loans and

(b) $125,000,000 in DIP Tranche A-1 Loans, from Bank of America, N.A. and DIP

Administrative Agent, Wells Fargo Bank, National Association as DIP Co-Collateral Agent, and

Crystal Financial LLC as DIP Tranche A-1 Documentation Agent.

18.     On March 12, 2018, the Court entered an order [D.I. 352] (the "Final DIP

Order")[6] authorizing the Debtors to, *inter alia*, obtain the DIP Financing on the terms proposed

in the DIP Motion, as modified by the Final DIP Order.  The DIP Financing provided the

---

[6]     *See Final Order (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief* [D.I. 352].

01:24012653.4

Debtors with funding to maintain their operations during the outset of the Chapter 11 Cases, satisfy the administrative costs incurred during the Chapter 11 Cases prior to the Closing Date (defined below), and pursue—and ultimately consummate—the Sale.

19.     The DIP Facility was paid off and satisfied, in full, in connection with proceeds realized from the Sale.

C.     *The Sale*

20.     On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of (A) an Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures, Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, and (III) Granting Related Relief; and (B) an Order (I) Approving Asset Purchase Agreement, (II) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [D.I. 18] (the "Sale Motion").

21.     On March 12, 2018, the Court entered that certain *Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures and Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, and (III) Granting Related Relief* [D.I. 348].

22.     On April 16, 2018, and April 17, 2018, the Debtors conducted an auction for all or substantially all of the Debtors' assets (collectively, the "Assets").

23. On April 18, 2018, the Court entered the Sale Order, pursuant to which the Court approved the Sale to the Purchaser. The Sale closed on April 19, 2018 (the "Closing Date").

24. In connection with the Sale, and pursuant to the Agency Agreement attached as Exhibit A to the Sale Order (the "Agency Agreement"), the Purchaser obtained, among other things, Designation Rights with respect to certain Assets, and, as noted above, the Debtors are working cooperatively with the Purchaser as it exercises and implements those Designation Rights in advance of the Designation Right Termination Date.

25. Pursuant to the Agency Agreement, the Agent was obligated to pay certain expenses (the "Expenses") and fund certain wind-down payments (the "Wind-Down Payment") pursuant to a Wind-Down Budget (the "Budget") to be implemented during the Designation Rights Period. Specifically, the Wind-Down Payment consisted of $93,800,000, which could be spent on specific Budget items set forth in the Agency Agreement. In addition, the Agent was responsible for certain Expenses as set forth in Section 4.1 of the Agency Agreement, and further supplemented by Schedule 4.1(c) to the Agency Agreement.

26. Upon the closing of the Sale, and after conducting negotiations with the Committee, the Agent assumed the obligation to pay (a) $2,000,000 (the "503(b)(9) Cap") on account of claims against the Debtors arising under section 503(b)(9) of the Bankruptcy Code (such claims, collectively, the "503(b)(9) Claims"), and (b) $8,000,000 (the "Stub Rent Cap") on account of claims against the Debtors consisting of stub rent (i.e. rent and related costs due, but not paid, for occupancy charges related to the Debtors' operation of leased retail locations between February 4, 2018, and February 28, 2018) and April 2018 rent waived by certain landlords with respect to 54 of the Debtors' retail locations (such "free rent" and stub rent

collectively referred to herein, and in the Agency Agreement, as "Stub Rent," and claims related thereto, collectively, the "Stub Rent Claims").  Amounts equal to the 503(b)(9) Cap and the Stub Rent Cap, which comprise components of the Wind-Down Payment, were placed into a segregated account established by the Agent and held in trust for the benefit of holders of 503(b)(9) Claims and Stub Rent Claims, respectively.  On April 30, 2018, the Debtors filed that certain *Notice of Proposed Amounts for Stub Rent Claims and 503(b)(9) Claims* [D.I. 662] (the "Claims Notice").  Prior to the objection deadline established in conjunction therewith, the Debtors worked with landlords and vendors to resolve any formal and informal responses to the Claims Notice, and in furtherance thereof, filed that certain *Notice of Revised Final Amounts for Stub Rent Claims and 503(b)(9) Claims* [D.I. 856] (the "Revised Claims Notice") on June 18, 2018.  As set forth therein, the Debtors have made all payments to the creditors identified on the exhibits annexed to the Revised Claims Notice in the amounts designated on such exhibits.

27.     The Sale Order and the Agency Agreement also authorized the establishment of the Carve Out Account (as defined in the Agency Agreement), which was funded in the amount of $15,800,000 for the purposes of satisfying Professional Fees incurred in these Chapter 11 Cases.  As of the date hereof, approximately $1,530,000 remains in the Carve Out Account, subject to further reduction for fees incurred by applicable Professionals and subject to the final fee process outlined herein.

28.     The Purchaser had authority to operate the Debtors' retail locations which were subject to nonresidential real property leases from the Closing Date through and including September 2, 2018 (the "Outside Operating Date"), subject to landlords consenting to a further extension.  As the Purchaser concluded its liquidation of the Debtors' inventory at the Debtors' retail locations, but no later than the Outside Operating Date, the Debtors, upon the direction of

the Purchaser, sought and obtained authority to reject their leases of nonresidential real property and, in furtherance thereof, tendered possession of such stores to applicable landlords. Since the passage of the Outside Operating Date, the Purchaser, with the Debtors' assistance, has been principally focused on monetizing the Debtors' remaining assets in which the Purchaser acquired an interest, including, among other things, owned real property, estate claims against third parties, and the Debtors' intellectual property. As noted above, to the extent that the Purchaser has not disposed of such remaining assets prior to the Designation Rights Termination Date, it is the Debtors' understanding that the Purchaser will designate any and all remaining assets of meaningful value to third parties or to special purpose entities established by the Purchaser for the purpose of holding and ultimately monetizing such assets. Otherwise stated, the Sale, and the procedures it established, will result in the estates no longer holding any assets of value once the Designation Rights Termination Date has passed.

> D.      *Liens and Superpriority Claims Granted to Agent*

29.      The Sale Order granted the Purchaser a senior lien on all Assets and proceeds thereof. Moreover, the Purchaser obtained a superiority administrative expense claim against the Debtors to the extent of any amounts owing from the Debtors to the Purchaser in connection with the Agency Agreement. As of the date hereof, the Second Lien Noteholders have not been repaid in full.

## C.      Claims Bar Date

30.      Given the terms of the Sale and because the Second Lien Noteholders have not been repaid in full, the Debtors determined that it was not in the estates' best interest to establish a bar date for general unsecured claims or administrative expense claims (and thereby incur significant costs in pursuit thereof) because it was highly unlikely that priority or unsecured

01:24012653.4

creditors would receive any distributions in these Chapter 11 Cases.  However, to the extent

creditors believed that they had postpetition administrative expense claims and contacted the

Debtors' undersigned counsel or the Debtors' representatives directly, the Debtors endeavored to

reconcile such asserted claims and satisfy undisputed postpetition administrative expense claims

in the ordinary course.

**D.     The Debtors' Books and Records**

31.     As of the Petition Date, the Debtors maintained voluminous books and

records, including, without limitation, hard copy and electronic copies of: (a) accounting

documents; (b) bank documents; (c) corporate governance documents; (d) documents related to

contracts, leases and other contractual agreements of the Debtors; (e) insurance documents;

(f) human resources and other related employment documents; (g) documents related to the

Chapter 11 Cases; and (h) customer lists (collectively, the "Books and Records").  On July 18,

2018, the Court entered that certain *Order Authorizing the Debtors to Destroy Certain*

*Documents and Records* [Docket No. 950] (the "Document Order"), pursuant to which certain of

the Debtors' Books and Records were destroyed, with the balance of the Debtors' physical

records being transferred to a third-party storage facility, and the Debtors' available HRIS,

Payroll, and Financial Systems electronic records being maintained.

32.     The Purchaser has the option to designate certain Books and Records for

assignment, and the Debtors hereby seek authority to destroy any and all Books and Records not

yet destroyed under the Document Order that the Purchaser elects not to designate (if any) by the

Designation Rights Termination Date, because the continued preservation of such Books and

Records would be a cost and burden to the Debtors' estates, and the destruction or abandonment

of such Books and Records is necessary for the resolution of the Chapter 11 Cases.  Because the

01:24012653.4

Debtors do not have any ongoing operations and there will not be any further claims

reconciliation, the Debtors do not believe that abandonment and destruction of such remaining

Books and Records would be prejudicial to the Debtors' stakeholders.  Importantly, the Debtors

simply have no access to any funds or alternative resources after the Designation Rights

Termination Date which would facilitate the ongoing storage and maintenance of such Books

and Records.

### E.    The AMT Refund

33.    The Debtors are entitled to an Alternative Minimum Tax ("AMT") refund

(the "AMT Refund") stemming from certain tax overpayments.  Upon information and belief,

the AMT Refund constitutes the Second Lien Noteholders' collateral.  The corporate AMT is

repealed after four years beginning after December 31, 2017, and existing AMT credits are

refundable over four years.  The Debtors believe that they are entitled to approximately $5.529

million on account of the AMT Refund, which would be claimed as refundable credits on the

corporate tax returns filed for tax years beginning in 2018 through 2021 as follows: $2.711

million on the 2018 federal return, $1.355 million on the 2019 return, and $678,000 on each of

the 2020 and 2021 returns.  To realize full value for the AMT Refunds, the Debtors' applicable

corporate entities must remain in existence and file appropriate tax returns on the timeline

contemplated for such returns.  As noted herein, upon passage of the Designation Rights

Termination Date, if the AMT Refund cannot be transferred to the Purchaser, the Debtors will no

longer have any corporate purpose, nor will the Debtors have any remaining employed officers

to execute and file tax returns.  In addition, there will no longer be any fiduciary insurance in

place.

**F.      Other Administrative Matters**

34.      On March 6, 2018, the Court entered that certain *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [D.I. 292] (the "Interim Compensation Order"), pursuant to which the Court approved procedures governing applications for and payments of fees and expenses requested by Professionals.

35.      In addition, the Debtors have also worked to prepare for the orderly wind-down of the Chapter 11 Cases.  For instance, the Debtors have sought, and obtained, numerous orders authorizing the rejection of leases and contracts that the Debtors (upon consultation with the Purchaser, as applicable post-closing) determined serve no benefit to the estates and are not needed for the wind down of the Debtors' affairs.  To the extent that there are any additional contracts that have not been rejected as of the date upon which the Initial Order is entered, the Debtors request that the Initial Order authorize the rejection of all remaining executory contracts as of the entry of such order.

## RELIEF REQUESTED

36.      By this Motion, the Debtors request entry of: (a) the Initial Order (i) establishing procedures for the payment of Professional Fees; and (ii) authorizing the destruction of all remaining Books and Records that the Purchaser has not designated by the Designation Rights Termination Date; and (b) the Dismissal Order (upon filing of a certification of counsel stating that the conditions precedent to dismissal have been met) dismissing the Chapter 11 Cases pursuant to section 1112(b) of the Bankruptcy Code.   For the avoidance of doubt, the steps taken pursuant to the Initial Order shall be made after the Debtors pay all U.S. Trustee fees, establish the Carve-Out Reserve (defined below) from the Carve-Out, and pay approved Professional Fees from the Carve-Out prior to establishing the Carve-Out Reserve.  To

the extent that there are any funds remaining with the estates upon the payment of allowed

Professional Fees from the Carve-Out and the establishment of the Carve-Out Reserve, such

funds shall be distributed to the Purchaser consistent with the terms of the Sale Order and the

Agency Agreement.

## BASIS FOR RELIEF REQUESTED

**A.      These Cases Must be Dismissed if the Elements for "Cause" Are Shown Under Section 1112(b)(4) of the Bankruptcy Code**

37.      Upon the request of a party in interest, § 1112(b)(1) of the Bankruptcy

Code provides that, absent unusual circumstances, a court "shall" dismiss a chapter 11

bankruptcy case (or convert such case to a case under chapter 7) "for cause."  *See* 11 U.S.C.

§ 1112(b)(1).  The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005

("BAPCPA") changed the statutory language with respect to conversion or dismissal from

permissive to mandatory.[7]  *See* H.R. Rep. No. 109-31(I), at 442, *reprinted in* 2005 U.S.C.C.A.N.

88, 94 (stating that the Act "mandate[s] that the court convert or dismiss a chapter 11 case,

whichever is in the best interests of creditors and the estate, if the movant establishes cause,

absent unusual circumstances."); *see also Nester v. Gateway Access Solutions, Inc. (In re

Gateway Access Solutions, Inc.)*, 374 B.R. 556 (Bankr. M.D. Pa. 2007) (stating that the

amendments to section 1112 limit the court's discretion to refuse to dismiss or convert a

chapter 11 case upon a finding of cause); *accord In re TCR of Denver, LLC*, 338 B.R. 494, 498

(Bankr. D. Colo. 2006) ("Congress has purposefully limited the role of this Court in deciding

issues of conversion or dismissal, such that this Court has no choice, and no discretion, in that it

---

[7]      Prior to the enactment of BAPCPA, a bankruptcy court had the discretion, pursuant to its broad equitable powers, to dispose of a debtor's case, including by means of dismissal.  However, a court was <u>not</u> mandated to dismiss a case upon the showing of cause.  H.R. Rep. No. 95-595, at 405 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963; S. Rep. No. 95-989, at 117 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787.

'shall' dismiss or convert a case under Chapter 11 if the elements for 'cause' are shown under 11 U.S.C. § 1112(b)(4).").

38.    The amendments to section 1112 thus limit the Court's discretion to refuse to dismiss or convert a chapter 11 case upon a finding of cause.  *In re 3 Ram, Inc.*, 343 B.R. 113, 119 (Bankr. E.D. Pa. 2006) ("Under new § 1112 when cause is found, the court shall dismiss or convert unless special circumstances exist that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate."); *see also In re Broad Creek Edgewater, LP*, 371 B.R. 752, 759 (Bankr. D.S.C. 2007).  For reasons more fully explained below, the Debtors submit that the Court should dismiss the Chapter 11 Cases because cause exists.  Further, dismissal (and not conversion to a case under chapter 7) is in the best interests of the Debtors, their creditors, and their estates.

**B.    Cause Exists to Dismiss the Chapter 11 Cases Because the Debtors Have Ceased Business Operations and Will Have Insufficient Assets to Confirm a Plan**

39.    Section 1112(b)(4) of the Bankruptcy Code provides a non-exhaustive list of sixteen grounds for dismissal.  11 U.S.C. § 1112(b)(4)(A)-(P).  *See In re Gateway Access Solutions*, 374 B.R. at 561 ("Generally, such lists are viewed as illustrative rather than exhaustive, and the Court should 'consider other factors as they arise.'") (quoting *First Jersey Nat'l Bank v. Brown (In re Brown)*, 951 F.2d 564, 572 (3d Cir. 1991)); *In re 3 Ram, Inc.*, 343 B.R. at 117 ("While the enumerated examples of 'cause' to convert or dismiss a chapter 11 case now listed in § 1112(b)(4) have changed under BAPCPA, the fact that they are illustrative, [and] not exhaustive has not.") (citation omitted); *accord Frieouf v. United States (In re Frieouf)*, 938 F.2d 1099, 1102 (10th Cir. 1991) (stating that section 1112(b)'s list is non-exhaustive).[8]

---

[8]    In *In re TCR of Denver*, the court recognized the apparent typographical error in section 1112(b)(4) of the Bankruptcy Code.  The sixteen illustrative examples of "cause" set forth in that section are linked by the word "and" after subsection (O).  Accordingly, strict construction of the statute would require that a debtor establish all of the

40.     One statutory basis to dismiss a case is where a party in interest shows that (a) there has been a "loss" or "diminution" of value of the estate and (b) the debtor does not have a "reasonable likelihood of rehabilitation."  *See* 11 U.S.C. § 111(b)(4)(A); *see also In re Photo Promotion Assocs., Inc.*, 47 B.R. 454, 458 (Bankr. S.D.N.Y. 1985); *see also In re Citi-Toledo Partner*s, 170 B.R. 602, 606 (Bankr. N.D. Ohio 1994) (finding that accumulation of real estate taxes impaired the value of the estate); *Clarkson v. Cooke Sales & Service Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir. 1985) (stating that dismissal warranted where "the absence of financial data and certain sources of income for the [debtors] indicate[d] the absence of a reasonable likelihood of rehabilitation").  Further, the dismissal of a chapter 11 case has been found appropriate where "a feasible plan is not possible."  *In re 3 Ram*, 343 B.R. at 117-18.  "If [a] chapter 11 [debtor] cannot achieve . . . reorganization within the statutory requirements of the Bankruptcy Code, then there is no point in expending estate assets on administrative expenses . . . ."  *Id.* at 118 (citing, *inter alia*, *In re Brown*, 951 F.2d at 572).

41.     As detailed above, the Debtors liquidated substantially all of their assets in connection with the Sale and no longer conduct business.  Since the Closing Date, the Debtors' estates have existed solely to (i) meet the Debtors' obligations under the Agency Agreement, (ii) effectuate an orderly exit from these Chapter 11 Cases, and (iii) satisfy the Debtors' valid postpetition obligations with the funds provided by the Purchaser in accordance with the Agency Agreement during the course of these Chapter 11 Cases.  While doing so, the estates continue to accrue Professional Fees and U.S. Trustee's fees, which have been reserved for and segregated in a finite amount pursuant to the Sale Order.  There is no longer a business to reorganize or assets to distribute, and thus no reason (or funds available) to pursue a plan of reorganization or

items constituting "cause" before a case can be dismissed by the court.  The *TCR* Court held that Congress could not have intended to require a "perfect storm" of all sixteen circumstances listed before a case may be dismissed.  *See In re TCR of Denver*, 338 B.R. at 498.

liquidation.  Accordingly, the Debtors submit that cause exists to dismiss the Chapter 11 Cases

pursuant to section 1112(b)(4) of the Bankruptcy Code and related relevant case law.

**C.      Dismissal is in the Best Interests of the Debtors' Creditors and Their Estates**

42.    Once a court determines that cause exists to dismiss a debtor's chapter 11

case, the court must then evaluate whether dismissal is in the best interests of the debtor's

creditors and of the estate.  *See, e.g.*, *Rollex Corp. v. Associated Materials, Inc. (In re Superior*

*Siding & Window, Inc.)*, 14 F.3d 240, 242 (4th Cir. 1994) ("Once 'cause' is established, a court

is required to consider this second question of whether to dismiss or convert.").  A variety of

factors demonstrate that it is in the best interest of the Debtors' estates and their creditors to

dismiss the Chapter 11 Cases.

43.    *First*, a dismissal of a chapter 11 bankruptcy case meets the "best interests

of creditors" test where a debtor has nothing to reorganize and the debtor's assets are fixed and

liquidated.  *See Camden Ordinance Mfg. Co. of Ark., Inc. v. U.S. Trustee (In re Camden*

*Ordnance Mfg. Co. of Ark., Inc.)*, 245 B.R. 794, 799 (E.D. Pa. 2000) (reorganization to salvage

business which ceased operations was unfeasible); *Royal Trust Bank, N.A. v. Brogdon Inv. Co.*

*(In re Brogdon Inv. Co.)*, 22 B.R. 546, 549 (Bankr. N.D. Ga. 1982) (court dismissed chapter 11

proceeding in part where there was "simply nothing to reorganize" and no reason to continue the

reorganization).  The Debtors have nothing left to reorganize because substantially all of their

assets of any value were or will be liquidated or transferred to the Purchaser as a result of the

Sale, and the Debtors have no go-forward source of cash from which they could satisfy

distributions to creditors pursuant to a chapter 11 plan or upon conversion of the Chapter 11

Cases to chapter 7.

44.    *Second*, courts have found that dismissal is in the "best interests of

creditors" where an interested party, other than the debtor, supports the dismissal of the debtor's

chapter 11 case. *See Camden Ordinance*, 245 B.R. at 798; *In re Mazzocone*, 183 B.R. 402, 414 (Bankr. ED. Pa. 1995), *aff'd*, 200 B.R. 568 (E.D. Pa. 1996) (factors weighed more heavily in favor of dismissal of chapter 11 case rather than conversion to chapter 7 where debtor and U.S. Trustee both favored dismissal).  The Debtors have consulted with the Committee regarding the dismissal of these Chapter 11 Cases, and the Committee's counsel has advised the Debtors' undersigned counsel that the Committee supports dismissal rather than conversion to chapter 7.

45.      *Third*, a court may find dismissal to be in the "best interests of the creditors" where a debtor demonstrates the ability to oversee its own liquidation.  *See Camden Ordinance*, 245 B.R. at 798; *Mazzocone,* 183 B.R. at 412 ("Only when a Chapter 11 debtor has no intention or ability to . . . perform its own liquidation . . . should a debtor be permitted to remain in bankruptcy . . . .").  Here, to the extent this factor is applicable to the post-closing facts and circumstances of these proceedings, the Debtors have already liquidated their assets and will have satisfied their obligations under the Sale Order through and including the Designation Rights Termination Date.

46.      *Fourth*, and finally, dismissal is appropriate where, as here, the dismissal of the Chapter 11 Cases will maximize the value of the Debtors' estates because the alternative—conversion to a chapter 7 liquidation and appointment of a trustee—is (a) unnecessary and would provide no benefit to creditors and (b) would impose significant additional administrative costs upon the Debtors' estates without any meaningful source of funds to satisfy such costs.

47.      Under the circumstances, a chapter 7 trustee would have no funds to satisfy additional claims arising after conversion to cases under chapter 7 of the Bankruptcy Code.  As noted earlier, substantially all of the Debtors' Assets have been sold to, or designated

by, the Purchaser.  The Debtors have further determined that the only remaining asset of any

value—the AMT Refund—is encumbered by the Second Lien Noteholders' valid, perfected

liens, and to the extent that the Debtors' interests in any AMT Refund are not or cannot be

designated to the Purchaser, it is therefore in the best interests of all parties to abandon the

estates' interest in the AMT Refund.  Indeed, the Debtors lack the funding to maintain required

corporate standing to approach the AMT Refund in any other manner.  As a result, creditors

would not receive greater recoveries in a chapter 7 liquidation.

48.     For these reasons, the Debtors submit that a dismissal pursuant to section

1112 of the Bankruptcy Code is in the best interest of the Debtors' creditors and their estates.

**D.      Dismissal of the Chapter 11 Cases is Warranted Under Section 305(a) of the Bankruptcy Code**

49.     Cause also exists to dismiss the Chapter 11 Cases pursuant to section

305(a) of the Bankruptcy Code, which provides that the "court, after notice and a hearing, may

dismiss a case under this title . . . at any time if—(1) the interests of creditors and the debtor

would be better served by such dismissal or suspension . . ."  *See* 11 U.S.C. § 305(a).  *In re*

*AMC Investors, LLC*, 406 B.R. 478, 487-88 (Bankr. D. Del. 2009).

50.     Whether dismissal is appropriate under this provision is determined on a

case-by-case basis and rests in the sound discretion of the bankruptcy court.  *In re Sky Grp. Int'l,*

*Inc.*, 108 B.R. 86, 91 (Bankr. W.D. Pa. 1989).  Many factors are considered when determining

the best interests of creditors and the debtor, including (a) the economy and efficiency of

administration, (b) whether federal proceedings are necessary to reach a just and equitable

solution, (c) whether there is an alternative means of achieving an equitable distribution of

assets, and (d) whether the debtor and the creditors are able to work out a less expensive out-of-

court arrangement that better serves all interests in the case.  *AMC Investors*, 406 B.R. at 488.

51.     Here, as described above, cause exists for dismissal under section 305 of the Bankruptcy Code.  The Debtors have sold substantially all of their assets, the only remaining asset of potential value is fully encumbered by a valid, perfected lien, the Purchaser has exhausted its Designation Rights and designated (or will have designated by the Designation Rights Termination Date) all assets of meaningful value for assignment to third parties or its newly-created special purpose entities, and the Debtors are unable to confirm a liquidating plan. Under the circumstances, conversion to chapter 7 would impose additional administrative costs with no corresponding benefit to the Debtors' creditors or their estates.  Dismissal of the Chapter 11 Cases as set forth in this Motion, among other things, provides the most efficient, cost-effective method of effectuating the wind-down of the Debtors' estates, and ensures payment of all U.S. Trustee's fees.

**E.     The Proposed Dismissal Complies with Applicable Law Governing Distributions**

52.     The proposed dismissal complies with applicable law governing distributions of estate property.  Specifically, a final disposition "in connection with the dismissal of a Chapter 11 case cannot, without the consent of the affected parties, deviate from the basic priority rules" contained within the Bankruptcy Code.  *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 978 (2017).  In other words, a debtor may not use a dismissal as a means to distribute assets to a favored class of "low-priority general unsecured creditors" while "skipping" a disfavored class that would otherwise be entitled to priority of payment under a plan of liquidation.  *See id.*  The Initial Order does not contemplate any distributions, all of which have been made since the Closing Date in the ordinary course or, as applicable, consistent with the mandate set forth in the Sale Order.  Accordingly, the Debtors submit that the relief requested herein does not run afoul of *Jevic*.

01:24012653.4

**F.**     **The Court Should Authorize the Debtors to Abandon and Destroy Remaining Books and Records**

53.     Section 554(a) of the Bankruptcy Code and Bankruptcy Rule 6007

authorize a debtor-in-possession, upon notice and a hearing, to abandon estate property that is of

little value to the estate or is otherwise burdensome to maintain.  As one bankruptcy court has

noted, if a debtor "feels an asset is of inconsequential value and benefit to the estate *or* that it is

'burdensome to the estate,' [the debtor] may abandon it."  *Reich v. Burke (In re Reich)*, 54 B.R.

995, 1004 (Bankr. E.D. Mich. 1985).

54.     Here, the Debtors request that the Court authorize, but not direct, the

Debtors to abandon and destroy the Books and Records pursuant to sections 105(a) and 554 of

the Bankruptcy Code, and Bankruptcy Rule 6007, to the extent that the Purchaser has not

designated such Books and Records for assignment by the Designation Rights Termination Date.

The Debtors believe that all desired Books and Records have been (or will be) transferred to the

Purchaser prior to the Designation Rights Termination Date.  However, to the extent any Books

and Records are retained, presumably because the Purchaser determines that the Books and

Records are of no value to the Purchaser going forward, they will be of no value to the Debtors

after dismissal of the Chapter 11 Cases.  For those reasons, and the fact that the Debtors lack any

funds to spend on storage and maintenance of Books and Records, the Debtors submit that they

should not incur the costs associated with maintaining and storing Books and Records that have

no value to their estates.

55.     Therefore, the Debtors submit that the relief requested herein with respect

to the Books and Records is necessary, prudent, and in the best interests of the Debtors' estates

and creditors, and therefore should be granted.

01:24012653.4

**G.**     **The Court Should Establish a Procedure to Approve Professional Fees and Establish the Carve-Out Reserve**

56.     In connection with winding down the Debtors' estates and the dismissal of the Chapter 11 Cases, and notwithstanding any provisions to the contrary in the Interim Compensation Order, the Debtors seek (a) the Court's approval of procedures for the final payment of Professional Fees and expenses incurred by Professionals on behalf of the Debtors' estates throughout the Chapter 11 Cases until such time as they are dismissed and (b) the authority to establish a Carve-Out Reserve (defined below) from the Carve-Out Account, after Professional Fees have been paid, in the amount of $75,000 to fund any fees and expenses that may arise in connection with the wind-down and dissolution of the Debtors post-dismissal, including U.S. Trustee fees incurred in connection with paying Professional Fees.  Courts in this jurisdiction have granted similar relief in the context of dismissals.  *See, e.g., In re Quantum Foods, LLC*, No. 14-10318 (Bankr. D. Del. Apr. 6, 2018) [D.I. 1798]; *In re Sunco Liquidation, Inc.*, No. 17-10561 (KG) (Bankr. D. Del. Aug. 18, 2017) [D.I. 706]; *In re Old Towing Co.*, No. 17-10249 (LSS) (Bankr. D. Del. May 30, 2017) [D.I. 381]; *In re TAH Windown, Inc.*, No. 16-11599 (MFW) (Bankr. D. Del. Jan. 13, 2017) [D.I. 408].

57.     The Debtors request that the Court schedule a final omnibus fee hearing (the "Final Fee Hearing") in the Initial Order.  The Debtors further request that the Court require all Professionals retained in the Chapter 11 Cases to file final requests for allowance and payment of all fees and expenses incurred during the Chapter 11 Cases (collectively, the "Final Fee Applications"), to the extent not already done, not later than twenty-one (21) days prior to the Final Fee Hearing and that any objections to the Final Fee Applications be filed and served on counsel for the Debtors and such applicable Professional by 4:00 p.m. (prevailing Eastern Time) at least seven (7) days prior to the Final Fee Hearing.  Specifically, the Debtors request

01:24012653.4

authority to use the Carve-Out Account to pay or fund, as applicable: (a) any outstanding

Professional Fees incurred through the dismissal of the Chapter 11 Cases which are approved in

connection with Final Fee Applications; (b) any remaining obligations owed to the U.S. Trustee;

(c) any remaining obligations owed to Prime Clerk as the claims and noticing agent; and (d) the

estimated amount of fees and expenses, not to exceed $75,000, necessary to wind down the

Debtors' estates after the dismissal of the Chapter 11 Cases and without further Court approval

(sub-clause (d), the "Carve-Out Reserve").  The Carve-Out Reserve shall be maintained by

Debtors' counsel, Young Conaway Stargatt & Taylor, LLP, and to the extent that any funds

remain in the Carve-Out Reserve after paying such post-dismissal fees and expenses (which, for

the avoidance of doubt, may include final fees and expenses incurred by Prime Clerk), such

funds shall be remitted to the Purchaser.

## H.      The Debtors Should be Dissolved

58.     Because the Debtors have sold substantially all of their assets and ceased

operations, the Court is empowered by sections 105 and 363(b)(1) of the Bankruptcy Code and

its general equitable powers to dissolve the Debtors.  *See, e.g., Weir v. JMACK*, No. 3263-CC,

2008 WL 4379592 at *2 (Del. Ch. Sept. 14, 2008) (granting dissolution of corporation by court

order and stating that "[i]t is well settled that this Court, as a court of equity, has the power to

order the dissolution" of a corporation).  Further, courts in this jurisdiction have previously

approved the dissolution of debtors by court order in connection with the dismissal of a chapter

11 case.  *See, e.g., In re Quantum Foods, LLC*, No. 14-10318 (Bankr. D. Del. Apr. 6, 2018) [D.I.

1798]; *In re Sunco Liquidation, Inc.*, No. 17-10561 (KG) (Bankr. D. Del. Aug. 18, 2017) [D.I.

706]; *In re TAH Windown, Inc.*, No. 16-11599 (MFW) (Bankr. D. Del. Jan. 13, 2017) [D.I. 408];

*In re Hospitality Liquidation I, LLC*, No. 13-12740 (BLS) (Bankr. D. Del. Jan. 5, 2015) [D.I.

447].

59.     Here, the Debtors respectfully submit that it is appropriate and necessary for the Court to authorize the dissolution of the Debtors.  The Debtors have no further business to conduct or other purpose to remain active corporate entities in their jurisdictions, and absent their prompt dissolution, the Debtors may incur additional taxes and statutory fees owing to their continued corporate existence.  Accordingly, it is in the best interests of the Debtors' estates for the Debtors to dissolve as soon as practicable.  Upon the entry of the Dismissal Order, counsel to the Debtors will promptly file all documents necessary to evidence such dissolution in accordance with applicable state law.

## I.      All Prior Releases, Stipulations, Settlements, Rulings, Orders and Judgments Should Remain Binding and Should Continue To Have Full Force and Effect

60.     The dismissal of a chapter 11 case ordinarily vacates all orders previously entered by the bankruptcy court and restores all parties to the prepetition status quo.  *See* 11 U.S.C. § 349(b).  A bankruptcy court may, however, "for cause, order[] otherwise . . . ."  *Id.* Courts in this jurisdiction have regularly allowed orders, including those approving releases and settlements, to be given continued effect after a dismissal, notwithstanding section 349 of the Bankruptcy Code.  *See, e.g., In re Sunco Liquidation, Inc.*, No. 17-10561 (KG) (Bankr. D. Del. Nov. 6, 2017) [D.I. 865] (giving continued effect to orders entered throughout the pendency of the chapter 11 cases); *In re Old Towing Co.*, Case No. 17-10249 (LSS) (Bankr. D. Del. May 30, 2017) [D.I. 381] (giving continued effect to 363 sale order and any releases, injunctions and successor liability provisions provided for in such sale);  *In re TAH Window, Inc.*, Case No. 16-11599 (MFW) (Bankr. D. Del. Jan. 13, 2017) [D.I. 408] (giving orders, releases, and injunctions continuing effect); *In re City Sports, Inc.*, Case No. 15-12054 (KG) (Bankr. D. Del. Mar. 4, 2016) [D.I. 647] (giving continued effect to previously entered orders); *In re Coach Am Group Holdings Corp.*, Case No. 12-10010 (KG) (Bankr. D. Del. May 31, 2013) [D.I. 1568] (same); *In*

*re ICL Holding Co.*, Case No. 12-13319 (KG) (Bankr. D. Del. Sept. 10, 2014) [D.I. 1367] (same).

61.    Given the circumstances and posture of the Chapter 11 Cases, the Debtors submit that ample cause exists to allow all prior orders, releases, stipulations, settlements, rulings, and judgments entered by the Court in connection with the Chapter 11 Cases to be given continued effect, notwithstanding the requested dismissal.

**J.    The Certification Process and the Request for Entry of Final Dismissal Order is Reasonable Under the Circumstances**

62.    As soon as reasonably practicable following the filing of a certification of counsel stating that the conditions precedent to dismissal have been met (the "Certification"), the Debtors request that the Court enter an order, substantially in the form attached hereto as Exhibit B, dismissing the Chapter 11 Cases.  Among other things, the Certification will verify that: (a) all quarterly fees of the U.S. Trustee owed in connection with the Chapter 11 Cases have been paid in full, including those related to Professional Fee disbursements made after the final monthly operating report has been filed[9]; (b) Professional Fees incurred in the Chapter 11 Cases have been approved on a final basis (to the extent applicable) and paid in full; and (c) the Carve-Out Reserve has been established.  The Dismissal Order will dismiss the Chapter 11 Cases immediately upon entry.

63.    The Debtors intend to serve the Certification on the U.S. Trustee and all entities that have requested notice pursuant to Bankruptcy Rule 2002 (the "Notice Parties"), but will not send the Certification to the Debtors' entire matrix of creditors and parties in interest, as

---

[9]    As of the Designation Rights Termination Date, and upon entry of the Initial Order, the Debtors will no longer have any employees or remaining officers, or any funds at their disposal to pay such individuals.  Given that the Debtors will have no operations after entry of the Initial Order, and the only disbursements anticipated after such time will be to Professionals and the U.S. Trustee, the Debtors seek authority to file their last monthly operating reports that relate to the period concluding on the Designation Rights Termination Date.  For the avoidance of doubt, the Debtors will reserve for, and pay, all U.S. Trustee fees that will arise as a result of Professional Fee payments approved in connection with Final Fee Applications.

01:24012653.4

such parties will receive reasonable notice of the proposed dismissal through notice of this Motion.

### NOTICE

64.     Notice of this Motion will be provided to: (a) the U.S. Trustee; (b) counsel to the Committee; (c) counsel to the DIP Administrative Agent and the Prepetition ABL Administrative Agent; (d) counsel to the DIP Tranche A-1 Documentation Agent; (e) counsel to the Second Lien Noteholders; (f) counsel to the Indenture Trustee under the Second Lien Indenture; (g) counsel to the Purchaser; and (h) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.

65.     In addition, the Debtors are serving a separate notice (the "Dismissal Notice") by first-class United States Mail to all creditors, as provided in Bankruptcy Rule 2002(a)(4).  The Dismissal Notice includes specific information regarding how to obtain a copy of this Motion free of charge and the procedures for filing objections to this Motion.  The Debtors submit that, under the circumstances, no other or further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

WHEREFORE the Debtors respectfully request entry of (i) the Initial Order, substantially in the form attached hereto as Exhibit A, granting the relief requested herein, (ii) the Dismissal Order, substantially in the form attached hereto as Exhibit B, upon filing of the Certification, and (iii) such other and further relief as is just and proper.

Dated:   January 10, 2019
　　　　 Wilmington, Delaware

/s/ Andrew L. Magaziner
Pauline K. Morgan (No. 3650)
Sean T. Greecher (No. 4484)
Andrew L. Magaziner (No. 5426)
Elizabeth S. Justison (No. 5911)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

-and-

Kelley A. Cornish
Alexander Woolverton
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

Co-Counsel to the Debtors and
Debtors in Possession

01:24012653.4